# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------- x
BRIAN BROOK and MATTHEW PEED,           :
                                        :   Index No. 17-cv-6435
Plaintiffs,                             :   (GBD)
                                        :
vs.                                     :
                                        :
SIMON & PARTNERS, LLP and BRADLEY D.    :
SIMON,                                  :
                                        :
Defendants.                             :
                                        :
---------------------------------- X

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6), FED. R. CIV. P.**

Kenneth C. Murphy
Simon & Partners LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900
kcmurphy@simonlawyers.com

*Attorney for Defendants*
*Simon & Partners LLP and Bradley D. Simon*

September 7, 2017

## Table of Contents

Table of Authorities……………………………………………………………………..….i

Summary of Argument…………………………………………………………………..….1

The Simon Declaration……………………………………………………………………..1

The Rule 12(b)(6) Standard………………………………………………………………...2

I. THE CLAIMS AGAINST SIMON INDIVIDUALLY
    MUST BE DISMISSED …………………………………………………………..3

    A. New York Does Not Preclude Limited Liability
       Partnerships With One Equity Partner ……………………………………………3

       1. Non-Equity Partners are Also "Co-Owners" in a Limited
          Liability Partnership ……………………………………………………3

       2. So Long As There is an Agreement, the Partners May Divide
          the Proceeds of the Partnership in Whatever Manner They Wish ……………..4

    B. S&P is a Valid LLP as a Matter of Law and Therefore Limited Liability
       Partnership Law § 26(b) Precludes Liability Against Simon…………………….....5

II. BROOK WHOLLY IGNORES THE FACT THAT THE UNJUST ENRICHMENT
    AND QUANTUM MERUIT CLAIMS CANNOT BE MAINTAINED BY A
    SALARIED EMPLOYEE …………………………………………………………….6

III. THE LAW OF NEW YORK THAT INDICATES A PROMISE OF EQUITY MAY
     NOT BE THE BASIS FOR A FRAUDULENT INDUCEMENT CLAIM
     ……………………………………………………………………………………….7

IV. AN ONGOING NEGOTIATION BETWEEN THE EMPLOYER AND THE
     EMPLOYEE IS NOT SUPPROTED BY THE ALLEGATIONS IN THE
     COMPLAINT ………………………………………………………………………...8

    A. Brook's Unilateral Requests for More Money or A Set Bonus Structure
       Do Not Amount to a Negotiation ………………………………………………….8

    B. New York Law Clearly Establishes that An Oral Contract Existed Between S&P
       and Brook ………………………………………………………………………...10

V. PEED'S CLAIMS ARE NOT COGNIZABLE UNDER NEW YORK LAW ……...12

## Table of Authorities

**Rules**

Rule 12(b)(6), Fed. R. Civ. P. ..................................................................................................3

Rule 56, Fed. R. Civ. P. ..........................................................................................................2

**Treatises**

2 James Wm. Moore et al., *Moore's Federal Practice* P 12.34[3][a] (3d ed. 1999) .......................3

Downey, Michael, *Law Firm Practice,* c. 2010, American Bar Assoc. Publishing ......................6

**State Cases**

*Bailey v. Fish & Neave,* 8 N.Y.3d 523 (2007)..........................................................................4

*Carella v. Scholet*, 5 A.D.3d 972 (3d Dep't. 2004) ..................................................................4

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382 (1987)......................................13

*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475 (1989). ......................12

*Conopco, Inc. v. Wathne*, 190 A.D.2d 587 (1st Dep't. 1993)..................................................11

*Eastman Kodak Co. v. Roopak Enterprises, Ltd.,* 202 A.D.2d 220 (1st Dep't. 1994) .............13

*Express Indus. & Terminal Corp. v. New York State DOT*, 93 N.Y.2d 584 (1999)...........11, 12

*Gordon v. Dino DeLaurntiis Corp.,* 141 A.D.2d 435 (1st Dep't. 1988) ..................................13

*In re Rosenberg's Will,* 251 N.Y. 115 (1929) ...........................................................................3

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105 (1981) ..................11, 12

*Lai v. Gartlan*, 46 A.D.3d 237 (1st Dep't. 2007) ......................................................................4

*Lanier v. Bowdoin*, 282 N.Y. 32 (1939) ...................................................................................4

