## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BRIAN C. BROOK and MATTHEW
J. PEED,

<em>Plaintiffs,</em>

v.

BRADLEY D. SIMON and SIMON &
PARTNERS, LLP,

<em>Defendants.</em>

Civil Action 1:17-cv-6435(GBD)


## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## RULE 60 MOTION FOR RELIEF FROM THE JUDGMENT

Rhett O. Millsaps II (RM-1336)
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (646) 535-1137
Fax: (646) 355-2816
rhett@rhettmillsaps.com

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ..............................................................................................................2

I.   THE JUSTIFICATIONS FOR PERMITTING AMENDMENT HERE CLEAR THE HIGHER BAR
     FOR LEAVE TO AMEND POSTJUDGMENT ....................................................................5

     A.   Granting this Motion will promote judicial economy by avoiding an
          unnecessary (and likely successful) appeal. .....................................................7

     B.   The Motion is timely filed. ...............................................................................10

II.  BROOK'S AMENDED QUASI-CONTRACT CLAIMS CLARIFY PREVIOUSLY CONFUSING
     PLEADINGS............................................................................................................10

     A.   The FAC distinguishes the procedural agreement that was reached (the
          "Negotiation Plan") from the substantive agreement to agree that was not
          (the "Cuti Matter Share"). .................................................................................11

     B.   Brook's compensation from the Cuti Matter (previously, the Executive
          Matter) is now clearly pleaded to be non-discretionary. ..................................12

     C.   Contemporaneous communications support the amendments. .........................14

     D.   Additional allegations help illustrate why Brook is entitled to relief as a
          matter of law, and why allowing Simon to keep the money generated by
          Brook would be unjust. .....................................................................................16

     E.   The FAC spells out the consequences of Defendants' attempt to unilaterally
          alter Brook's employment status.......................................................................16

     F.   Count Two alleges, in the alternative, that the scope of any agreement was
          limited, and thus does not preclude quasi-contract relief on services rendered
          outside that scope..............................................................................................18

     G.   Even if there was a binding agreement on Brook's compensation, Brook can
          assert claims for breach of contract, including breach of the implied covenant
          of good faith and fair dealing............................................................................19

     H.   Additional alternative claims are asserted.........................................................20

III. THE FRAUD CLAIMS HAVE BEEN ESSENTIALLY DROPPED ........................................22

IV. PEED'S QUASI-CONTRACT CLAIM HAS BEEN EASILY CURED....................................23

CONCLUSION .........................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Aramony v. United Way of America,*
   949 F.Supp. 1080 (S.D.N.Y.,1996) ........................................................................2

*Bader v. Wells Fargo Home Mortg. Inc.,*
   773 F.Supp.2d 397 (S.D.N.Y. 2011) ......................................................................22

*Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.,*
   401 B.R. 598 (S.D.N.Y. 2009) ................................................................................8

*Block v. First Blood Assocs.,* 988 F.2d 344 (2d Cir.1993) ...........................................5

*Campeggi v. Arche, Inc.,*
   No. 15 Civ 1097 (PGG), 2016 WL 4939539 (S.D.N.Y. Sept. 14, 2016)...................17

*Conley v. Gibson,*
   355 U.S. 41 (1957) ................................................................................................7

*Dalton v. ETS,*
   87 N.Y.2d 384 (1995) ...........................................................................................19

*Ferrand v. Credit Lyonnais,*
   No. 02–CV–5191, 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003)............................9

*Foman v. Davis,*
   371 U.S. 178 (1962) ..............................................................................................5

*Hutner v. Greene,*
   734 F.2d 896 (2d Cir. 1984)..................................................................................13

*In re AXA Equitable Life Ins. Co. COI Litig.,*
   2018 WL 3632500 (S.D.N.Y. July 30, 2018)............................................................3

*Int'l Minerals & Resources, S.A. v. Pappas,*
   96 F.3d 586 (2d Cir. 1996).....................................................................................8

*Kaplan v. Capital Company of America LLC,*
   747 N.Y.S.2d 504, 298 A.D.2d 110 (N.Y.A.D. 1 Dept. 2002) ....................................9

*Laurel Hill Advisory Group, LLC v. American Stock Transfer & Trust Co., LLC,*
   997 N.Y.S.2d 213 (App. Div. 1st Dept. 2013) ..........................................................8

*Lopez v. Ward,*
   681 F.Supp. 192 (S.D.N.Y. 1988) .........................................................................21

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,*
    265 F.R.D. 106 (S.D.N.Y. 2010) .................................................................13

*Michael Coppel Promotions Pty. Ltd. v. Bolton,*
    982 F.Supp. 950 (S.D.N.Y. 1997) ...........................................................7, 15

*Oliver Schools, Inc. v. Foley,*
    930 F.2d 248 (2d Cir.1991)........................................................................2

*Ronzani v. Sanofi S.A.,*
    899 F.2d 195 (2d Cir.1990).......................................................................2

*S.E.C. v. Cavanaugh,*
    1 F. Supp. 2d 337 (S.D.N.Y. 1998) .........................................................13

*State Teachers Ret. Bd. v. Fluor Corp.,*
    654 F.2d 843 (2d Cir.1981).......................................................................5

