**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - X

BRIAN BROOK and MATTHEW PEED,     :

                                       :    Index No. 17-cv-6435 (GBD)

Plaintiffs,                   :

                                       :

vs.                            :

                                     :

SIMON & PARTNERS LLP and BRADLEY D.    :
SIMON,

                                     :

Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - -- X

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO VACATE JUDGMENT PURSUANT TO RULE 60(b), FED. R. CIV. P.

---

Kenneth C. Murphy
RIVKIN RADLER LLP
477 Madison Avenue
New York, New York 10022
(516) 357-3154 (D)
(212) 455-9555 (M)
casey.murphy@rivkin.com
*Attorneys for Defendants Simon &*
*Partners LLP and Bradley D. Simon*

October 2, 2018

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................... ii

Preliminary Statement............................................................................................................ 1

Summary of Argument .......................................................................................................... 1

Argument ............................................................................................................................... 2

I.  PLAINTIFFS' RULE 60 MOTION MUST BE DENIED .......................................... 2

    A.  Plaintiffs Have Failed to Establish Newly Discovered Evidence
        to Justify Setting Aside the Judgment................................................................ 3

    B.  Plaintiffs Have Failed to Establish Mistake, Inadvertence, Surprise
        or Excusable Neglect to Justify to Set Aside the Judgment................................. 7

    C.  Judicial Economy is Not a Basis to Set Aside a Judgment Under Rule 60(b)........ 7

    D.  Plaintiffs Have Failed to Identify Any Other Reason For Relief
        Under Rule 60(b)(6)............................................................................................ 9

II.  THE NECESSITY FOR FINALITY OF JUDGMENTS WARRANTS
    DENIAL OF THIS MOTION.................................................................................... 11

III.  THE AMENDED COMPLAINT DOES NOT WARRANT THE
    COURT'S REVIEW IN THE CONTEXT OF A RULE 60 MOTION........................... 13

IV.  EVEN IF THE COURT FEELS COMPELLED TO REVIEW THE AMENDED
    COMPLAINT, A REVIEW REVEALS THE IT STILL IS DEFICIENT ...................... 14

    A.  The Quasi-Contract Theories............................................................................... 15

    B.  The Breach of Contract Theories ........................................................................ 16

    C.  The New York Labor Law Claims....................................................................... 18

    D.  The Rescission and Fraudulent Inducement ....................................................... 20

CONCLUSION...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Life Med. Techs., Inc.,*
    135 F. Supp. 3d 185 (S.D.N.Y. Sep. 29, 2015)....................................................................14

*In re Evergreen Mut. Funds Fee Litig.,*
    240 F.R.D. 115 (S.D.N.Y/ Feb. 27, 2007) ...........................................................................3

*Fleming v. N.Y.,*
    865 F. 2d 478 (2d Cir. 1989)................................................................................................11

*Gowan v. Patriot Group, LLC (In re Dreier LLP),*
    452 B.R. 391 (Bankr. S.D.N.Y. June 16, 2011)..................................................................14

*International Minerals & Resources, Sa. v. Pappas,*
    96 F. 3d 586 (2d Cir. 1986)...................................................................................................8

*James v. Watt,*
    716 F. 2d 71 (1st Cir. 1983)................................................................................................11

*Kaplan v. Capital Co. of Am. LLC,*
    298 A.D. 2d 110 (N.Y. App. Div. 2002) ..............................................................................9

*Laurel Hill Advisory Group, LLX .v. American Stock Transfer & Trust Co., LLC,*
    997 NY.S. 2d 213 (N.Y. App. Div. 2013) ........................................................................8, 9

*Leonared F. v. Israel Disc. Bank,*
    199 F.3d 99 (2d Cir. 1999)..................................................................................................18

*Michael Coppel Promotions Pty. Ltd . v. Bolton,*
    982 F. Supp. 950 (S.D.N.Y. 1997) ........................................................................................8

*Nat'l Petrochem Co. of Iran v. M/T Stolt Shear,*
    930 F .2d 240 (2d. Cir. 1991)................................................................................................3

*Nat'l Petrochem Co. of Iran v. M/T Stolt Shear,*
    930 F.2d 240 (2d Cir. 1991).........................................................................................11, 13

*Neimaizer v. Baker*
    793 F. 2d 58 (2d Cir. 1986).......................................................................................3, 11, 14

*Rinieri v. News Syndicate Co.,*
    385 F.2d 818 (2d Cir. 1967)..................................................................................................3

*Spool v. World Child Intn'l Adoption Agency*,
  520 F. 3d 178 (2d Cir. 2007)...................................................................................14

*Trachtbel Energy Marketing, Inc. v. Suez Energy Marketing NA, Inc.*
  487 F.3d 89 (2d Cir. 2007). (*See also,* May 14 Order (ECF No. 26)) .....................17

*Varney v. Ditmars*,
  217 N.Y. 223 (1916) ...............................................................................................20

*Williams v. Citigroup*,
  659 F.3d 208 (2d Cir. 2011).....................................................................................11

**Statutes**

New York Labor Law .................................................................................................18, 19

New York Labor Laws......................................................................................................15

NY Labor Law Sec. 193 .......................................................................................15, 18, 19

NY Labor Law Sec. 195 ...................................................................................................15

NY Labor Law Sec. 198 ...................................................................................................15