*Levy* v. *Leavitt*, 257 N. Y. 461 (1931) ......................................................................................4

*May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260 (1943) ...........................................11, 12

*McCrea v. Mclenahan,* 131 A.D. 247 (2d Dep't. 1909)..............................................................6

*People v. Zinke,* 76 N.Y.2d 8 (1990) ........................................................................................4

*Reiser v. Plaza College, Ltd.,* 2013 N.Y. Misc. LEXIS 5138, 2013 NY Slip Op 32819(U)

    (Queens Sup. Ct. 2013)..........................................................................................................6

*Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209 (1894)......................................................11

*Sandra Greer Real Estate v. Johansen Organization,* 182 A.D.2d 468 (1st Dep't. 1992)............13

*Sanyo Electric v. Pinros & Gar Corp.,* 174 A.D.2d 452 (1st Dep't. 1992) ................................13

*Sforza v. Health Ins. Plan*, 210 A.D.2d 214 (2d Dep't. 1994) ..................................................13

*Sterling Fifth Assocs. v. Carpentille Corp.*, 9 A.D.3d 261 (1st Dep't. 2004).................................4

*Wallace v. Crisman,* 173 A.D.2d 322 (1st Dep't. 1991) ...........................................................13

*Werronen v. Taylor*, 187 A.D.2d 774 (3d Dep't. 1992) .............................................................4

**Federal Cases**

*Abrams v. Life Med. Techs., Inc.,* 135 F. Supp. 3d 185 (S.D.N.Y. Sep. 29, 2015) .........................2

*AdiPar Ltd. v. PLD Int'l Corp.,* 2002 U.S. Dist. LEXIS 23375, No. 01-cv-0765 (S.D.N.Y. Dec.

    5, 2002) ..................................................................................................................................2

*Adjustrite Sys. V. GAB Bus. Servs.,* 145 F. 3d 543 (2d Cir. 1998) ..................................................12

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993)......................................2

*Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287 (E.D.N.Y. Sep. 29, 1998)

    ..............................................................................................................................................11

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), *cert. denied*, 503 U.S. 960

    (1992).....................................................................................................................................2

*Fischer v. OBG Cameron Banfill LLP,* 2010 U.S. Dist. LEXIS 101261, 2010 WL 3733882 (S.D.N.Y. Sep. 24, 2010)..................................................................................................5

*Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391 (Bankr. S.D.N.Y. June 16, 2011).............................................................................................................................3

*Iqbal v. Ashcroft*, 556 U.S. 662 (2009).........................................................................................3

*KJ Robert & Co. v. MDC Partners, Inc.*, 605 Fed Appx 6 (2d Cir. 2015).....................................12

*Pahlavi v. Palandjian,* 809 F. 2d 938 (1st Cir. 1987)...................................................................11

*S.E.C. v. Simonson,* 2000 U.S. Dist. LEXIS 8553, No. 96 Civ. 9695, 2000 WL 781084 (S.D.N.Y. Jun. 19, 2000) ...............................................................................................................2

*Spool v. World Child Intn'l Adoption Agency,* 520 F.3d 178 (2d Cir. 2007) .................................3

*Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89 (2d Cir. 2007) .................................12

*Viacom Int'l Inc. v. Tandem Prod., Inc.*, 368 F. Supp. 1264 (S.D.N.Y. Jan. 4, 1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975) .....................................................................................................11

*Walsh v. Maryland Bank, N.A.* (91-cv-7483 (CSH)), 1994 U.S. Dist. LEXIS 4612, 1994 WL 132234 (S.D.N.Y. Apr. 11, 1994)......................................................................................11

**State Statutes**

New York Partnership Law § 26(b).........................................................................................1, 6

NY Partnership Law § 51 [1]........................................................................................................4

## Summary of Argument[1]

Citing no law in support of their argument, B&P continue to make the baseless claim that a limited liability partnership ("LLP") in New York must have more than one *equity* partner in order to be valid. Likewise, B&P wholly ignore New York Partnership Law § 26(b) which precludes a limited liability partner, such as Simon, from being held personally responsible for the debts of his law firm. Further, although both the pleading and common sense make it clear that Simon had discretion to award bonuses as he deemed fit (as pertains to Brook) and that he never committed to do anything but "re-visit" the potential hourly rate paid to Peed, B&P now try to couch every request for more money and a greater share of the earnings on the Executive Matter as an "ongoing negotiation." However, the Complaint does not describe any counterproposals or any ongoing negotiation between the employer and the employee. Moreover, Brook utterly ignores the substantial body of case law that establishes that a salaried employee cannot prevail on a claim for unjust enrichment and/or quantum meruit. Finally, he ignores the overwhelming body of New York law that indicates that there can be no fraud where the "promise" relied upon is an equity stake in a business.