*Wachtler v. County of Herkimer,*
    35 F.3d 77 (2d Cir. 1994)..........................................................................6

*Williams v. Citigroup, Inc.,*
    659 F.3d 208 (2d Cir. 2011)......................................................................5

**Statutes**

N.Y. LAB § 191...................................................................................18, 21

N.Y. LAB § 195........................................................................................18

N.Y. LAB § 195........................................................................................21

N.Y. LAB § 217........................................................................................18

**Rules**

Fed. R. Civ. P. 15.................................................................................5, 21

Fed. R. Civ. P. 60............................................................................1, 5, 10

L.C.R. 6.3..................................................................................................1

Pursuant to Federal Rule of Civil Procedure 60, Plaintiffs Brian C. Brook and Matthew J. Peed respectfully submit this Memorandum of Law in support of their Motion for Relief from the Judgment. A proposed First Amended Complaint ("FAC") is attached to the accompanying Declaration of Brian C. Brook ("Brook Decl.") as Exhibit F.

## PRELIMINARY STATEMENT

Justice requires that relief from the judgment be granted and the case reinstated with the FAC. The Court's dismissal was based primarily on a reading of the Complaint's facts that was inconsistent with Plaintiffs' intended narrative and factually incorrect. The narrative is easily corrected. Allowing Plaintiffs to correct the record is essential to ensuring that judgment is rendered on the merits.

Evidence attached to this motion demonstrates Plaintiffs' good faith in amending. From the original Complaint, the Court drew inferences that were demonstrably incorrect. For example, the Court concluded that Brook and Simon reached an agreement about Brook's compensation. Mem. Decision & Order dated May 14, 2018 ("Op.") at 11. But contemporaneous emails show that no such meeting of the minds actually occurred. *See infra* § II(C). Notably, this supporting evidence could not have been attached to the previous motion for reconsideration, as the Local Rules prohibit it. L.C.R. 6.3 ("No affidavits shall be filed by any party unless directed by the Court.").

The quasi-contract claims asserted here are straightforward and should be allowed to proceed to discovery. The FAC clarifies the original pleadings that caused the Court to conflate a mere procedural agreement on steps for negotiation with a

final agreement on Brook's compensation. The FAC cures the faults found by the Court by clearly alleging that the parties never intended to confer discretion on Simon as to the final amount of Brook's compensation. By separating the procedural agreement from the substantive issues as to which there was no agreement, the FAC sufficiently alleges the absence of any enforceable agreement.

Additionally, unlike the original Complaint, the FAC includes more claims for Brook that are stated in the alternative—as pleadings are permitted to do. Even if there was an agreement anywhere along the lines found by the Court based on the original Complaint, Brook still would have claims, and he should be allowed to pursue them on the merits.

## ARGUMENT

The Second Circuit has said that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'" *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991) (quoting *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990)). "'Where the possibility exists that the defect can be cured and there is no prejudice to defendant, leave to amend at least once should normally be granted as a matter of course.'" *Aramony v. United Way of America*, 949 F. Supp. 1080, 1086 (S.D.N.Y.,1996) (quoting *Oliver Schools*, 930 F.2d at 253).

This Court inexplicably deviated from the usual practice, appearing to deny Plaintiffs a single opportunity to amend, even though the Court's opinion repeatedly identified ways in which the pleadings appeared to suffer from technical deficiencies

or inconsistencies that were easy to cure.[1] For example, the Court's opinion repeatedly disagreed with Plaintiffs' description of the original Complaint. *See, e.g.*, Op. at 11 n.7 ("Though Plaintiffs attempt to draw a distinction… the complaint draws no such distinction."); *see also id.* at 10 ("Though Plaintiffs characterize…"). Plaintiffs ought not need to go to the Second Circuit to argue about whether the Court construed the Complaint in a manner consistent with the standard of review because this misunderstanding is easily remedied by alleging the facts more clearly.

By permitting amendment for purposes of clarifying the pleadings, the Court will be advancing the interests of justice and judicial economy. Justice will be served because there was no agreement to give Simon discretion over the amount of Brook's compensation, but dismissal would give Simon that unintended and un-bargained-for benefit. Permitting amendment now will also preserve judicial economy by avoiding an unnecessary appeal.

A copy of the proposed FAC is attached hereto. This Memorandum does not attempt to address all of the amendments to the pleadings; it identifies only reasons why the amendments are made in good faith and would not be futile. To that end, the exhibits attached to the Brook Declaration show that these amendments are supported by contemporaneous evidence.

---

[1] Plaintiffs' previous motion for reconsideration of the Court's directive to close the case was filed because it appeared inconceivable that leave to amend was not intended when it was clear that deficiencies were so easily curable. The Court denied that motion by relying on considerations of finality, quoting a case that denied leave to amend for a *third* time. Dkt. #40 at 5 (quoting *In re AXA Equitable Life Ins. Co. COI Litig.*, 2018 WL 3632500, at *1 (S.D.N.Y. July 30, 2018)).