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................................................................................................14

Rule 15, Fed. R. Civ. P. ......................................................................................................2

Rule 60(b), Fed. R. Civ. P..................................................................................................1

Local Civil Rule 5.3 ...........................................................................................................8

Local Civil Rule 6.3 ...........................................................................................................1

Rule 59(b) .................................................................................................................2, 4, 12

Rule 59(e) .......................................................................................................................1, 8

Rule 60(b) ......................................................................1, 2, 3, 4, 5, 7, 9, 11, 12, 13, 14

Rule 60(b)(2)......................................................................................................................4

Rule 60(b)(6)......................................................................................................................9

**Preliminary Statement**

This memorandum of law is filed in opposition to the Plaintiffs' Motion for Relief from Judgment, made pursuant to Rule 60(b), Fed. R. Civ. P. ("Rule 60(b)"). (ECF No. 41).

**Summary of Argument**[1]

On September 4, 2018, this Court denied Plaintiffs' Motion for Reconsideration, thereby denying their request to amend the complaint. In denying that motion, the Court held that granting leave to amend would promote the very "practice of a losing party examining a decision and then plugging the gaps of a lost motion for additional matters 'that Rule 59(e) and Local Civil Rule 6.3 were intended to prevent.'" *Memorandum Decision and Order* (ECF No. 40) ("September 14 Order") *quoting and citing In re AXA Equitable life Ins. Co. COI Litig,* WL 3632500 at *1 (S.D.N.Y. 2018).

Plaintiffs now, again, attempt to set aside the Judgment. This time, however, they seek to do so pursuant to Rule 60(b). In so doing, they do not address the standards of Rule 60(b) but, instead, proffer a lengthy (sixty-six pages and three-hundred ninety two paragraph), confusing and tortured Complaint that largely abandons the fraud claims and attempts to lay out multiple new claims based upon additional facts and purportedly new evidence. They entirely fail to address how, pursuant to Rule 60(b), the Judgment should be set aside but, instead, posit new legal theories that could have been presented long ago. Nevertheless, tardiness alone does not warrant denial of this motion. The motion should also be denied because of the severe prejudice to defendants to re-open this matter after so much time and the fact that the new pleading is so strained and so illogical as to be implausible on its face.

---

[1] Insofar as the Court has already issued two decisions in this matter, the facts will not be re-stated here.

In the end, nothing Plaintiffs have offered changes the simple fact that (a) Brook was employed as an associate for seven months was given, received and accepted discretionary bonuses (that he was unhappy with) and "haggled" repeatedly in an effort to convince his employer to give him more, all to no avail; and (b) that Peed was a contract attorney receiving $125 per hour for his time but who wanted more and  never received it.

## **Argument**

### I.   **PLAINTIFFS' RULE 60 MOTION MUST BE DENIED**

Plaintiffs move to vacate the judgment pursuant to Rule 60 (a motion they should have made in the first instance as pointed out by Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Reconsideration of Dismissal ("Motion for Reconsideration").  p. 7 (ECF No 35)).  Although they now properly acknowledge that Rule 60(b) applies to any request to file an amended complaint post-judgment (and not Rule 15, Fed. R. Civ. P.), they deliberately sidestep, at every turn, the exceedingly high standard that is set forth in Rule 60(b).

Rule 60(b) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment order, or proceeding for the following reasons:
>
> (1) Mistake, inadvertence, surprise, or excusable neglect;
>
> (2) Newly discovered evidence, that, with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b)
>
> (3) Fraud (whether previously called intrinsic or extrinsic), misrepresentation or misconduct by an opposing party;
>
> (4) The judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) Any other reason that justifies relief.

The Second Circuit has repeatedly stated that "[s]ince Rule (60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." *Neimaizer v. Baker* 793 F. 2d 58, 61 (2d Cir. 1986). "The rule may not be used as a substitute for a timely appeal." *Neimaizer,* 793 F. 2d at 6 *citing  United States v. O'Neil*, 709 F.2d 361, 372 (5th Cir. 1983); *Rinieri v. News Syndicate Co.*, 385 F.2d 818, 822 (2d Cir. 1967). The Court has broad discretion to deny such request so long as it sets forth the reasons for doing so. *See Nat'l Petrochem Co. of Iran v. M/T Stolt Shear,* 930 F .2d 240, 245 (2d. Cir. 1991). "Furthermore, '[w]hen the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave to amend, a court may exercise its discretion more exactingly.'" *In re Evergreen Mut. Funds Fee Litig.,* 240 F.R.D. 115, 120 (S.D.N.Y/ Feb. 27, 2007) *quoting State Trading Corp. of India v. Assuranceforeningen Skuld,* 921 F.2d 409, 418 (2d Cir. 1990).

Plaintiffs contend that they should be granted the unusual relief of leave to amend "to correct what was at worst an unintended drafting error." (Plaintiffs' Memorandum of Law in Support of Motion to Set Aside the Judgment ("Pl. Memo"), p. 6 (ECF No. 42)). What they categorize as a mere correction of an "unintended drafting error" is a lengthy new complaint, containing a plethora of new allegations and causes of action, raised for the first time post-judgment. This cannot be countenanced.