## The Simon Declaration

B&P claim that the Simon Declaration may not be considered by this Court in ruling on this motion. (Plaintiffs' Response to Motion to Transfer or Dismiss, ECF No. 9, p. 9 (hereafter "Pl Memo"). They are wrong. In determining the sufficiency of a complaint a court may consider documents attached to it as exhibits or incorporated in it by reference, matters of which

---

[1] The same abbreviations will be used here as those identified in the memorandum of law filed in support of this motion, ECF No. 5 (hereafter "Def Memo"), for example, "B&P" remains Plaintiffs Brian Brook and Matthew Peed.

1

judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)).

Here, the Brook Proposal, as well as the salary and bonus payments (supported by paystubs and tax documents such as the 1099-MISC and W-2s referenced in the Complaint) are all documents upon which plaintiffs specifically relied in bringing this suit and in drafting this Complaint. (*E.g.* Complaint ¶¶ 32, 37-38, 43, 48, 66, 69, 70, 75). In addition, the payments themselves were each received by Brook and, therefore, qualify as information "of which plaintiff[] had knowledge and relied" in drafting the Complaint. *Id.* Finally, the invoices for services rendered by S&P are noted in the Complaint and incorporated by reference. (Complaint ¶¶ 39, 45, 74 and 83 (referring to the invoices)). Accordingly, the documents and factual recitations of the amounts paid to Brook as set forth in the Simon Declaration *can* properly be considered by the Court on this Motion to Dismiss. (BDS Decl ¶¶ 23-26, 28-30, 32, 35-36).[2]

## The Rule 12(b)(6) Standard

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face." *Abrams v. Life Med. Techs., Inc.,* 135 F. Supp. 3d 185, 191 (S.D.N.Y. Sep. 29, 2015). "Courts do not make plausibility determinations in a vacuum; it is a 'context-specific task that requires the reviewing court to

---

[2] The Court also has the option to convert this motion to one for dismissal under Rule 56, Fed. R. Civ. P. *See e.g., AdiPar Ltd. v. PLD Int'l Corp.,* 2002 U.S. Dist. LEXIS 23375, *1, No. 01-cv-0765 (S.D.N.Y. Dec. 5, 2002 (*citing S.E.C. v. Simonson,* 2000 U.S. Dist. LEXIS 8553, No. 96 Civ. 9695, 2000 WL 781084, at *1 (S.D.N.Y. Jun. 19, 2000); 2 James Wm. Moore et al., *Moore's Federal Practice* P 12.34[3][a] (3d ed. 1999)).

draw on its judicial experience and common sense.'" *Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 406-407, (Bankr. S.D.N.Y. June 16, 2011) (*quoting Iqbal v. Ashcroft*, 556 U.S. 662, 679 (2009)) (citation omitted). And while courts in a 12(b)(6) motion construe the pleadings liberally, "bald assertions and conclusions of law will not suffice," because "[t]he pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Intn'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2007).

## I. THE CLAIMS AGAINST SIMON INDIVIDUALLY MUST BE DISMISSED

### A. New York Does Not Preclude Limited Liability Partnerships With One Equity Partner

#### 1. Non-Equity Partners Are Also "Co-Owners" in a Limited Liability Partnership

B&P claim S&P cannot be a *partnership* at all (whether general or limited) because it lacks more than one "owner." (Pl Memo p. 25, Complaint ¶ 120). According to B&P, "equity" automatically equates to "ownership" and, therefore, insofar as there were never two "equity" partners, S&P never had two "owners" and S&P was invalid as an LLP.