In addition to clarifying the factual allegations, the FAC includes additional legal theories and claims that are alleged in the alternative, in the event that the Court still concludes that the pleadings establish that there was a valid and binding employment agreement between Brook and Simon. Such a finding would not foreclose relief for breach of contract: even if such a contract existed (contrary to the evidence as it may be), Brook should be able to amend to assert claims for breach of contract in the alternative. New York law holds that where a contract contemplates the exercise of discretion, that discretion must be exercised reasonably. *See infra* II(G). And as the FAC illustrates, there is a sufficient factual basis to infer that Simon exercised his discretion in an arbitrary or capricious manner and thus to support a breach of contract claim.

The Court also will note some stylistic changes to the FAC's narrative. For example, the identities of "the Executive" and his former "Employer" are now stated using their proper names: Anthony Cuti and Duane Reade, Inc. Plaintiffs hope that this will make the FAC easier to follow.

By identifying the client as Anthony Cuti, the former CEO of Duane Reade, the FAC is also free to identify other lawyers that were involved in the unique story of how Brook and his client continued working together after Brook left his associate position at one of the country's largest law firms. FAC ¶¶ 27–30, 37, 42–46. The identities show that Brook and his client were not at a loss for other options besides Simon. But Simon snagged Brook and Cuti by misleading Brook about the very nature of his Firm and his relationship with his so-called "partners." And while

Simon's attempt to take over the Cuti Matter resulted in him being sidelined, Simon kept an even larger share of the Cuti Matter profits from that point forward because he failed to pay Brook *anything* for the last two months of work on the appellate brief. *See* FAC ¶¶ 219, 221 (Simon previously paid Brook 60% of his own Cuti Matter billings or 1/3 of the total Cuti Matter billings).This is a textbook example of unjust enrichment.

## I.    THE JUSTIFICATIONS FOR PERMITTING AMENDMENT HERE CLEAR THE HIGHER BAR FOR LEAVE TO AMEND POSTJUDGMENT

Because the Court has entered judgment and refused to reconsider doing so, Plaintiffs must file this as a motion for relief from the judgment under Rule 60(b).[2]

The Second Circuit has said that "postjudgment motions for leave to replead must be evaluated with due regard to both the value of finality and the policies embodied in Rule 15." *Williams v. Citigroup, Inc.*, 659 F.3d 208, 213 (2d Cir. 2011). In *Williams*, the Second Circuit reversed the district court's denial of a post-judgment motion for leave to amend that had overemphasized considerations of finality. *Id.* at 210 ("We hold that the district court, in denying the postjudgment

---

[2] In the prejudgment setting, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993); *see also State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) ("Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). In determining what constitutes prejudice, courts consider whether the amended pleading would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] significantly delay the resolution of the dispute." *Block,* 988 F.2d at 350. "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Id. See also Foman v. Davis,* 371 U.S. 178, 182 (1962) ("Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.").

motion, applied a standard that overemphasized considerations of finality at the expense of the liberal amendment policy embodied in the Federal Rules of Civil Procedure.").

Here, although Defendants did not request dismissal with prejudice, and even though some of the issues were raised by the Court *sua sponte* after briefing was closed,[3] the Court entered judgment almost simultaneously with its granting of the motion to dismiss.

Considerations of finality do not justify denying Plaintiffs at least one chance to amend, however. As explained below and illustrated in greater detail in the attached FAC, amendment is necessary to clarify the facts to allow a just resolution on the merits.

Plaintiffs are aware of no precedent denying leave to amend to correct what was at worst an unintended drafting error. The Court's decision identified several such mistakes, which led the Court to perceive an unintended disconnect between Plaintiffs' briefs and the original Complaint. *See, e.g.*, Op. at 11 n.7 ("Though Plaintiffs attempt to draw a distinction… the complaint draws no such distinction."); *see also id.* at 10 ("Though Plaintiffs characterize…"). Plaintiffs should be allowed to restate the allegations to ensure that the Court rules on the true merits.

---

[3] The Court's decision raised several issues *sua sponte*, without notice or an opportunity to be heard. *See Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) (dismissal *sua sponte* requires notice to the plaintiff and an opportunity to be heard).

Likewise, the Court identified matter missing from the original Complaint. *See, e.g.*, Op. at 11 ("the complaint does not allege…"); 12 ("Brook has not pled facts…."); 13 ("Peed provides no explanation…"); 19 ("the facts alleged do not support…"); 20 ("the complaint does not allege…"). Most if not all of the holes identified in the pleadings were not raised by Defendants. Plaintiffs should be allowed at least one chance to try to fill in the blanks that were identified by the Court. To hold otherwise would make "pleading [] a game of skill in which one misstep by counsel may be decisive to the outcome"—an approach that the Federal Rules "reject." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Instead, the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id*.

**A. Granting this Motion will promote judicial economy by avoiding an unnecessary (and likely successful) appeal.**

In addition to advancing a just resolution, permitting amendment will avoid a full-blown appeal simply to be able to correct the demonstrably improper inferences drawn by this Court on a motion to dismiss as to Brook, or to satisfy an easily-cured pleading requirement as to Peed.