### A. Plaintiffs Have Failed to Establish Newly Discovered Evidence to Justify Setting Aside the Judgment

Plaintiffs have failed to establish that newly discovered evidence warrants a Rule 60(b) set aside. Most notably, the emails they now rely upon are emails that Brook himself had for seven years but now, all of the sudden, "with the assistance of his counsel" has reviewed. (Declaration of Brian C. Brook (Brook Decl."), ¶ 3 (ECF No. 43)). These are emails in Brook's

personal Gmail account, in other words, emails that were available to Brook (a litigator himself) *for the last seven years*. These are not, for example, some blockbuster hot documents recently uncovered from a third party or a source unavailable to Brook until now. Accordingly, the emails are not "newly discovered evidence that, with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Rule 60(b)(2). For this reason alone, this motion must be denied.[2]

Indeed, it is worth noting that none of this purportedly "new" information alters the sound findings of this Court that an oral contract existed which included the payment of discretionary bonuses as set forth in the Dismissal Order.

First, Exhibit A is an email exchange between Brook and a headhunter on the same day he accepted the offer of employment. In that email, Brook tells the headhunter he accepted a position at S&P and he tells her what the offer was: "150k. plus periodic bonuses depending on collections. His (Simon's) current associates corroborated that that's what happens. He guaranteed me I'd end up over $200K, and if Cuti stuff comes in, 'considerably' over that." Thus, this email acknowledges (1) the offer and (2) Brook's acceptance. There is nothing in this email that suggests that there would be continued negotiations or that the discretionary bonuses

---

[2] Brook no doubt planned to bring suit since his departure from Simon & Partners LLP. After his departure in 2012, Brook made demands of $633,476 and even retained counsel to assist in those demands. (Declaration of Bradley D. Simon, dated July 7, 2017 ('BDS Decl."), ¶ 33 (ECF No. 4)). He brought suit five years later just as the statute of limitations for some of his claims was about to expire. Certainly, a trained litigator such as he, knew full well the value of there emails (if there was any) and had them set aside, waiting for the day when he would bring these claims. As set forth below, the reason he never mentioned these emails previously is because they undercut rather than support his claims. Nevertheless, in a shameless Hail Mary, he pulls them out now under the feigned argument that they are new materials under Rule 60(b) that shed otherwise unseen light on the issues. They do not.

would be set according to some pre-agreed metric (despite Brook's subjective hope to the contrary).[3]

Most importantly, there is nothing in the email to suggest that Brook would have *any* say in what bonus he would receive even if the "Cuti stuff [came] in." Brook tells the headhunter that he is "still *trying* to haggle compensation." Thus, it is quite clear from that very email, that it was only a "hope" and that the express terms of the oral contract were exactly as Brook relayed them to the headhunter. As further evidence of this, Brook told his headhunter that once the issue of the payment of Cuti's bills gets sorted out, "*hopefully* he works with me more, I think I will be in a better place than now." (Brook Decl. Ex A (ECF No. 43)). In other words, the email underscores the agreement.[4]

Remarkably, Brook attempts to offer this email for the proposition "that there was no final agreement" because he was "[s]till trying to haggle compensation." (Pl. Memo, p. 14 (ECF No. 42)). While Brook may have hoped to "haggle," the email proves irrefutably that there was an express offer and acceptance without any further ongoing negotiation. It strains credulity for Plaintiffs to argue that this email demonstrates a lack of a final agreement. At best, it shows wishful thinking on Brook's part and nothing to suggest that Simon's offer was anything but firm.

Brook has the temerity in his Declaration, under oath under penalty of perjury, to state that "in response to a question about where I accepted employment, I explicitly stated that I was

---

[3] Notably, Brook did end up earning considerably over $200,000. In fact, had he accepted the final payment of $75,000, he (a seventh year associate) would have received $391, 891.89. (BDS Decl., ¶ 32 (ECF No. 4)).

[4] Indeed this email highlights the extent of Brook's conniving. He tells the headhunter "even though I won't have the leverage of choosing somewhere else, I will still have the leverage of walking away with the client. At the moment, due to also the client's antics, that's merely a mild threat." (*Id.*)

still in the process of negotiating my complete compensation package." (Brook Decl. ¶ 4 (ECF No. 43)). "Still trying to haggle compensation" after an accepted offer is very different from "still in the process of negotiating my complete compensation package." Nothing in that email exchange with the headhunter indicates that Simon was still negotiating with Brook. More importantly, his conduct in the ensuing months (*e.g.,* accepting the salary, accepting the bonuses and working) speaks volumes about the fact that an agreement was reached).[5]

Second, Exhibit C is a credit reference letter signed by Simon which Brook explains he wrote and asked Simon to sign "in connection with a personal matter." He then compares it to Exhibit B which is a similar letter which Brook asked his previous employer, Greenberg Traurig to sign. Because Brook's Greenberg Traurig letter contained the word "discretionary," and Brook's S&P letter did not, he offers this as evidence that he was entitled to non-discretionary bonuses. Of course, Brook offers no commentary between himself and Simon with respect to this letter, (because it would appear that Brook presented the letter to Simon for his signature, told him why he needed it and Simon obliged Brook and immediately signed it). Brook argues: "Just as Exhibit A supports finding that no agreement was reached, the evidence also shows that the 'bonuses' portion of the Cuti Matter Share were not discretionary. ... Brook drafted a letter stating as much in October 2011 and Simon signed it." (Pl. Memo, p. 15 (ECF No. 42)). The contention that this three line credit reference letter has any relevance, let alone proof of the awarding of non-discretionary bonuses, is absurd.