B&P's overly simplistic argument fails for several reasons. Most importantly, while partnership law requires more than one partner, it does not require more than one *equity* partner. Not surprisingly, there is not one legal authority identified by B&P in support of its argument. As the New York Court of Appeals stated long ago: "It is not necessary to the constitution of a general partnership that the partners should be proportionate joint owners of its assets. The capital may vest and remain in one or more of the partners who have furnished it." *In re Rosenberg's Will,* 251 N.Y. 115, 124 (1929). Certainly, this simple principle is no less applicable to limited partnerships. In fact, "[t]he term 'co-owners' in Partnership Law § 10 [1] refers to the business, not to the assets used in that business." *Werronen v. Taylor*, 187 A.D.2d

774, 774-775, (3d Dep't. 1992). *See also, NY Partnership Law* § 51 [1] (*defines* partners as "co-owners"); *People v. Zinke,* 76 N.Y.2d 8, 15 (1990) (noting that all partners are owners of partnership property). Accordingly, the non-equity partners are *owners* of the partnership even if Simon was the sole equity partner.

2. **So Long As There is an Agreement, the Partners May Divide the Proceeds of the Partnership in Whatever Manner They Wish**

B&P rely upon three assertions to support their theory that the partnership was a sham: (1) Simon *apparently* assumed all risk of loss (Pl Memo p. 16); (2) the non-equity partners received bonuses at Simon's discretion; and (3) Simon's partners received "salaries"—with only discretionary "bonuses" atop those salaries. (*Id.* at 25-26). They argue that, therefore, even if S&P was validly registered and even if it operated pursuant to a partnership agreement, those allegations "foreclose" treating S&P as a legitimate LLP. (Pl Memo p. 25).

B&P have entirely missed the point. They wholly ignore the long line of New York precedent that holds that partners, as between themselves, are free to enter whatever partnership agreement they choose. "In the absence of prohibitory provisions of the statutes or of rules of the common law relating to partnerships, or considerations of public policy, the partners of either a general or limited partnership, as between themselves, may include in the partnership articles any agreement they wish concerning the sharing of profits and losses, priorities of distribution on winding up of the partnership affairs and other matters. If complete, as between the partners, the agreement so made controls." *Lanier v. Bowdoin,* 282 N.Y. 32, 38 (1939) (*citing Levy v. Leavitt,* 257 N. Y. 461 (1931)). *See also, Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007); *Lai v. Gartlan,* 46 A.D.3d 237, 244, (1st Dep't. 2007); *Sterling Fifth Assocs. v. Carpentille Corp.,* 9 A.D.3d 261, 263 (1st Dep't. 2004); *Carella v. Scholet,* 5 A.D.3d 972, 974 (3d Dep't. 2004).

S&P's partners (as they had a right to do) chose to have one equity partner with the power to award discretionary bonuses and two non-equity partners. It is that simple and clear.[3]

### B. S&P is a Valid LLP as a Matter of Law and Therefore Limited Liability Partnership Law § 26(b) Precludes Liability Against Simon

Once B&P's improper conclusions of law are established, all the claims against Simon must be dismissed. First, the pleading itself reveals that S&P is a valid LLP. The Complaint admits that S&P was a registered LLP with offices in New York (Complaint ¶ 7); Simon referred regularly to Messrs. Waller and Murphy as his partners (Complaint ¶ 145); the name of the firm was Simon & Partners LLP (*id.*); the firm was practicing law as an LLP (*id.*); and the partners represented themselves to the outside world as partners. (*See* Complaint ¶¶ 7, 11-13). In fact, S&P has been duly registered as a LLP since 2004 (and B&P have not alleged otherwise) and the non-equity partners received K-1s (despite B&P's demonstrably false claims to the contrary). (Declaration of Kenneth C. Murphy, dated September 7, 2017, Ex-1 (K-1s)).