The alternative to granting relief is to require a lengthy and expensive appeal, which has a high probability of success given that inferences were supposed to be drawn in Plaintiffs' favor from the original Complaint. For example, the Court found—on the pleadings alone—that (a) a disputed oral agreement existed and (b) it gave Defendants discretion over Brook's bonuses. Op. at 10–11. But these findings decidedly placed the cart before the horse.

The fact question of whether an oral agreement has been reached is inappropriate for resolution on a motion to dismiss. *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F.Supp. 950, 953 (S.D.N.Y. 1997) (Chin, D.J.). The Second Circuit has repeatedly held that district courts should not make such a finding at all, as it is appropriately left to the jury:

> [T]he Second Circuit has made clear, "the issue of whether (and when) the parties intended to be bound is a factual issue that should [be] submitted to the jury."

*Id.* (quoting *Int'l Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586, 593 (2d Cir. 1996)). Being inappropriate even for summary judgment, this Court's finding that a binding agreement was reached based on mere allegations of the Complaint would most likely constitute reversible error.

New York state courts concur that the existence of an oral agreement is a fact question that cannot be decided in a manner adverse to the plaintiff on a motion to dismiss, even when there is also a written agreement, so long as the plaintiff disputes its validity. *See, e.g.*, *Laurel Hill Advisory Group, LLC v. American Stock Transfer & Trust Co., LLC*, 997 N.Y.S.2d 213, 214-15 (App. Div. 1st Dep't 2013) ("The dispute over the validity of the written agreement and the inconsistent terms between that agreement and the alleged oral agreement raise factual issues that cannot be resolved at this juncture.").[4]

---

[4] This Court's reliance on *Trachtbel* and similar cases to essentially ignore the unresolved term of the amount of origination credit was misplaced because those cases concerned written agreements, and New York law treats written agreements very differently than oral agreements. As other judges in this District have recognized, the situation of an oral agreement is completely different:

> In *Trachtbel*, AEP sought to enforce a *fully executed*, written agreement that, on its face, contained language specifically binding the parties to the contract. Furthermore,

Similarly, New York courts have held that "ordinarily the question of whether unpaid compensation constitutes a discretionary bonus or nonforfeitable earned wages is a question of fact." *Kaplan v. Capital Company of America LLC,* 747 N.Y.S.2d 504, 505, 298 A.D.2d 110, 111 (N.Y.A.D. 1st Dep't 2002) (cited by *Ferrand v. Credit Lyonnais,* No. 02–CV–5191, 2003 WL 22251313, at *12 (S.D.N.Y. Sept. 30, 2003)). Only when there is a clearly written employee handbook have courts held otherwise—on summary judgment, not at the pleading stage. *Id.* Here, nothing in the Complaint expressly alleged that Simon had discretion to decide Brook's Executive (Cuti) Matter compensation, but the Court held that the allegations nonetheless "indicate[d]" that that was the case. Op. at 11.

Thus, the Court's premature findings most likely would be reversed on appeal. Since the Court's error can instead by attributed to a confusingly drafted original Complaint, the Court should permit the filing of the proposed FAC.

Requiring Plaintiffs to appeal rather than permitting amendment would unnecessarily tax an already overburdened Court of Appeals and needlessly waste the parties' resources in a case where the amount of discovery required is likely to be limited. Virtually all of the relevant facts are already known, and most of the

---

the parties had performed under and relied upon the contractual provisions for years prior to one party's repudiation. The parties even modified and reaffirmed the terms of their deal in writing. Moreover, the Second Circuit found that the provisions left open for further negotiation were mere "details" rather than material terms.

*Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.,* 401 B.R. 598, 616–17 (S.D.N.Y. 2009) (McMahon, D.J.) (emphasis in original). In addition, this Court appears to have mistakenly read *Trachtbel* as permitting a contract without "material terms" agreed upon when, as Judge McMahon noted, the terms left open in *Trachtbel* were "mere 'details'" instead. *Id.* More importantly, *Trachtbel* was decided on summary judgment, not on the pleadings alone.

important communications were verbal rather than written. Moreover, the opportunity to take testimony about the relevant verbal communications could be lost, or become less reliable, if substantially more time elapses.

## B. The Motion is timely filed.

A motion to reopen a case under Rule 60(b) is timely if made "within a reasonable time," although reasons such as "mistake" or "excusable neglect" must be asserted within one year of entry of judgment. Here, judgment was entered on May 16, 2018, and this motion is filed less than four months later, just fourteen days after this Court denied Plaintiffs' motion for reconsideration, which would have rendered this motion moot if it had been granted. Accordingly, whether this is considered on grounds of "mistake" or for "any other reason that justifies relief," it is timely.

No precedent suggests that Plaintiffs were required to incur the substantial costs attendant to preparing this motion when they believed in good faith that it should be moot. Nor have Plaintiffs sat on their hands while the Court was deciding the motion for reconsideration. In the meantime, Plaintiffs have conducted additional investigation of the facts to confirm that the proposed FAC accurately describes the agreements reached (and not reached) between the parties. *See* Brook Decl. ¶¶ 2–8.