Third, Exhibit D is an email dated October 25, 2011 that Brook sent to his father. In that email, Brook complains that Simon won't negotiate with him. That is not surprising because, as

---

[5] This email also belies Brook's repeated allegation that Simon misled him and that he lost out on other employment opportunities as a result. The email conclusively reveals that Brook entered into the oral contract with his eyes wide open and knew exactly what he was doing.

his Complaint and his own email to the headhunter reveal, there was an offer and acceptance, Brook began work at S&P, S&P paid Brook and Simon had no obligation to engage in further negotiations no matter how many times Brook was "hoping to haggle compensation."

Finally, Exhibit E is an unsigned letter dated October 26, 2011 that Brook prepared but clearly never gave to Simon.  Because it is clear Simon never received it (Brook in his e email to his father was unsure whether he wanted to send it to Simon) it has no value whatsoever.  It does, however, underscore the extent to which Brook was any employer's worst nightmare, an associate who, from the time he arrived to the time he departed, did nothing but complain, haggle and attempt to renegotiate.

**B.     Plaintiffs Have Failed to Establish Mistake, Inadvertence, Surprise or Excusable Neglect to Justify to Set Aside the Judgment**

Plaintiffs do not even attempt to argue that there was a mistake, inadvertence, surprise or excusable neglect to warrant setting aside the judgment because, as they know, none exists.  (Pl. Memo, p. 5-7 ECF No. 42)).

**C.     Judicial Economy is Not a Basis to Set Aside a Judgment Under Rule 60(b)**

Rather than address the Rule 60(b) grounds, Plaintiffs argue that "permitting amendment will avoid a full-blown appeal, which has a high probability of success given the demonstrably improper inferences drawn by this Court on a motion to dismiss."  (Pl. Memo., p 7 (ECF No. 42)).  While they claim to be concerned with judicial economy, notwithstanding having filed two post-judgment motions and, now, a proposed amended complaint double the size of the original and more than fifteen months after the case was filed, it is clear that Plaintiffs' true motivation is to harass Simon enough such that he cries "uncle" and writes them a settlement check.  This can be gleaned from their memorandum of law where they concede that they had hoped that the mere

filing of their complaint would cause Simon to "prefer to discuss settlement" to avoid Plaintiffs attempt to tarnish his reputation. (Pl. Memo, p. 23 (ECF No. 42)).

In the end, contrary to Plaintiffs' threats, if one is to evaluate "judicial economy," one would conclude that (as this Court already has) "granting leave to amend would promote the very 'practice of a losing party examining a decision and then plugging the gaps of a lost motion for additional matters' that Rule 59(e) and Local Civil Rule 5.3 were intended to prevent." September 4, 2018 Order, p. 5 *citing In re AXA Equitable Life Ins. CO. COI Litig,* WL 3632500, at * 1 (S.D.N.Y. 2018). (ECF No. 40).

Furthermore, it is worth noting that Plaintiffs' proclamation of a high likelihood of success on appeal is baseless. In this regard, they announce a purported sweeping new legal doctrine that the existence of an oral agreement is not appropriate for resolution by a motion to dismiss. However, the cases cited by Plaintiffs establish no such *per se* principle. For example, in *Michael Coppel Promotions Pty. Ltd . v. Bolton,* 982 F. Supp. 950 (S.D.N.Y. 1997) the Court noted that "partial performance is an unmistakable signal that one party believes that there is a contract and the party who accepts performance signals, by that act that it also understands a contract to be in effect." *Id* at 954 (S.D. N.Y. 1997). Similarly in *International Minerals & Resources, Sa. v. Pappas,* 96 F. 3d 586 (2d Cir. 1986)*,* the court there held that "if the parties have settled on the contract's substantial terms, a binding contract will have been created, even though they also intended to memorialize it in writing." *Id.* at 593. Additionally, in their discussion of *Laurel Hill Advisory Group, LLX .v. American Stock Transfer & Trust Co., LLC,* 997 NY.S. 2d 213 (N.Y. App. Div. 2013), Plaintiffs again concoct a legal principle that they falsely claim is black letter law. Specifically, they state: "New York state courts concur that the existence of an oral agreement is a fact question that cannot be decided in a manner adverse to

the plaintiff on a motion to dismiss, even when there is a written agreement, so long as the plaintiff disputes its validity." (Pl. Memo, p. 8 (ECF No. 42)).  New York courts have made no such pronouncement.  The court in *Laurel Hill* simply held that the existence of a written agreement in that case, the terms of which contradicted an oral agreement, raised an issue of fact. Here there is no written agreement (and there never was).

Similarly, Plaintiffs also claim the existence of a sweeping legal principle under New York law with respect to employee bonuses.  They assert: "[O]nly when there is a clearly written employee handbook have courts held otherwise-on summary judgment" that the question of whether unpaid compensation constitutes a discretionary bonus is a question of fact.  (Pl. memo, p. 9 (ECF No. 42)).  Once again, no such broad principle exists.  The cases cited by Plaintiffs simply hold that employee handbooks are one factor to consider in determining a plaintiff's entitlement to bonus compensation.  For example, in *Kaplan v. Capital Co. of Am. LLC,* 298 A.D. 2d 110 (N.Y. App. Div. 2002), the plaintiff received no bonuses at all.