Second, B&P now admit that NY Partnership Law § 26(c) does not apply here (Pl Memo p. 25, *fn.* 3), however, they continue to ignore NY Partnership Law § 26(b), which specifically limits the liability of partners in LLPs for debts of the partnership. The law is clear that partners are shielded from partnership liabilities in a LLP:

> No partner of a partnership which is a registered limited liability partnership is liable or accountable, directly or indirectly (including by way of indemnification, contribution or otherwise), for any debts, obligations or liabilities of, or chargeable to, the registered limited

---

[3] While Dreier LLP is undoubtedly the most famous law firm with such a structure, it was not unique. (Pl Memo p. 27). Many smaller firms—particularly firms whose business development is driven largely by the personality of and reputation of one large rainmaker—have only one equity partner. Downey, Michael, *Law Firm Practice,* c. 2010, American Bar Assoc. Publishing, p. 41. *See e.g. Fischer v. OBG Cameron Banfill LLP,* 2010 U.S. Dist. LEXIS 101261, *4-5, 2010 WL 3733882 (S.D.N.Y. Sep. 24, 2010). Notably, *none* of the many Dreier decisions ever invalidated or questioned the legality of that sole-equity partner model.

liability partnership or each other, *whether arising in tort, contract or otherwise,* which are incurred, created or assumed by such partnership while such partnership is a registered limited liability partnership.

*NY CLS Partn* § 26(b) (emphasis added).

There is no doubt—indeed B&P never argue to the contrary—that they were each hired *by S&P*. In short, since all of Simon's conduct was in his capacity as managing partner on behalf of S&P, the effort to hold him *personally liable* for debts purportedly owed by S&P is in direct contravention of the partnership law of New York.[4]

II. **BROOK WHOLLY IGNORES THE FACT THAT THE UNJUST ENRICHMENT AND QUANTUM MERUIT CLAIMS CANNOT BE MAINTAINED BY A SALARIED EMPLOYEE**

Citing a litany of cases that have directly addressed the point, Simon has demonstrated that under New York law a salaried employee cannot sue for unjust enrichment. (Def. Memo p. 20-22 (Point IV)). Brook entirely ignores this argument other than to say that it is "beside the point." (Pl. Memo p. 17). Brook does not, for example, attempt to address or distinguish *even one single case* relied upon by Simon in this regard. (*Id.* (listing cases)).[5]

---

[4] B&P cite a more than one hundred year old case, *McCrea v. Mclenahan*, 131 A.D. 247, 248 (2d Dep't. 1909), for the argument that "an agent is always liable for his own torts, even if committed to advance the interests of his company." (Pl Memo p. 23). *McCrea*, however, stands simply for the principle that an agent, acting on behalf of a corporation of which he is an officer, can also be held liable for *conversion* even if the conversion is carried out in the interests of the corporation. Those are not the claims here.

[5] It has come to the attention of the undersigned that there was an error in the Def Memo at p. 20. Specifically, the following statement: "[T]he law is clear that a plaintiff may not allege that his former employer was 'unjustly enriched' at his expense when the employer compensated plaintiff by paying him a salary," is attributable to the decision in *Reiser v. Plaza College, Ltd.,* 2013 N.Y. Misc. LEXIS 5138, *14, 2013 NY Slip Op 32819(U) (Queens Sup. Ct. 2013) (and citing the federal cases of *Karmilowicz* and *Levion* previously discussed in the Def Memo).

6

In the end, Brook ignores this argument because it is a death knell to his unjust enrichment and quantum meruit claims (counts one and two). Instead, now faced with law that entirely undercuts his pleading, he attempts to wiggle out of his own allegation that he was a salaried employee. The simple fact is that he was a salaried associate at S&P for seven months (from July 15, 2011 until February 15, 2012). (BDS Decl ¶ 24). The Complaint clearly references him having received a "base salary" noting that he started receiving that salary as of July 16, 2011 and stopped receiving it at some time after February 6, 2012. (Complaint ¶¶ 43, 70). Even the Brook Proposal, which is discussed as having been presented to Simon after the February 6 meeting (Complaint ¶ 69) and a copy of which was provided in support of the instant motion (the authenticity of which is *not* questioned by Brook) states clearly and unequivocally that: "[Brook] became a full-time employee at the Firm (with the title of Associate) on July 13, 2011, at an agreed-upon salary of $150,000 per year (paid bi-monthly) plus benefits." (BDS Decl Ex 5 p. 2). Thus, there is no "plausible" argument that he was not a salaried employee for seven months.

Respecting the short time period after Brook had been taken off salary, Brook was informed by Simon that thereafter he would be paid dollar-for-dollar for work that he did on the Executive Matter. (Complaint ¶¶ 66, 71). Notably, Brook *does not allege anywhere in the Complaint* that Simon failed to fulfill this promise. Accordingly, the unjust enrichment/quasi-contract claim must be dismissed.