## II.  BROOK'S AMENDED QUASI-CONTRACT CLAIMS CLARIFY PREVIOUSLY CONFUSING PLEADINGS

Because the Court read the original Complaint in a manner that was neither intended by Plaintiffs nor accurate, the FAC reframes the same facts more clearly.

In its opinion granting the motion to dismiss, the Court found that the original Complaint established the existence of a binding agreement and noted that even if there "were material terms that were left open for future agreement, that fact would not preclude formation of a valid agreement between Brook and Simon & Partners." Op. at 11. While this is true, such an agreement would be limited in its scope. Without an express agreement on compensation, it would not be a binding employment contract. *See* Op. at 14 ("The essential terms of an employment contract include compensation."). And as the FAC clarifies—and as the attached evidence shows—reaching a limited agreement on preliminary matters, without agreement as compensation, is indeed what happened.

A. **The FAC distinguishes the procedural agreement that was reached (the "Negotiation Plan") from the substantive agreement to agree that was not (the "Cuti Matter Share").**

Perhaps the most important curative step taken by the FAC is to separate out the different agreements:

(1) The final amount of Brook's compensation was to be heavily dependent on revenue generated from the Cuti Matter, in an amount to be agreed upon after the parties had more information about the extent to which Cuti's former employer, Duane Reade, would pay. *See* FAC ¶¶ 58, 62-63 (referring to this as Brook's "Cuti Matter Share").

(2) The parties' future negotiations to reach agreement on the Cuti Matter Share were to involve several specific steps in an effort to foster good faith and to prevent Brook from being in the position of negotiating while

Simon held all the economic leverage. *See* FAC ¶¶ 64–67 (referring to this as the "Negotiation Plan").

The Negotiation Plan was a contract. But the Cuti Matter Share was merely an agreement to agree, and thus not legally binding.

By failing to expressly acknowledge the procedural agreement that was reached as distinct from the substantive issue of compensation, the original Complaint led the Court to conclude that the existence of that procedural agreement precluded quasi-contractual relief on the unresolved substantive issue.

The FAC is now clear that the final amount of compensation due to Brook was never agreed upon, and thus a quasi-contract claim is not precluded.

**B. Brook's compensation from the Cuti Matter (previously, the Executive Matter) is now clearly pleaded to be non-discretionary.**

The Court read the original Complaint as alleging that "the amount of Brook's bonuses and origination credit were not left open for negotiations; they were to be determined by *Simon*, who would calculate them based on what Simon thought was 'fair.'" Op. at 11 (emphasis in original). The Court's reading was not what Plaintiffs intended or attempted to allege. *See supra* § II(A) (explaining that Simon's determination was a procedural step and not intended to grant him final authority or discretion).

Indeed, the Court acknowledged that Plaintiffs argued in their opposition brief that there was "a distinction between Brook's '[non-discretionary] periodic bonuses based on revenue from the Executive Matter' and 'discretionary bonuses for Brook's work on other matters," Op. at 11 n.7 (quoting Opp'n Br. at 13). The original

Complaint had used the label "discretionary" only to describe the second category of "bonuses" based on "other Firm matters," Compl. ¶ 32, and Plaintiffs had believed that in labeling one "discretionary" but not the other, Plaintiffs were entitled to the inference that the other category was not discretionary. Whether or not that favorable inference was reasonable and therefore required by the standard of review, Plaintiffs should not have to take up an appeal, as the issue can be mooted by simply amending the pleadings to clear up the unintended confusion.

As the FAC now makes clear, Brook *never* assented to giving Simon unilateral authority to determine the final amount paid to Brook based on Cuti Matter revenue. FAC ¶ 67. The obligation to pay Brook a portion of all revenue received from the Cuti Matter was non-discretionary.[5] *Id.* ¶¶ 58, 61. Only the amount was left undecided, but since that was a material term, no enforceable agreement was reached. *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 127 (S.D.N.Y. 2010) ("[P]laintiffs fail to plead the existence of a traditional contract because a material term—the amount of compensation—is missing."); *S.E.C. v. Cavanaugh*, 1 F. Supp. 2d 337, 386 (S.D.N.Y. 1998) ("the amount of compensation" is "irrefutably a material term"); *see also Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir. 1984) (finding that absence of a price term did not impair *quantum meruit* claim).

---

[5] And as discussed above, the parties did in fact agree that "Brook would play a role in the determining the amount of those periodic bonuses" based on revenue from the Executive/Cuti Matter. Op. at 11 n.7.

## C. Contemporaneous communications support the amendments.

Because the truth is that no agreement on compensation was reached, justice requires permitting amendment to correctly state this fact.

Contemporaneous communications between Brook and others during his long-running negotiations with Simon (from June 2011 through February 2012) demonstrate that these amendments are made in good faith and in the interest of achieving a just outcome on the merits.

This evidence shows that Brook never believed that he had reached a final agreement with Defendants about the amount of his compensation. And without a meeting of the minds, no binding agreement existed.

This evidence also illustrates the factual inaccuracy of the Court's inference from the original Complaint that Brook and Simon reached an agreement on "the amount of Brook's bonuses and origination credit" in which the amounts were to be determined by Simon. Op. at 11 (citing Compl. ¶¶ 34–35). The cited paragraphs recounted a June 20, 2011 discussion; thus, in the Court's view, there was a final and binding agreement on that date.