In the end, the discussion of Plaintiff's likelihood of success on appeal is *not* one of the grounds evaluated by a Court on a Rule 60(b) motion.  All these arguments, and all the cases cited by Plaintiffs' now in there motion were made previously (or available to them) when the underlying motion to dismiss was litigated long ago.  Essentially, they are re-arguing that which has already been addressed.

### D.    Plaintiffs Have Failed to Identify Any Other Reason For Relief Under Rule 60(b)(6).

Rule 60(b)(6) includes the catch-all that permits a party to set aside a verdict for "any other reason that justifies relief."  While not specifically stating it, Plaintiffs appear to argue now that this unusual relief of permitting a post-judgment amendment of the Complaint will be "consistent with advancing the truth, in the pursuit of justice."  (Pl. Memo, p. 15 (ECF No. 42)).

Nothing could be more disingenuous.  Plaintiffs' submission itself is littered with inaccuracies and deliberate misstatements.  More importantly, the new, revised, sixty-six page Complaint does nothing more than attempt to heap scurrilous and inflammatory accusations against Simon, a former federal prosecutor with a spotless reputation and a thirty-seven year career in practice in New York.  This win-at-all cost conduct should not be rewarded.  For instance, Plaintiffs' state that "after the largest payment was received from Duane Reade Simon paid Brook nothing."  (P. Mem, p. 19 (ECF No. 42)).  No mention is made of the fact that *by the time* this payment was received, Brook had already left the firm and taken the client with him.  Nonetheless S&P offered to pay Brook $75,000 but required him to sign a release since he had been steadfastly leveling threats against the firm.  Brook refused.  Refusing to take a payment of $75,000  does not equate to being paid "nothing."  No mention is made of the fact (as set forth in the underlying motion to dismiss) that Brook, at the time a seventh year associate, was paid a whopping $316,891.89 for seven months of work and stood to make as much as $391,891.89 for that seven month period if he accepted the final payment.  (BDS Decl., ¶ 32 (ECF No. 4)).  This would have been more than Simon, or anyone else at the firm, earned.

Most importantly, one must question how the ends of justice can be served when a litigant waits five years to file suit, litigates extensively a motion to dismiss, *has full and fair notice of the deficiencies of his pleading and waits to file that proposed Amended Complaint* not only after the judgment, not even in the first post-judgment motion, but, instead, in the *second* post-judgment motion more than *seven years* after the events in question.  These litigants are not un-educated or unsophisticated individuals; these are *lawyers* who tout themselves as handling "a wide range of commercial cases—including contract and licensing disputes, securities actions, and consumer cases—in trial courts, appeals courts, and before arbitrators," with clients that

include corporate executives, governmental officials, investment fund managers, teachers, accountants, and even other lawyers, as well as a variety of small and mid-size companies." (https://www.clintonbrook.com/brian-c-brook).

If we are to truly evaluate the "ends of justice," then there must be for Simon some finality to this stage of the proceeding.

## II.   THE NECESSITY FOR FINALITY OF JUDGMENTS WARRANTS DENIAL OF THIS MOTION

To re-open this matter would give these plaintiffs license to continue to misuse the judicial system by making endless arguments (some of which are border on the absurd).   It is well settled that Rule 60 is intended to protect the finality of judgments. *Neizmaizer v. Baker,* 793 F. 2d 58, 61 (2d cir. 1986).   *United States v. International board of Teamsters,* 247 F. 3d 370, 391 (2d Cir. 2001).   A party may not use Rule 60(b) to re-litigate the merits of his claim. *Fleming v. N.Y.,* 865 F. 2d 478 , 484 (2d Cir. 1989).

Justice Breyer likewise recognized the importance of finality of judgments in *James v. Watt,* 716 F. 2d 71 (1st Cir. 1983) when, upholding denial of post-judgment request for leave to amend, he wrote for the First Circuit:

> To require the district court to permit amendment here would allow plaintiffsto pursue a case to judgment and then, if they lose, to reopen the case byamending their complaint to take account of the court's decision. Such a practice would dramatically undermine the ordinary rules governing the finality of judicial decisions and should not be sanctioned in the absence of compelling circumstances.

*Id.* at 78.

While  the Court must set forth some basis for *why* such a motion is denied other than simply because it was not made earlier,  *See, Williams v. Citigroup,* 659 F.3d 208, 213 (2d Cir. 2011), the Court has broad discretion to deny such request so long as it sets forth the reasons for doing so.  *See Nat'l Petrochem Co. of Iran v. M/T Stolt Shear,* 930  F.2d 240, 245 (2d Cir. 1991).

Here, as set forth above, there is a significant basis upon which this motion should be denied.  Specifically, not only because they waited too long with no justification, but also (and more importantly) because of Plaintiffs' utter failure to establish any basis under Rule 60(b) to warrant this extreme remedy.  They have not shown, for example, any mistake, inadvertence, surprise, or excusable neglect. They have not established newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).  They have not set forth any fraud (whether previously called intrinsic or extrinsic), misrepresentation or misconduct by Defendants in litigating this matter.  In short, they repeatedly rely upon "demonstrably improper inferences drawn by this Court," (Pl. Memo, p. 7 (ECF No. 42)), attributed to a "confusingly drafted original Complaint," (*Id.*, p. 9) – a Complaint they, two lawyers, drafted, and that the Court's reading of their Complaint was "not what Plaintiffs intended or attempted to allege," (*Id.*, p. 12).