### III. THE LAW OF NEW YORK ESTABLISHES THAT A PROMISE OF EQUITY MAY NOT BE THE BASIS FOR A FRAUDULENT INDUCEMENT CLAIM

Brook similarly ignores the authority cited by S&P for the basic proposition that, in the context of compensation claims, a plaintiff cannot pursue a fraud claim against a defendant for a

7

failure to deliver an equity stake in a business. Time and time again, New York courts have held that a promise to give an equity interest or share of profits is unenforceable where the promise lacks definiteness as to the exact form, amount, or accrual of such compensation. (Def. Memo p. 25, *fn.* 9 (listing cases)). Brook inexcusably avoids this legal argument as well as the additional arguments in the Def Memo which reveal why the fraud claim must fail. (Def Memo Point VI).[6]

### IV. AN ONGOING NEGOTIATION BETWEEN EMPLOYER AND EMPLOYEE IS NOT SUPPROTED BY THE ALLEGATIONS IN THE COMPLAINT

#### A. Brook's Unilateral Requests for More Money or A Set Bonus Structure Do Not Amount to a Negotiation

As noted in Defendant's moving papers, Brook was hired under an oral employment contract that permitted discretionary bonuses. (Def Memo p. 16-20). Brook now argues that because the size of his bonus and origination credit were unresolved by the time that he started working, his entire seven month term of employment at S&P was one long "negotiation" between himself and Simon that never ended in an agreement. (Pl Memo p. 11-16).

Brook's argument is ridiculous. In fact, the Complaint itself establishes that the reason that Brook's origination credit was unresolved when he commenced working is precisely because they were at the discretion of his boss, a thirty-year lawyer and former federal

---

[6] More remarkably, Brook now claims that "separate from the contractual terms, the Complaint alleges that Defendants falsely told Brook that [S&P] had equity partners other than Simon, to induce him to believe that he might become an equity partner." (Pl Memo p. 19 *with no citation to the Complaint*). In fact, this is false. Nowhere in the Complaint is it ever alleged that Simon (or anyone else at S&P) ever told Brook there was more than one equity partner. At best, it is alleged that Simon promised "the prospect of partnership in the near future" which meant "sharing in the wealth." (Complaint ¶ 57). This, however, is a far cry from a promise of equity. Certainly, even being a non-equity partner in a small law firm is not inconsistent in any way with sharing in the profits when the business experiences profitable years. Of course, should this matter proceed past this motion (which it should not), Simon will enter an Answer and respond appropriately to this allegation; but this is not the time. Nevertheless, the point is this: The Complaint itself as pleaded does not even allege a promise of equity.

prosecutor and the person that the Executive chose to retain. The story told in the Complaint is that of an associate who accepted an oral job offer, who worked and accepted a salary and unspecified bonuses *even after* he was turned down when he asked for more money. At best, the Complaint describes an employer who made promises that he would deliver more money and/or potential partnership in a firm, *but never agreed to any set calculation* or, alternatively, an employer who outright denied the employee's requests. This is far from a "negotiation."

Significantly, there is no allegation in the Complaint about "counter-proposals" by Simon despite B&P's false claim that these were "ongoing negotiations." Rather, the Complaint alleges five occasions when Simon and Brook purportedly discussed his payments. None of these, however—even accepting the allegations as true—amount to negotiations:

> In the June 20, 2011 meeting (before he was hired) Simon did not offer to make Brook a partner or an *of counsel* attorney but, instead, offered Brook a Senior Associate position and a set salary and refused to give any defined bonus calculation. (Complaint ¶¶ 32-37).
>
> In October 2011, Brook asked to go off salary and get paid dollar-for-dollar for his work on the Executive Matter. Simon declined Brooks' request and Brook stayed a salaried employee. (Complaint ¶¶ 51-58). Brook did not leave the Firm, although he was free to do so.
>
> On or about February 6, 2012, Brook met with Simon and Simon informed Brook that he would no longer receive any base salary but, instead, receive one hundred percent of what he billed on the Executive Matter going forward. Brook alleges that he protested but that Simon would not budge. (Complaint ¶¶ 66-69). Brook continued to remain associated with the firm.
>
> After [the February 6] meeting, Brook drafted the Brook Proposal. Simon rejected it immediately without reading past the first few lines: Simon walked into Brook's office and yelled, 'If what I'm offering isn't good enough you and [the Executive] can go elsewhere." (Complaint at ¶ 69). Brook remained associated with the firm.
>
> On May 23, 2012, Simon instructed Brook to vacate his office by the end of the day. He said that Brook could continue to work with the Firm on the Executive Matter, but that Brook would no longer manage the case