But an email sent by Brook on June 21, 2011 to the recruiter who introduced him to Simon shows that there was no final agreement. Brook had agreed to start working with Simon despite the fact that he was "[s]till trying to haggle compensation." Brook Decl. Ex. A.

The compensation issue was still unresolved in October 2011, when Brook wrote to his father that Simon "refused *again* to agree to any particular numbers." Brook Decl. Ex. D (emphasis added). Brook also drafted a letter with proposed

terms for Simon; consistent with the absence of any existing agreement, this letter makes no reference to any prior agreement. *See generally id.* at 2–3.

And in February 2012, after the Cuti appellate brief was filed and the relationship between Brook and Simon was severely strained, Brook described Simon's outrageous and unprofessional conduct to Peed, lamenting that Simon "put himself in this position by refusing to ever finalize terms before. He said I'm never satisfied and always want more, but I reminded him that I never claimed to have been satisfied previously and that he's consistently refused to reach any sort of final terms." Brook Decl. Ex. E.

Just as the evidence supports finding that no agreement was reached, the evidence also shows that the "bonuses" portion of the Cuti Matter Share were *not* discretionary. *See supra* § II(B). Brook drafted a letter stating as much in October 2011, and Simon signed it. *See* Brook Decl. ¶¶ 5–6 & Exs. B–C.

This evidence is not attached to the FAC because it is unnecessary to support a complaint with evidence.[6] But this evidence is presented now in the hope that it will demonstrate to the Court that Brook's request to amend in order to clarify the events in question is fundamentally consistent with advancing the truth, in the pursuit of justice.

---

[6] There is more than enough documentary evidence to survive a motion for summary judgment, particularly given the Second Circuit's "clear" instruction that whether an oral agreement has been reached is for the jury to decide. *Michael Coppel*, 982 F. Supp. at 953.

**D. Additional allegations help illustrate why Brook is entitled to relief as a matter of law, and why allowing Simon to keep the money generated by Brook would be unjust.**

The FAC explains that, for approximately two months prior to the filing of the Cuti Matter appellate brief, Simon did *nothing* of value, except eventually get out of the way. Brook retained former U.S. Solicitor General Seth Waxman to fill the role that Brook had originally hoped Simon would fill. *See* FAC ¶¶ 111–116. However, Simon proved not only useless, but untrustworthy and obstructive. *Id.*

After enticing Brook to choose S&P over other lucrative alternatives, Simon moved against Brook and sought to take Brook's high-profile client for himself. *Id.* ¶ 112. To that end, Simon lied to the client and engaged in other inequitable conduct. *Id.* ¶¶ 112–113. Although his self-serving efforts were unsuccessful—and actually backfired by getting Simon effectively removed from the case, *id.* ¶¶ 114–116—these additional allegations support Brook's unjust enrichment claim.[7] These allegations also illustrate why the instant motion should be granted to allow the claims against Defendants to proceed, and to thereby advance the interests of justice.

**E. The FAC spells out the consequences of Defendants' attempt to unilaterally alter Brook's employment status.**

The FAC also clarifies the nature of the payment that S&P made to Brook in April 2012—over two months after Simon "terminated" Brook's employment without telling him. *See* FAC ¶¶ 140–156, 259; *see also id.* at Ex. A (Chart of Cuti

---

[7] *See also id.* at 169–173 (describing Simon's similar mistreatment of a more junior associate who helped Simon land a significant client from the associate's old firm just weeks after joining S&P).

Matter billings and payments). The Court's opinion mistakenly described that payment as "a check that reflected the total amount Brook billed for the Executive Matter during that pay period." Op. at 5. Not so. The check paid in April 2012 reflected payment for work done earlier, in October 2011. FAC ¶ 146. The Court's confusion is understandable, as Defendants' briefing had been misleading on this important point.[8] Ultimately, the fact that S&P paid Brook as an "independent contractor" for work that he had performed while he was an employee is an important admission: it shows that Brook performed services that were independent from his position as an employee.[9]

In addition, the FAC explains how Defendants bungled their attempt to reclassify Brook as an independent contractor in February 2012. Regardless of whether that change in classification was valid or merely an attempt to evade taxes,

---

[8] After describing the February 2012 meeting where Simon promised Brook 100% of fees, Defendants described the payment of $105,254.64 as "bonus money for past work Brook had done as Simon had promised." Def. Mem. at 8, ECF No. 5. It was unclear what "promise[]" Defendants were referencing, since they denied the existence of an obligation to pay Brook bonuses from Cuti Matter revenue, yet here they were acknowledging that that promise had led to paying Brook even after his employment was officially terminated. In the FAC, two additional claims are now stated based on Defendants' failure to follow-through "as Simon had promised" with another such payment after receiving even more money from Duane Reade a few weeks later. *See* FAC ¶¶ 212–235 (Counts Three and Four).