The prejudice to S&P and Simon *cannot be understated*.  This is a significant fact that the Court must consider in evaluating the propriety of allowing a post-judgment Amended Complaint.  In other words, it is not just that it is "too late," it is that it is so late in the game that Defendants are unjustly harmed by the delay.  It is not as though these events occurred two years ago.  For example, all of the former employee-witnesses at S&P are no longer employed there. The emails, payment records and communications are now, in some instances, seven years old and long-since archived (if available).  One is to seriously wonder *how* any of the purported witnesses regarding Brook's other potential business opportunities (e.g. the headhunter, Richard Ware Levitt, Esq.) could possibly recall the facts in question.  The alleged conversation regarding the now-detailed three-step "Negotiation Plan" happened *more than seven years ago*. Brook left S&P in May 2012, nothing prevented him from commencing his case at any time.

12

Nevertheless, not only did he wait until June 19, 2017 to commence the case, despite the repeated reminders in all of the previous court filings that the pleadings were deficient, they failed to do so until September 2018.

**III.    THE AMENDED COMPLAINT DOES NOT WARRANT THE COURT'S REVIEW IN THE CONTEXT OF A RULE 60 MOTION**

The vast majority of Plaintiffs' argument relies upon the purported legitimacy of the new claims as set forth in the Amended Complaint and arguments which they assert are now sufficiently drafted to warrant discovery.  These are arguments and submissions that could have been made at any time between July 7, 2017 (when Defendants submitted the Motion to Dismiss) and May 14, 2018 (when the court decided that motion).  (Pl. Memo, p. 10-24 (ECF No. 42)).  Indeed, the title of Point II is, "Brook's Amended Quasi-Contract Claims *Clarify Previously Confusing Pleadings*."  (Pl. Memo, p. 10) (emphasis added).  Thus, now, more than a year later, Plaintiffs begrudgingly state that their prior pleadings were "confusing" (as opposed to deficient).  While it has been stated that in a post-judgment motion to amend, it *might* be proper to take into account the nature of the proposed amendment, *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 930 F.2d 240, 245 (2d Cir. 1991), we submit that this is not such a case.  Plaintiffs are attorneys, well versed in the law.  They waited an inordinate period of time, the prejudice set forth above is substantial, they have now in their *second* post-judgment motion finally sought the proper procedure to file such a Complaint (Rule 60(b)); nevertheless, they now provide the Court with a pleading itself that is extraordinarily lengthy, very difficult to follow and substantially different than the original (and they have not even offered the Court of counsel the benefit of a redlined copy to identify the changes).  In light of the strong preference in the Second Circuit for finality of judgments, this motion can be decided without a detailed analysis of the proposed Amended Complaint.

## IV.   EVEN IF THE COURT FEELS COMPELLED TO REVIEW THE AMENDED COMPLAINT, A REVIEW REVEALS THE IT STILL IS DEFICIENT

While the Court is not required to do a line-by-line review of the proposed Amended Complaint in this context (a post-judgment motion to file an Amended Complaint pursuant to Rule 60(b)), nevertheless, a brief review reveals that it too fails to cure the many deficiencies identified by the Court in the May 14 Order.  Notably, Plaintiffs have tried to have a "do over" that is inappropriate at this juncture.  "An argument based on hindsight regarding how a movant would have preferred to have argued its case does not provide grounds for Rule 60(b) relief." *Nemaizer v. Baker,* 793 F.2d 58, 62 (2d Cir. 1986).

It is well-settled that to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face." *Abrams v. Life Med. Techs., Inc.,* 135 F. Supp. 3d 185, 191 (S.D.N.Y. Sep. 29, 2015).  "Courts do not make plausibility determinations in a vacuum; it is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Gowan v. Patriot Group, LLC (In re Dreier LLP),* 452 B.R. 391, 406-407, (Bankr. S.D.N.Y. June 16, 2011) *quoting Iqbal v. Ashcroft*, 556 U.S. 662, 679 (2009) (citation omitted).  And while courts in a 12(b)(6) motion construe the pleadings liberally, "bald assertions and conclusions of law will not suffice," because "[t]he pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Intn'l Adoption Agency,* 520 F. 3d 178, 183 (2d Cir. 2007)

To state it simply, the Amended Complaint is a meandering tome almost impossible to comprehend.  You can put lipstick and a dress on a pig but, in the end, it remains still a pig.  By the same token, Plaintiffs efforts to explain *ad nauseam* what subjectively was in the mind of

Brook or Peed, or what Brook or Peed *hoped* was to happen in the future, does not serve to overcome the deficiencies in their legal pleadings.