9

and that Simon would do so instead. Later that day, Simon repeated this instruction by email and stated that Simon would make 'all staffing decision with respect to the reply [brief]' that would be filed in June. (Complaint ¶¶ 80- 81).

In short, none of these allegations *in the Complaint* plead a negotiation.[7]

**B. New York Law Clearly Establishes that An Oral Contract Existed Between S&P and Brook**

New York law dictates that a contract here was formed. Even accepting the allegation that some "origination bonus" was discussed when Brook was hired on June 20, 2011, according to the Complaint, while the *amount* of that origination bonus was undetermined, the manner in which it would be decided was clearly up to Simon, the principal of the law firm and Brook's employer. Later, on September 30, 2011, when he received his first bonus in the amount of $35,000, although he was displeased with it, considered "leaving S&P to start his own practice," and complained to Simon about it, Brook does not allege now that he was entitled to a set percentage or that Simon was bound to give him a specified metric. (Complaint ¶¶ 48-49, 50, 55; BDS Decl ¶ 26). In other words, according to the Complaint, from September 2011 to February 2012, Brook accepted the monies paid to him (even if it was not what he wanted) and he remained employed at S&P. Partial performance is a significant factor in determining the

---

[7] Brook argues that, "Simon's payment of over $100,000 as a 'bonus' to Brook—after, Simon claimed, Brook was no longer an employee—further refutes Simon's claim that Brook was receiving standard discretionary bonuses, since typically employees have no rights to bonuses paid after their employment ends." (Pl Memo p. 16 (citations omitted)). This is the height of hypocrisy. Simon exercised his discretion in a fair and generous manner towards Brook, who had already done the work on the matter for which he was given a bonus. By Brook's logic, however, had Simon refused to pay him any money and simply said, "too bad, you are no longer employed here," Simon would be on firmer legal ground in arguing that there was a binding oral contract with *discretionary* bonuses as between the parties. Brook appears to argue, therefore, that because Simon *exercised* his discretion, there is evidence that Simon had no discretion. That is circular logic the Court should reject. After accepting his $105,000 bonus, Brook did not, according to the Complaint, complain that Simon had failed to follow some set, pre-determined metric for his bonus. Instead, he continued working, apparently pleased with the payment, until asked to leave in May 2012.

10

existence of a binding oral agreement. *See Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 296 (E.D.N.Y. Sep. 29, 1998); *see also Viacom Int'l Inc. v. Tandem Prod., Inc.*, 368 F. Supp. 1264, 1270 (S.D.N.Y. Jan. 4, 1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975). Here, there was more than even *partial performance*, according to the pleading, both parties *fully* performed under the oral employment contract—Brook worked and Simon paid him for his work.

At best, Brook believed (or hoped) that someday Simon would re-visit a set metric for what he would paid for the "origination bonus," or that he could leverage his relationship with the Executive to demand set portion of the billings. However, it is well settled that, "[a] party's subjective belief is irrelevant in the determination of the existence of a contract." *Walsh v. Maryland Bank, N.A.* (91-cv-7483 (CSH)), 1994 U.S. Dist. LEXIS 4612, *6, 1994 WL 132234 (S.D.N.Y. Apr. 11, 1994). *See also, Pahlavi v. Palandjian,* 809 F. 2d 938, 945 (1st Cir. 1987) (contracting parties are bound by objective manifestations, not subjective expectations).

Most importantly, a contract does not lack all effect merely because it expresses the idea that something is left to future agreement. *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264 (1943); *Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209, 213-214 (1894); *Conopco, Inc. v. Wathne*, 190 A.D.2d 587, 588 (1st Dep't. 1993). Even if the origination credit issue was left open, as Brook claims, this does not negate the oral employment agreement:

> "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) (citation omitted). However, "not all terms of a contract need be fixed with absolute certainty." [*Express Indus. & Terminal Corp. v. New York State DOT*, 93 N.Y.2d 584, 589 (1999)]. "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y.