[9] In a footnote, this Court *sua sponte* raised an argument that was never briefed or argued about the impact of Brook being an at-will employee. Op. at 11 n.8 (asserting it "provides another basis for dismissing his quasi contract claims"). Respectfully, since all employment is presumptively at will, that means that any employment that occurs without a contract is at will. So, if at-will status prevented a quasi-contract claim, then there would never be a quasi-contract claim based on someone's services as an employee, and that simply is not so.

The case law cited by the Court did not involve dismissing *quasi*-contract claims due to at-will status. The main quotation relied on by the Court comes from a block quote following a sentence that reads, "Plaintiff's at-will employment status – during the Agreement's second term –is fatal to both her [1] breach of contract claim and her [2] claim for breach of the implied covenant of good faith and fair dealing." *Campeggi v. Arche, Inc.*, No. 15 Civ 1097 (PGG), 2016 WL 4939539, at *6 (S.D.N.Y. Sept. 14, 2016). Indeed, the fact that the *Campeggi* Court did not dismiss the quasi-contract claim on similar grounds illustrates that at-will status is no impediment to a quasi-contract claim.

Defendants violated New York labor law either way. If Brook did become an independent contractor, then his employment was necessarily terminated; but S&P failed to give Brook notice of the termination required by N.Y. LAB § 195(7).[10] FAC ¶¶ 259–267 (stating claim under N.Y. LAB § 217). On the other hand, if Brook remained an employee, then S&P owed him payments for his work at least semi-monthly. FAC ¶¶ 248–250 (stating claim under N.Y. LAB § 191).

Ultimately, this Court ought not to parse all of the various possible ways in which Defendants' confusing actions could be interpreted now, prior to having the benefit of Simon's explanation (which should come through an Answer or discovery rather than more procedurally inappropriate declarations), because the FAC more than adequately pleads several plausible alternative causes of action for breach of contract and quasi-contract.

### F. Count Two alleges, in the alternative, that the scope of any agreement was limited, and thus does not preclude quasi-contract relief on services rendered outside that scope.

In light of the possibility that the Court may find that the existence of a salary component to Brook's compensation as an associate precludes him from pursuing a complete quasi-contract remedy as to all of his services, the FAC includes an alternative quasi-contract claim for Brook under Count Two. *See* FAC ¶¶ 195–211.

---

[10] To the extent that Defendants attempt to change their position (again) and claim that Brook was not terminated as an employee, Brook would then have a claim against S&P for unpaid salary from mid-February 2011 forward.

Most clear is that Brook received a salary only from July 16, 2011 to approximately February 17, 2012. While Brook was paid 100% of his billings for the post-February 17, 2012 period, Brook was never paid for the time he billed prior to July 16, 2011. Brook is entitled to payment for that time. If not in quasi-contract under Counts One or Two, then at least by awarding him his base salary as required by New York Labor Law. *See infra* § II(H).

### G. Even if there was a binding agreement on Brook's compensation, Brook can assert claims for breach of contract, including breach of the implied covenant of good faith and fair dealing.

The Court found that there was a valid and binding oral agreement between Simon & Partners and Brook, and that that contract provided Simon with discretion to determine the amount of Brook's bonuses, even when those bonuses were to be based on his origination and management of the Executive Matter. Op. at 11.

New York courts have held that even when a contract contemplates the exercise of discretion by one party, that party is prevented from acting arbitrarily or irrationally. *See Dalton v. ETS*, 87 N.Y.2d 384, 389 (1995) ("Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.").

Here, Simon's provision of "bonuses" based on origination were arbitrary and erratic. Indeed, Simon's largest "bonus" amount was paid *after* Brook's employment was supposedly terminated. FAC ¶ 144. And yet, after the largest payment was received from Duane Reade, Simon paid Brook *nothing*. *Id.* ¶ 219.

Counts Three and Four in the FAC both deal with this unconscionable scenario under alternative contract theories. Count Three explains how Simon's failure to pay Brook anything after receipt of the May 2012 Duane Reade payment violated an express part of the Negotiation Plan. Alternatively, Count Four asserts, consistent with the law quoted above, that Simon's non-payment breached the implied covenant of good faith and fair dealing.

**H. Additional alternative claims are asserted.**

Just because Brook's broad quasi-contract claim was dismissed does not mean that he has no avenue to relief that would be consistent with that conclusion (assuming that the Court does not change its view based on the FAC and the evidence). Other amendments include additional claims pleaded in the alternative.[11] No just reason exists to deny Brook relief that is wholly consistent with the Court's opinion construing the agreement.

Several alternative claims for breach of contract, violations of New York labor laws, and quasi-contract are based on Defendants' failure to pay Brook for his services rendered prior to July 16, 2011. It is alleged (and undisputed) that Brook provided substantial services for Simon & Partners before July 16, 2011, but that Simon & Partners did not put Brook on its payroll until that date. One way or another, Brook deserves to get paid for the work that he did—but unless Plaintiffs

---

[11] As explained above, *supra* § I(A), such alternative pleading is appropriate at this stage, because the question of what the terms were, if any, that the parties agreed to be bound by is something that the Second Circuit has made clear should be decided by the jury.

are allowed to amend (or are forced to appeal), he never will. *See* FAC Count Two (alternative quasi-contract claim); Count Five (New York Labor Law violations).