The following is a succinct overview of the new claims:

I.     Count One – Quasi Contract
       A.  Quantum Meruit
       B.  Unjust Enrichment
II.    Count Two – Quasi Contract Alternative Theory
       A.  Pre-Associate Compensation
       B.  Compensation for Services Note Encompassed in Associate Compensation
III.   Count Three – Breach of Contract the Negotiation Plan
IV.    Count Four – The Implied Covenant of Good Faith and Fair Dealing
V.     Count Five – Violations of New York Labor Laws
       A.  NY Labor Law Sec. 193
       B.  NY Labor Law Sec. 198
       C.  NY Labor Law Sec. 195
VI.    Count Six Breach of Contract – Alternative Theories
VII.   Count Seven – Promissory Estoppel
VIII.  Count Eight – Rescission Fraudulent Inducement
IX.    Count Nine – Breach of Contract (Peed)
X.     Count Ten – Quasi Contract (Peed)

### A.     The Quasi-Contract Theories

With respect to the new counts One and Two (the quasi contract theories), they remain legally deficient based upon a few general principles of New York common law. First, as argued both in the underlying motion to dismiss and in the reply, under New York law, a salaried employee cannot sue for unjust enrichment. (Def. Memo p. 20-22 (Point IV) (ECF No. 5); Def. Reply Memo p. 6-7 (Point II) (ECF No. 18)).[6] While the Amended Complaint tries to avoid acknowledging that Brook received a *salary* and was an at-will employee, that claim is not even remotely plausible.

Moreover, as the Court has already noted, Brook's status as an at-will employee provides another basis for dismissing his quasi-contract claims. In New York, '[i]f an employer changes

---

[6] At the risk of overburdening the Court here, the multiple cases cited in the Defendants' pervious briefs will not be cited again here in. All of the authority for this proposition has been set forth in detail for the Court twice already.

the terms ... and the employee chooses to remain in the employer's employ after being advised of that change, the employee is deemed to have acquiesced to the new terms ... and cannot later claim compensation based on the terms of the original contract." (May 14 Order, *fn.* 8 *quoting Campeggi v. Arche Inc.,* No 15-cv-1097 (PGGP, 2016 WL 493539 * 6 (S.D.N.Y. Sep. 14, 2016) (Collecting Cases)). Even now, at best, the Amended Complaint lays out examples of Brook's frustration that Simon always refused to agree to a set bonus metric. Nevertheless, despite his displeasure, and his purported belief that there was some oral agreement to the "Three-Step Negotiation Plan," by October 2011 when Brook received his second bonus (this time in the amount of $60,000) there was no agreement reached on how these bonus payments were to be determined (i.e. they were discretionary as Simon always intended), Brook accepted the payment and continued to work at S&P. (*See* Amended Complaint, ¶¶ 109-110 (ECF No. 43-6)).

**B.    The Breach of Contract Theories**

Furthermore, with respect to Counts Three and Four, the "Negotiation Plan" now forms the core of those newly drafted claims. In short, the "Negotiation Plan" theory is not plausible on its face; it makes no sense. What employer is going to agree to some three-step process with an employee to "agree to agree" in the future? What it indicates (even as drafted) was that, at best, Simon said he would listen to Brook's complaints about bonuses *that Simon gave to Brook,* and consider the issue – not that Simon was obligated, or could be forced to, at some point, tie himself to a set value that satisfied Brook's never-ending demands.

More importantly, however, this "Negotiation Plan" is just expanding on the exact argument that Brook already made in opposing the underlying motion to dismiss. There he already argued that his entire seven month term of employment at S&P was one long negotiation. (*See* Plaintiff's to Motion to Transfer and Dismiss, p. 11-16 (ECF No. 9) *see also* Defendant's Memorandum of Law in Further Support of Motion to Dismiss, p. 8-10 (ECF No. 18)). The

Court rejected this argument and the new pleading does nothing more than describe a negotiation where *none plausibly occurred.*  There was, for example, no counter-offer by Simon, no back-and-forth agreements, no comparisons to other employees set bonus structures (because none existed); instead, there was an employee hoping and, by his own statements now, attempting to leverage his relationship with the client to get more and more and more, and the employer rebuffing those requests and indicating that the employer would determine what was fair.

Finally, the new Amended Complaint does not change the fact that, "even where parties explicitly designate a material term 'to be mutually agreed upon' in the future … courts may still find the presence of a binding agreement where 'the parties intend to enter into a binding contractual relationship.'"  *Trachtbel Energy Marketing, Inc. v. Suez Energy Marketing NA, Inc.* 487 F.3d 89, 96-97 (2d Cir. 2007).  (*See also,* May 14 Order, p. 9 (ECF No. 26)).

Sadly, the Amended Complaint is nothing more than yet another step in Brook's campaign to harass, intimidate and injure Simon's reputation.  For example, the Complaint now highlights Simon allegedly becoming "completely unhinged," and then screaming, banging on his desk and accuses him of being a "Serial Breacher of Oral Arguments With Young, Skilled Lawyers."  (ECF No. 43-6, ¶¶ 152-153, p. 29).  What legitimate purpose could these allegations have?  How do these scurrilous claims further Plaintiffs' legal theories?