> 260, 264 (1943). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but "parties . . . should be held to their promises." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989).

*Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 95 (2d Cir. 2007).

Finally, the ultimate irony is that by his own opposition papers Brook concedes *that he was not entitled to any origination bonus at all.* If there was nothing more than an agreement to agree—a proverbial kicking of the can down the road on that issue—then there was never any right to *any origination credit. See KJ Robert & Co. v. MDC Partners, Inc.*, 605 Fed Appx 6, 7 (2d Cir. 2015) (citing *Express Indus. & Terminal Corp., supra.* quoting *Joseph J. Martin, Jr. Delicatessen, supra.*)

## V. PEED'S CLAIMS ARE NOT COGNIZABLE UNDER NEW YORK LAW

Peed's arguments do not cure the deficiencies in his pleadings either. First, as noted, a contract does not necessarily lack all effect merely because it expresses the idea that something is left to future agreement *May Metro. Corp. supra.* Peed has pleaded that there was an oral contract to work, he worked pursuant to that contract and he was paid for every hour that he worked. His effort to elevate this simple arrangement to some sort of sophisticated "Type-2" agreement is pure overreaching. (Pl Memo p. 22-23). Type-2 contracts involve sophisticated businesses and complex commercial transactions involving preliminary and final agreements. *See e.g., Adjustrite Sys. V. GAB Bus. Servs.*, 145 F. 3d 543 (2d Cir. 1998). This was hardly such a situation. This was a contract attorney working for an hourly wage on an appellate brief. Instead, Peed has set forth at best two separate agreements: the first, to work for $125 per hour; the second, to "agree to agree" on a higher hourly rate thereafter if the S&P invoices were paid. One contract would be enforceable while the other one would not.

12

Second, with respect to the fraud claim, Peed fails to address the well-settled principle that a statement of future intention cannot be the basis for a claim of fraud. *Eastman Kodak Co. v. Roopak Enterprises, Ltd.,* 202 A.D.2d 220, 222 (1st Dep't. 1994). Here, Peed's fraud claim merely restates his breach of contract claim, to wit, that Simon knowingly agreed to pay him $125 per hour and then to re-negotiate that rate if the Executive's employer later paid the bills but Simon never truly intended to do so. "A fraud claim is not sufficiently stated where it alleges that a defendant did not intend to perform a contract…when he made it." *Gordon v. Dino DeLaurntiis Corp.,* 141 A.D.2d 435, 436 (1st Dep't. 1988); *see also, Sandra Greer Real Estate v. Johansen Organization,* 182 A.D.2d 468, 469 (1st Dep't. 1992); *Sanyo Electric v. Pinros & Gar Corp.,* 174 A.D.2d 452, 453 (1st Dep't. 1992); *Wallace v. Crisman,* 173 AD2d 322, 322 (1st Dep't. 1991) (same). In such an instance, a plaintiff is "consigned to the breach of contract claim" because the fraud is in no way collateral to the alleged business dispute. *Sforza v. Health Ins. Plan*, 210 A.D.2d 214, 214 (2d Dep't. 1994). (*See* Def Memo p. 28 collecting cases).

Finally, with respect to the unjust enrichment and quantum meruit claims, should the Court determine that a contract in fact existed, the unjust enrichment and quantum meruit claims must be dismissed under the authority of *Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 388 (1987). (Def Memo p. 16-19 (Point III)). Alternatively, even if the Court determines that no oral employment agreement existed, the logic of *Karmilowicz,* and *De Madriaga v. Union Bancaire* (Def. Memo p. 20-22 (Point IV)) warrants dismissal of the quasi-contract claims with respect to Peed just as they do with respect to Brook. While we concede that those cases refer to *salaried employees,* the logic of those decisions is the same for a contract attorney being paid an hourly wage who was paid for each hour that he worked.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion to Dismiss in all respects.

Dated: New York, New York
       September 7, 2017

SIMON & PARTNERS LLP

Attorneys for Defendants

By: _____
Kenneth C. Murphy
551 Fifth Avenue
New York, NY 10176
(212) 332-8900