Another cause of action arises from S&P's purported termination of Brook's status as an employee without providing the required written notification under New York Labor Law § 195. By failing to provide this notification, S&P is at a minimum liable to Brook for the salary that he should have been paid from February 6, 2012 through May 24, 2012 (the date when Simon first gave written notice to Brook).[12] Alternatively, to the extent that the Court concludes that Brook remained an employee after that supposed termination date (because, *inter alia*, Brook continued to be provided with office space and health insurance), that may mean that Brook is entitled to recover his unpaid base salary for that period, since it seems New York Labor Law requires that all employees be paid at least semi-monthly. *See* N.Y. LAB § 191(1)(d).

S&P's positions with respect to the terms and dates of Brook's employment have consequences. If accepted by the Court, S&P is then subject to additional claims, including for multiple violations of New York's labor law. The FAC lays out the violations in simple and straightforward terms. FAC ¶¶ 235–66 (Count Five).

---

[12] To the extent that Defendants might attempt to claim that amendments would be barred by the statute of limitations, such arguments would be premature. *See Lopez v. Ward*, 681 F.Supp. 192, 195 (S.D.N.Y. 1988) ("If an amended pleading adds a new claim or asserts a claim against a new party and the applicable statute of limitations period has expired between the filing of the original and amended pleadings, a question arises as to whether the amended pleading relates back to the date of the original pleading. That question is governed by Rule 15(c), which by its terms, comes into play *after* a pleading is amended. When a court grants leave to amend a pleading pursuant to Rule 15(a), it does not necessarily determine whether otherwise untimely claims are saved by Rule 15(c).") (emphasis in original).

Most notable is that New York Labor Law recognizes that "bonuses" are often non-discretionary, even when tied to an employee's performance, and that in those circumstances, they constitute wages that are protected against diminution. *See generally Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 416 (S.D.N.Y. 2011). Here, the bonuses due Brook as a result of the Cuti Matter meet the definition of wages for purposes of stating a claim.

## III.    THE FRAUD CLAIMS HAVE BEEN ESSENTIALLY DROPPED

As amended, the fraud claim is substantially changed. First, it is stated only as a fraudulent inducement claim, meaning that Brook is seeking an alternative basis for rescission should the Court find that there was a contract notwithstanding the amended pleadings. Brook is not seeking double recovery for compensatory damages, and he has dropped the request for punitive damages based on allegations of fraud.

Second, the factual basis for the rescission/fraud claim is premised solely on Simon's factual misrepresentation about the nature of his firm as a "partnership" when in fact he had no partners in the ordinary or relevant sense.[13] The FAC makes clear that Brook understood S&P to be an equity partnership, and Simon caused Brook to have that mistaken belief. The FAC also elaborates on why the distinction was material, not only as a matter of law, but as a practical matter to Brook.

---

[13] As originally pled, Defendants and this Court construed Brook's fraud claim to be based on assertions of unkept promises of partnership and fair compensation. Op. at 19. This, too, was not intended. Justice would be served by allowing Brook the chance to clarify his claim.

## IV.  PEED'S QUASI-CONTRACT CLAIM HAS BEEN EASILY CURED

Peed and Simon agreed on a temporary compensation scheme that would naturally terminate when the uncertainty about what Duane Reade would pay was resolved—*i.e.*, upon receiving the first payment from Duane Reade for Peed's time. FAC ¶¶ 85–86.

By the time the payment came in from Duane Reade however, Simon was bitter indeed. His failed attempt to push Brook aside and take over the Cuti Matter had backfired: Simon was off the case entirely. *Id.* ¶¶ 112–116. Under the circumstances, Simon surely knew that he had next to zero leverage to try to negotiate a deal with Peed whereby Simon got to keep any significant portion of the profits for himself. That is presumably why he decided to avoid the negotiation by concealing the fact that Duane Reade had paid from Peed. *Id.* ¶¶ 357–365.

The original Complaint omitted these facts about Simon's behind-the-scenes scheming because Plaintiffs had originally hoped (in vain) that Simon might prefer to discuss settlement before forcing Plaintiffs to disclose more of the nasty truth about his hot temper and utter lack of integrity.

Simon's temper and lack of integrity might help explain why he breached his agreement with Peed and refused to negotiate a final agreement on Peed's compensation, but it does not excuse his doing so.

With respect to the original Complaint, this Court dismissed Peed's quasi-contract claim based on an issue that Defendants did not raise in the briefing. Op. at 13 (finding "no basis upon which the 'reasonable value' of his services can be

determined"). Accordingly, Peed never had any chance to amend in response to that issue.

The FAC fully addresses the Court's questions about the reasonable value of Peed's services. *See* FAC ¶¶ 387–91.

## CONCLUSION

The Court should grant Plaintiffs relief from the judgment and permit Plaintiffs at least one chance to amend their complaint, especially when some of the bases for dismissal were never briefed prior to the Court's order of dismissal.

Respectfully submitted,

Dated: September 18, 2018

/s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II (RM-1336)
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (646) 535-1137
Fax: (646) 355-2816
rhett@rhettmillsaps.com

*Attorney for Plaintiffs*