While the Amended Complaint is voluminous, and it is exceedingly difficult to compare the original to the new one (as noted, no redlined version was provided for the Court or counsel), one glaring reversal that is worth noting shows the bad-faith conduct exhibited here (at least by Plaintiff Brook).  Specifically, in the original Complaint, Brook described an important meeting that he had with Simon to voice his unhappiness over his bonus payments on February 6, 2012.  After that meeting, he drafted and submitted to Simon a proposed written agreement (previously

referred to as the "Brook Proposal"). In the original Complaint, Brook states, "Simon rejected Brook's proposal without reading past the first few lines: He walked into Brook's office, threw the document at Brook, and yelled, 'If what I'm offering isn't good enough, you and [the Executive] can go elsewhere.'" (ECF No. 1, ¶ 69). The Brook Proposal was previously properly provided to the Court in support of the motion to dismiss as it was referenced specifically in that pleading. *See Leonared F. v. Israel Disc. Bank,* 199 F.3d 99, 107 (2d Cir. 1999). The Brook Proposal clearly and unequivocally noted Brook's understanding, as of February 6, 2012, that he was a full-time employee, entitled to a *salary* (and not a "base" salary) and "unspecified periodic bonuses." (BDS Decl., Exhibit 5 (ECF No. 4-5)).

Now, in the Amended Complaint and in furtherance of the strained "Negotiation Plan" theory, Brook does a one hundred eighty degree turnaround. He now claims that Simon, "did not reject Brook's condition, but instead said he was still considering it." (ECF No.43-6, ¶ 138). According to Brook, Simon "kicked the can down the road." Interestingly, in the original Complaint there was no kicking the can down the road, on the contrary, the statement by Simon was "if you and the client are not happy with what I am paying you, you can go elsewhere." And, ultimately, they did. Brook's effort to rescue his claims by arguing a "negotiation" where none actually existed knows no end. [7]

### C.     The New York Labor Law Claims

Brook now posits New York Labor Law claims. The first is a claim under N.Y, LAB § 193 ("§ 193") that S&P failed to pay him "wages" in the form of bonuses. (ECF No. 43-6, ¶¶ 239-245). This theory is premised upon his underlying argument (which has been rejected

---

[7] Indeed, as set forth above, the emails that Brook has apparently unearthed in his own Gmail account also reveal that there was never a "negotiation," there was, instead, an associate who hoped to use the "leverage" of the opportunity to walk away with his client to demand more money. (*E.g.,* June 21, 2011 Email of Brook to ngable@deltaforcelegal.com: " (ECF No. 43-1)).

already by this Court) that the wages were non-discretionary.  If the wages are discretionary, an employee has no § 193 claim.

The second argument is that S&P failed to pay base salary amounts for the period from June 20, 2011 to July 15, 2011 and then from February 7, 2012 to May 25, 2012.  (ECF No. 43-6, ¶¶ 246-251).  These claims are also futile because the necessity to pay a salary is only for the period when the employee is employed.  Here, it is beyond dispute, indeed, it was acknowledged in the original Complaint that Brook commenced as an *employee* on July 13, 2011 (ECF No. 1, ¶ 38: "Brook began his employment at S&P on July 13, 2011")).  It is also undisputed (and the Court has already noted) that he stopped receiving a salary on February 15, 2012 (BDS Decl. ¶ 24 (ECF No. 4)) and he was paid for every dollar that S&P received for his work on the Cuti matter thereafter.  (*See* May 14, Order, p. 4, p. 12 (ECF No. 26)).  It is not even plausible that Brook can now allege that, after February 2012 when Simon told him he would be paid dollar-for-dollar for each and every hour he put into the Cuti matter and *after he stopped receiving his bi-monthly salary,* that he could have believed that he remained an employee of S&P.  Accordingly, that claim would be futile even if it was permitted to now be pursued.

Furthermore, even if pursuant to N.Y, LAB §§ 195(1) and (6) 1there was a viable claim that S&P was obligated to give written "notice" both upon hiring and firing (and the undersigned has not even endeavored to research that issue), the failure to do so has no damage attached to it.  This administrative error is certainly not a basis for a federal lawsuit or federal jurisdiction.  Finally, even if the New York Labor Law claims were legitimate (e.g., the base salary before hiring and after termination), the damages are less than $75,000 and this Court would not have jurisdiction.  Accordingly, the New York Labor law claims proposed would be futile in the end.

**D.    The Rescission and Fraudulent Inducement**

Brook's re-pleaded fraud claim does nothing to cure the many deficiencies previously noted by the Court.  (May 14 Order, p. 19-21 (ECF No. 26)).  This claim continues to be premised upon Brook's claim that he was defrauded in that he was deliberately mislead to believe he would become a partner.  While he has now expanded on his claim that he believed "partnership" meant "equity," it still remains the case that under New York law "a promise to give an equity interest or share of profits is unenforceable where the promise lacks definiteness as to the precise form, amount or accrual of such compensation."  *Varney v. Ditmars,* 217 N.Y. 223, 225-6 (1916).  (*See also* Memorandum of Law in Support of Motion to Dismiss, p. 25-26 (ECF No. 5)).

## CONCLUSION

Defendants are entitled to finality of judgment.  For the reasons set forth above and in the Court's earlier decision denying Plaintiffs' Motion Reargue, Plaintiff's latest post-judgment motion should be denied in all respects.

Respectfully submitted,

Kenneth C. Murphy
Rivkin Radler LLP
477 Madison Avenue
New York, New York 10022-5843
(516) 357-3154 (direct)
Casey.Murphy@Rivkin.com
*Attorneys for Defendants Simon & Partners LLP
and Bradley D. Simon*

4126510 v1