**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

BRIAN C. BROOK, MATTHEW J.
PEED, and BROOK & ASSOCIATES,
PLLC

             Plaintiffs,

v.

BRADLEY D. SIMON and
SIMON & PARTNERS, LLP,

             Defendants.

_____

Civil Action 1:17-cv-6435 (GBD)

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

Plaintiffs, Brian C. Brook ("Brook"), Matthew J. Peed ("Peed"), and Brook & Associates,

PLLC ("B&A"), as assignee of certain of , by way of First Amended Complaint against the

Defendants, Bradley D. Simon ("Simon") and Simon & Partners, LLP ("S&P"), say the

following:

### NATURE OF THE ACTION

1.      Plaintiffs Brook and Peed are attorneys who were briefly associated with

Defendant S&P in 2011-12. They worked primarily on a case that Brook brought with him from

his previous employer. Brook managed this case and was lead counsel of record in the Second

Circuit. Plaintiffs also worked on a _pro bono_ case for an indigent defendant facing charges that

would have meant a mandatory life sentence if he had been convicted.

2.      Each Plaintiff agreed to work with S&P based on preliminary oral agreements that

were expressly temporary and incomplete: Neither agreement specified a final amount of

compensation for either Plaintiff because critical information for making that determination was

unavailable. Instead, each oral agreement included two things: (1) an amount of initial,

temporary compensation, and (2) a plan to reach a final agreement at a later date after they had more information and the financial uncertainties were eliminated.

3.      The parties proceeded to practice law together based on those preliminary oral agreements, as they had to act quickly to support the needs of Brook's client.

4.      Once it became clear that Brook's case would be extremely profitable, Defendants refused to adhere to the agreed-upon plan for resolving the final amount of compensation. Defendants insisted on amending the plan to kick the can down the road. Worse, Defendants concealed material information that they were required to disclose. In short, they failed to negotiate a final resolution in good faith as they had agreed. As a result, no final and binding agreements were reached as to the amounts of Plaintiffs' compensation.

5.      Defendants have been unjustly enriched while Plaintiffs were denied the fair and reasonable value of their services. This lawsuit seeks to recover funds paid to Defendants for Plaintiffs' work, hold Defendants accountable for breaching their preliminary agreements with Plaintiffs, and recover damages with an appropriate quasi-contractual remedy.

## PARTIES

6.      Plaintiff Brian C. Brook ("Brook") is an attorney practicing law in New York, New Jersey and Washington, D.C. Brook graduated from Duke University School of Law in 2005 and then worked as a litigation associate with Sullivan & Cromwell LLP in New York City. He became a member of the New York State Bar in 2006. In 2007, he left Sullivan & Cromwell for a one-year judicial clerkship. In 2008, he re-entered private practice as a litigation associate with Greenberg Traurig LLP in New York City, where he remained employed until June 2011.

7.     Plaintiff Matthew J. Peed ("Peed") is an attorney practicing law in Washington, D.C. with the law firm Clinton & Peed, PLLC (C&P).  Peed graduated from Harvard University in 2000 and worked in a variety of public service and charitable jobs before attending law school at Duke University School of Law, from which he graduated in 2005.  After a one-year judicial clerkship, Peed joined Williams & Connolly in Washington D.C. as an associate in 2006. In 2010, he left Williams & Connolly and joined Timothy Clinton to form Clinton & Peed, PLLC.

8.     Plaintiff Brook & Associates, PLLC ("B&A") is a New York professional limited liability company, formed in June 2012. Brook is the sole member. From mid-2013 until the end of 2018, B&A was a partner in Clinton Brook & Peed, a general partnership with C&P.

9.     Brook has assigned his contract and tort claims to B&A (Brook's statutory claims under New York labor laws have not been assigned, however). Therefore, in accordance with the Federal Rules of Civil Procedure, B&A is the real party in interest and appropriately named as a plaintiff. Nonetheless, for narrative clarity, the remainder of this complaint is drafted with reference to all of Brook's claims as belonging to Brook, whether or not they have been assigned.

10.     Defendant Bradley D. Simon ("Simon") is an attorney licensed to practice in New York. He is also a citizen of New York with a residence in Manhattan. He is currently a partner in Philips Nizer LLP.

11.     Simon & Partners, LLP ("S&P" or "the Firm") is registered as an inactive Limited Liability Partnership in the state of New York, with a registered address of 30 Rockefeller Plaza, 42nd Floor, New York, New York 10112. Before it ceased operating in 2019, the Firm's primary business was the practice of law with offices in the French Building, 551 Fifth Avenue, 31st Floor, New York, New York 10176.

12.     Defendant Simon is, and at all relevant times was, S&P's sole owner.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs are currently domiciled in New Jersey and Virginia, while Defendants are domiciled in New York; and the amount in controversy exceeds $75,000.

14.     The Court has personal jurisdiction over Defendants because S&P is a registered LLP with the New York Department of State and Simon works and resides in New York.

15.     Venue in this District is appropriate under 28 U.S.C. § 1391(b)(1) because S&P, LLP and Simon are residents of this District; and under 28 U.S.C. § 1391(b)(2) based upon the substantial events occurring within the District, as detailed below.

## FACTS COMMON TO ALL COUNTS

16.     From October 27, 2008 to June 27, 2011, Brook was a full-time associate in Greenberg Traurig's New York office. In 2011, Brook had an annual salary of $230,000 plus discretionary bonus. Brook's last discretionary bonus was $45,000 in December 2010.

17.     In or about late 2010, Peed became a Partner at Clinton & Peed, PLLC in Washington, DC. Peed had no salary or guaranteed payments. He was paid solely out of the profits of the firm, if any.

### The Cuti Matter

18.     While at Greenberg Traurig, Brook represented Anthony Cuti, the former Chief Executive Officer of Duane Reade Drugstores, in connection with federal civil and criminal securities fraud charges (the "Cuti Matter"), and a then-stayed arbitration against Duane Reade.

19.     The federal cases against Mr. Cuti both began on October 9, 2008. The defense team was composed of two firms: Steptoe & Johnson and Greenberg Traurig.

20.     The criminal trial began on April 6, 2010. Brook was a key part of Cuti's trial team, billing over 1500 hours on the case within a four-month period.

21.     On June 8, 2010, after a ten-week trial, Mr. Cuti was found guilty.

22.     Mr. Cuti then asked Brook to take a leading role in appealing his conviction, which would require Brook to leave Greenberg Traurig. Brook agreed.

23.     A few months later, a key witness who had not testified at trial—the original whistleblower—came forward to accuse the prosecutors of "railroading" Mr. Cuti. He offered new evidence that he and his lawyers said had been disclosed to prosecutors before trial, but which had not been passed along to the defense in the FBI Form-302s or notes.

24.     On July 28, 2011, Mr. Cuti filed a post-trial motion for a new trial based on the statements provided by the whistleblower and his lawyers. Simon signed the motion, which was the combined work product of three firms. Simon edited only one word of the entire 25-page brief submitted by Brook. Simon told Brook that he had significantly improved upon the work done by the other two law firms.

25.     During a post-trial *Fatico* hearing to determine the amount of loss due to the crimes of conviction, the prosecutors argued that Duane Reade's private equity owner was the main victim, along with Duane Reade itself, with losses of more than $40 million. This hearing began in November 2010 and continued until June 21, 2011.

26.     On July 29, 2011, the District Court issued its *Fatico* decision, finding that the Government failed to prove any loss as a result of Mr. Cuti's conduct.

27.     Mr. Cuti was sentenced on August 22, 2011.

28.     Mr. Cuti appealed his conviction to the Second Circuit.

29.     Brook was designated as lead counsel for the appeal. Brook signed all of the filings for the appeal and made all oral arguments. Although Simon entered an appearance, Simon's name did not appear in the signature block of any substantive filings.

30.     Simon stopped working on the Cuti Matter entirely by mid-December 2011. Instead, Brook retained WilmerHale to provide the necessary appellate expertise. WilmerHale did so behind the scenes. Mr. Cuti elected to keep Brook in the lead role.

31.     After Mr. Cuti's conviction was affirmed, Brook proposed that former Solicitor General Seth Waxman of WilmerHale enter an appearance and take over the lead role. Mr. Waxman did so, filing petitions for rehearing and *certiorari*; neither was successful.

32.     Mr. Waxman sponsored and moved for Brook's admission to the U.S. Supreme Court, so that Brook's name could appear on the cover of the petition that they prepared.

33.     From 2013 through 2017, Brook also represented Mr. Cuti in two separate appeals of the restitution portion of his sentence to the Second Circuit. He and his firm did so without WilmerHale's involvement. Both appeals resulted in partial vacaturs and remands.

34.     Mr. Cuti continued to retain Brook as lead counsel in arbitration proceedings against Duane Reade. An arbitration hearing occurred in February and March 2017.

35.     As of June 2018, Brook continues to represent Mr. Cuti.

**Attorneys' Fees for the Cuti Matter Were Paid by Duane Reade**

36.     From mid-2007 through mid-2011, Mr. Cuti's attorneys' fees for the Cuti Matter had been paid primarily by his former employer, Duane Reade, which was obligated to indemnify Mr. Cuti for his "expenses (including attorneys' fees) actually and reasonably incurred by [him] in connection with the defense." 8 Del. Code § 145. Furthermore, Duane

Reade's Certificate of Incorporation and its Employment Agreement with Mr. Cuti required advance payment of such expenses as they were incurred.

37.     As a matter of practice, Mr. Cuti's lawyers submitted bills directly to Duane Reade and Duane Reade paid Mr. Cuti's lawyers directly, rather than going through Mr. Cuti.

38.     The information available to Brook in mid-2011 indicated that Duane Reade had not always made timely and complete payments. Brook was told that Duane Reade had challenged numerous charges as being supposedly unreasonable and excessive, including questioning the number of lawyers and law firms assigned to the case.

39.     Duane Reade's scrutiny of Mr. Cuti's legal expenses had sometimes resulted in significant underpayments. For example, in June 2009, Duane Reade paid just $179,617 to Greenberg Traurig for an invoice that had sought payment of $348,041 in fees and expenses—a 49% reduction.

40.     Brook's understanding was that Duane Reade had objected to Mr. Cuti having two law firms represent him at trial (Greenberg Traurig and Steptoe & Johnson), and that Duane Reade had objected to Mr. Cuti's recent retention of a third law firm, MoloLamken.

41.     By mid-2011, Duane Reade's non-payment of outstanding invoices had severely strained Mr. Cuti's relationship with MoloLamken, which Mr. Cuti had retained to prepare and file a post-trial motion for a new trial, and to represent him further on appeal if necessary.

42.     Brook and Mr. Cuti doubted whether Duane Reade would accept yet another new firm to take over the post-trial motion and appeal, and whether Duane Reade would impose conditions or limits on its future payments of attorneys' fees, if it paid at all in light of Mr. Cuti's conviction and Duane Reade's claim that Mr. Cuti owed it tens of millions of dollars.

**The Ali Matter**

43.     In or about April 2011, Peed was retained by Ali Mohamed Ali, who had recently served as the Director-General for Education in the autonomous region of Somaliland in the northern part of Somalia. The federal government had tricked Mr. Ali to come to the United States, where he was arrested and charged with high seas piracy, 18 U.S.C. § 1651. If convicted, Mr. Ali would have faced a mandatory life sentence.

44.     In or about May 2011, Peed asked Brook if he was interested in working on the Ali Matter as co-counsel, given Brook's recent experience in a federal criminal trial. Brook was interested, but Greenberg's *pro bono* chair denied Brook's request to work on the Ali Matter *pro bono* as supporting counsel to Peed. Greenberg's refusal to allow Brook to work on the Ali Matter, spurred Brook to look harder for a new firm, as the case was uniquely compelling.

**Brook Nearly Started His Own Firm to Work on the Cuti and Ali Matters**

45.     In Spring 2011, Brook's search for a new firm yielded several opportunities. By mid-June, due to a large law international firm's conflict preventing him from working on the Cuti Matter, Brook narrowed his choice down to either starting his own firm or joining S&P.

46.     After Peed started his own practice outside of a major law firm, Peed encouraged Brook to leave Greenberg to do the same thing. Peed said that there would be great opportunities to work together because of his partner's business connections in New York. On April 26, 2011, Brook emailed Peed, saying "So I'm getting very close to striking out on my own after all. Do you guys still think you might find it helpful to have someone in NY to assist?" Peed responded, "Definitely." Peed expressed interest in assisting with the Cuti Matter and said that he would do so on the same terms that he had agreed to with his current partner: 60% of Peed's billed fees would go to Peed, while 40% would go to the originating/supervising attorney (Brook).

47.     On June 14, 2011, Brook called Richard Ware Levitt ("Levitt") of Levitt &
Kaizer, a small criminal defense firm that had come highly recommended. Brook inquired about
whether he (a) was interested in the Cuti Matter and (b) was interested in working with Brook.
After a phone call, Levitt expressed interest in working together, and they arranged a meeting.

48.     On June 16, 2011, Brook met with Levitt in person. Levitt advised Brook that
although he was interested in the Cuti Matter, the firm could not commit to giving Brook work
enough to offer Brook employment. Levitt nonetheless offered to co-counsel with Brook on the
Cuti Matter and help Brook start his own firm. Levitt offered to let Brook work out of his firm's
office space. Levitt explained that, upon starting his own firm, Brook would be able to collect all
of his own billings (they discussed the rate of $500 per hour). In that situation, however, Levitt
would not pay Brook any origination credit or referral fees because Brook would not technically
be associated with his firm.

49.     After meeting with Levitt, Brook was satisfied with the opportunity to start his
own firm and to work with Levitt on the Cuti Matter, while also being able to work with Peed on
the Ali Matter.[1] Accordingly, Brook informed the large international law firm that he declined its
offer of employment and finalized his plans to leave Greenberg Traurig by June 27, 2011.

50.     That same day, Brook also met with Defendant Simon for the first time.

**Brook's Discussions with Simon Led to His Agreement to Join S&P, Instead
of Starting His Own Firm, Despite Uncertain Compensation**

51.     On June 14, 2011, Brook spoke to Bradley Simon over the phone about the Cuti
Matter and about Brook's intention to leave Greenberg Traurig. During the call, Simon stated
that he had just hired a second associate a few weeks earlier and that he could not provide

---

[1] The same day, Brook also met with Bracewell & Giuliani ("Bracewell"). A few days later, the Bracewell partner
with whom Brook was meeting declined to represent Mr. Cuti, but he offered Brook the possibility of using its New
York office as a "home" for Brook to continue to represent Mr. Cuti.

enough work to bring Brook on as another associate. Brook explained that he expected his time would be devoted to the Cuti Matter for the foreseeable future, and that he would be satisfied with deriving his income solely from revenue generated by the Cuti Matter. Simon expressed interest in such an arrangement and the parties agreed to meet in person.

52.     On June 16, 2011, Simon and Brook first met one-on-one, then Mr. Cuti joined along with Simon's "partner" Brian Waller, and then Simon and Brook met one-on-one again. Brook and Simon also met again on June 17.

53.     During the meetings, Brook and Mr. Cuti informed Simon in detail about the history of payment issues with Duane Reade. They wanted to make sure Simon knew what he was getting into because it had led to problems with Mr. Cuti's previously retained lawyers. Simon told Brook that he would gladly have Brook join S&P if Brook successfully ensured that Mr. Cuti retained S&P, because otherwise Simon could not pay Brook anything.

54.     During the meetings on June 16 and 17, Brook and Simon also discussed Brook's other options, such as starting his own practice and working with Levitt and Peed,

55.     On or before June 19, 2011, Brook agreed to work with S&P, although the terms of his employment were then completely undecided.

56.     On June 19, 2011, Brook drafted an engagement agreement between Mr. Cuti and S&P. Brook set his own billing rate at $500 per hour, and he also set the billing rates for the other S&P lawyers.

57.     On the morning of June 20, 2011, Mr. Cuti executed the engagement agreement with S&P.

10

58.     Brook began billing time for S&P on the Cuti Matter immediately on the morning of June 20, 2011, starting with another meeting with Simon and Mr. Cuti, this time to discuss substantive matters relating to his criminal case.

**The Parties Deferred Negotiating the Specifics of Brook's Compensation, But Reached Agreement on a Procedure for Future Negotiations (the "Negotiation Plan")**

59.     Late afternoon on June 20, 2011, Brook and Simon met again without Mr. Cuti to discuss Brook's employment terms.

60.     Simon proposed that Brook's compensation be expressly variable, primarily based on a non-discretionary portion of Cuti Matter revenue generated, plus potential discretionary bonuses for Brook's work on other Firm matters.

61.     Specifically, Simon proposed that Brook's portion of the Cuti Matter revenue (referred to herein as Brook's "**Cuti Matter Share**"), include an amount proportionate to Brook's own billings plus a percentage of other lawyers' billings. Simon would pay the Cuti Matter Share to Brook in two ways: (1) regular semi-monthly payments (the "base salary") and (2) periodic, non-discretionary supplemental payments (the "bonuses").[2]

62.     In order for Brook legally to be an employee of S&P, New York Labor Law required S&P to pay Brook at least semi-monthly—thus necessitating some form regular payroll, notwithstanding the absence of agreement on the full amount of compensation. *See* N.Y. LAB § 191(1)(d).

63.     The "Base Salary" functioned as a draw against the Cuti Matter Share, and was expressly not to be a factor in the final amount of Brook's compensation:

---

[2] During their discussions, Simon generally referred to all variable payments as "bonuses." Simon expressly distinguished (a) the non-discretionary "bonus" payments based on revenue from associate-originated matters from (b) the discretionary bonuses that were typically paid to others at the Firm. Simon described another associate's recent origination of a case as an example. *See infra* ¶¶ 174–176.

    a.   The "base salary" of $150,000 per year was presented not as a normal salary, but rather as essentially a draw against the Cuti Matter Share.

    b.   Simon apologetically described the base salary amount as "artificially low" and assured Brook it would have "no bearing" on Brook's full compensation, assuming that at least some of the Cuti Matter fees were paid.

    c.   Based on Simon's description, Brook did not attempt to negotiate the amount of the base salary.

    d.   Brook agreed that payments he received as part of his base salary should count towards the Cuti Matter Share (at least as long as he was not working on other matters). Otherwise, it could lead to the unfair result of Brook earning more money if Duane Reade took longer to pay.

64.    The "bonus" payments relating to the Cuti Matter were non-discretionary payments that S&P had to make to Brook as necessary to complete payment of the Cuti Matter Share to Brook. In terms of timing, such "bonuses" were to be paid periodically, both when money came in from the Cuti Matter, plus more at year end.

65.    The amount of the Cuti Matter Share was left unspecified, nor was there a proposal by Simon as to the formula (e.g., a percentage of collections) for calculating the amount. Brook had a proposal that he asked Simon to consider, but Simon said that he did not want to hear it yet.

66.    Instead, Simon requested that they hold off on agreeing to any specific numbers because of the significant uncertainties about the Cuti Matter, including but not limited to the potential difficulties in receiving full and prompt payment from Duane Reade.

12

67.     Simon proposed the following procedure (the "**Negotiation Plan**") to ensure that the parties were committed to negotiate the Cuti Matter Share on fair terms at a future date:

      a.   **Step One:** After Duane Reade paid S&P, Simon would direct deposit the sum of money that Simon believed, in good faith, was fair to complete the Cuti Matter Share, taking into account the circumstances that existed at that time.

      b.   **Step Two:** With the money in hand, Brook would decide if he agreed that Simon's proposed Cuti Matter Share was fair and satisfactory.

      c.   **Step Three:** If unsatisfactory, then Brook and Simon would proceed to negotiate "fixing" the Cuti Matter Share so that they both agreed it was fair. It was implied that Simon and Brook would conduct any such future negotiations in a good faith effort to reach an agreement.

68.     Brook believed that the Negotiation Plan was a reasonable way to resolve the tension between (a) Mr. Cuti's desire to engage counsel promptly in order to file a post-trial motion, and (b) Brook's desire to avoid leaving money on the table should Duane Reade turn out to be more cooperative in paying Mr. Cuti's legal bills than anticipated. Brook especially liked Simon's proposal to pay Brook some amount of money before engaging in negotiations, since that would diminish Simon's financial leverage over Brook and help to ensure that the ultimate terms were not the product of undue economic pressure.

69.     Brook raised the possibility that they could not reach an agreement, and Simon assured Brook that he was always fair and that working for S&P would be the best option financially, and that Brook would earn more than if he started his own practice and got paid his full hourly rate, which Brook said should be $500 per hour. Among the advantages of joining

S&P that Simon described were earning origination credit for other lawyers' work, as well as avoiding significant administrative hassle and direct overhead expenses.

70.     To be clear, Simon's proposal was merely that he would determine the *initial* payment(s) to Brook (Step One in the Negotiation Plan). And though he had discretion to determine that initial amount, the discretion was not unfettered: Simon was required to pay the amount that he believed, in good faith, was fair. Moreover, Simon's definition of fairness was circumscribed by his assurance to Brook that Brook would make more money by joining S&P than he would starting his own firm. By contrast, as to the final amount of Brook's Cuti Matter Share, Simon explicitly proposed to leave it temporarily unspecified, to be finalized through a bilateral agreement later. Simon never sought unilateral authority or discretion to determine the final Cuti Matter Share, and Brook certainly did not agree to give Simon any such authority or discretion.

71.     Brook also inquired about Simon's willingness to support him working on the Ali Matter. Simon promised that Brook would have S&P's "full support" for the Ali Matter.

72.     On June 20, 2011, based on Simon's verbal promises and assurances, Brook verbally accepted Simon's preliminary employment terms, including the Negotiation Plan for reaching an agreement on final terms.

73.     After reaching the preliminary agreement, Brook gave notice of resignation to Greenberg Traurig within an hour. And over the next two days, Brook informed Peed, Levitt, and Bracewell about his decision to join S&P instead of starting his own law practice.

**Brook Started Working for S&P Before His Base Salary Began**

74.     Starting on June 20, 2011, Brook began recording his time spent working with Simon on the Cuti Matter.

14

75.     On June 21, 2011, Brook attended another day of testimony in *Fatico* hearing.

76.     Brook began moving files into his new office at S&P on June 27, 2011, before leaving for an important trip abroad. Brook continued working on the Cuti Matter from abroad.

77.     Brook began working in his office on S&P on July 13, 2011.

78.     On the first day, Brook signed up for direct deposit, meaning that payments from S&P were deposited directly into Brook's checking account without any affirmative action by Brook to accept the funds.

79.     Brook also enrolled in a health insurance plan, paid for by the Firm.

80.     On or about July 29, 2011, Brook received his first paystub/direct deposit from S&P, in the gross amount of $6,250 for the period from July 16 through July 31, 2011.

81.     Brook recorded 52.3 billable hours to the Cuti Matter from June 20 through July 15, 2011. But even though S&P included most of those billable hours on the first Cuti Matter invoice to Duane Reade, Brook did not receive any payments or benefits for that work.

82.     Based on Brook's understanding that his base salary payments would have no bearing on his ultimate income, but instead were just a draw against his Cuti Matter Share, Brook did not object to not receiving any payroll payments for the pre-July 16 period.

### Peed Joins S&P

83.     In or about mid-September 2011, Peed, Simon, and Brook attended a meeting in Washington, D.C. with the prosecutors for in the Ali Matter. After the meeting with the prosecutors, Simon and Peed discussed potential terms for working together on the Cuti Matter.

84.     At the time of the meeting, Duane Reade was already late in paying the first Cuti invoice.

85.    Simon related to Peed his concern that Duane Reade was already behind in paying its bills and had not paid any of them yet. Simon and Brook both stated that they believed it was likely that Duane Reade was scrutinizing the bills to challenge specific line items, and perhaps billing rates as well.

86.    Simon expressed concern as to whether Duane Reade would pay Peed's $450 hourly rate. Simon said he did not plan to try to bill Duane Reade for Peed "getting up to speed," including tasks like reviewing the trial record.

87.    Nonetheless, Simon told Peed that he believed that Peed "should be paid for every hour worked regardless" of whether Duane Reade paid for Peed's time. Simon also said that Peed "should not have to wait for Duane Reade to pay its bills in order to receive compensation."

88.    Based on the foregoing, Simon presented the following offer:

    a.   S&P would pay Peed a temporary rate of $125.00 per hour for his time spent on the case until such time as it was determined whether Duane Reade would pay Peed's time in full at the rate of $450.00 per hour. S&P would promptly pay Peed out of its own funds after he submitted his time sheets to S&P, and the payments were not contingent upon receiving payment from Duane Reade.

    b.   Simon would inform Peed when Duane Reade paid the first bill with Peed's time on it, and at that point, Simon and Peed would negotiate an increase of Peed's hourly rate in good faith, including potentially renegotiating the amount that Peed was paid for work already completed.

    c.   S&P would provide Peed with health insurance and office space in D.C.

89.    Relying upon Simon's representations and promises, Peed accepted the terms of Simon's offer except for the health insurance and office space, which Peed already had.

90.     Peed began working on the Cuti Matter on September 22, 2011.

**Miscellaneous Facts About Cuti Matter Bills**

91.     Attached hereto as "**Exhibit A**" is a chart detailing the Cuti Matter fees billed by S&P and the dates of Duane Reade's payments.[3] The chart does not reflect cost recovery.

92.     Brook was substantially involved in preparing the S&P's first three invoices for the Cuti Matter. Brook also was S&P's primary interface with Mr. Cuti's Delaware counsel to try to ensure that Duane Reade made timely and complete payments.

93.     On November 1, 2011, Waller sent Brook a draft of S&P's fourth Cuti Matter invoice for Brook to review. Fifteen minutes later, Brook provided a comment and a question. Brook commented that the time billed by a junior associate "seems excessive for the tasks involved" and proposed reducing it. Brook also asked if he "already wrote off some of Matt [Peed]'s time spent getting up to speed?" Waller responded over 20 hours later, "I did not write off Matt's 'getting up to speed time. . . . Am I missing something?" Brook then met with Waller in person and Brook informed him about the negotiations between Simon and Peed.

94.     S&P proceeded to bill essentially all of Peed's submitted time, including numerous hours of "getting up to speed time" spent "review[ing] trial transcripts and accompanying exhibits," writing off only 0.4 hours of his submitted time.

95.     After Brook questioned S&P's failure to write-off any significant amount of Peed's time, S&P stopped allowing Brook to review the Cuti invoices from that point forward.

---

[3] In 2013, Brook finally obtained copies of all Cuti Matter invoices issued by S&P. Brook more recently obtained information about when Duane Reade paid the invoices.

96.     S&P did not tell Brook that it had made any decision to stop involving Brook with the Cuti invoices, let alone say when that decision was made and why. As a result, Brook held the mistaken belief that S&P had fallen behind in sending its invoices to Duane Reade.

### After Duane Reade Paid, Simon Kicked the Can Down the Road, Again

97.     Duane Reade paid Invoices 1 and 2 in mid-September 2011. *See* Ex. A.

98.     On September 30, 2011, S&P made a "bonus" direct deposit to Brook of $35,000. This payment was expected by Brook pursuant to Step One of the Negotiation Plan.

99.     The September 30 payment was much smaller than Brook had expected, especially based on repeated statements from Simon in June 2011 about wanting to help Brook become "rich." They were so far apart that Brook became seriously concerned about whether Simon and he could reach an agreement through negotiations, and that if not, Brook would have to leave S&P, which he did want to do. Brook attempted to involve Waller to help, since by then they had built a strong working relationship and trust, and Brook believed that Waller would advocate for Simon to do what was necessary to keep Brook at the Firm.

100.    Brook asked Waller to help him deliver the message to Simon, pursuant to Step Two of the Negotiation Plan, that he was dissatisfied with the amount that Simon had paid. Waller first spoke with Simon as a neutral intermediary, and then advised Brook that he should meet with Simon directly.

101.    On or about October 25, 2011, after some difficulty getting Simon to sit down and talk numbers, Brook finally met with Simon. They engaged in an extensive and relatively civil debate, only the most relevant portions of which is recited herein.

102.    Unfortunately, Simon made clear at the outset that he was not prepared to proceed with Step Three of the Negotiation Plan to finalize the Cuti Matter Share. Simon began by

stating that Brook's concerns were "premature" and assured Brook that he would pay him a "much larger" year-end Cuti Matter Share "bonus" payment. Simon said that he had not intended to proceed to negotiations to finalize the numbers with Brook until after year end.

103.    Brook objected to kicking the can down the road again. By then they knew that Duane Reade would pay the Cuti Matter bills. Brook explained that he had delivered even more value than either of them had expected, since Duane Reade had not pushed back on the amounts of S&P's bills.

104.    Brook also reminded Simon of his June 20 promise that Brook's joining S&P would be more financially rewarding than if Brook started his own law firm. Based on that, Brook said that he understood Simon to be saying that Brook would earn at least as much as if he were paid his hourly rate for the Cuti Matter.

105.    Simon purported to explain how he had arrived at such a small Cuti Matter Share payment. He said it was based on his "long term" view, and specifically his expectation that he might pay Brook's base salary for another three or four years after the Cuti appeal is filed.[4]

106.    Simon's purported "long term" view was based on faulty logic: It assumed that Brook was interested in remaining with S&P even if he was not working on any cases or generating any revenue. Brook never had any desire or intention to be in such a position.

107.    In response, Brook proposed eliminating his base salary, as he had not insisted upon one in the first place. Brook was willing to be paid only if and Brook delivered value by generating actual revenue for the Firm, assuming he was compensated fairly for doing so.

---

[4] Brook's understanding at the time was that equity partners in a law firm did not have any amount of guaranteed income, but that income partners or non-equity partners did receive a guaranteed amount of income. Accordingly, Brook interpreted Simon's statement that he expected to pay Brook a base salary for another three or four years as an indication that Simon would not consider Brook for partnership for another three or four years.

108.     By the time of this meeting, Simon had assigned Brook to several non-Cuti matters. Simon said that Brook needed to be on salary to keep working on those matters, as Simon wanted Brook to do because he was doing exceptional work. Brook proposed that Simon could pay him by the hour for non-Cuti work and still turn a tidy profit. Though Brook did not know it at the time, Brook's billing rate on those non-Cuti matters was just $250 per hour—*half* his rate billed and paid for his work on the Cuti Matter.

109.     After more back and forth with Brook, Simon expressed his willingness to think more about his own expectations and to reconsider them before their next discussion. Simon also expressed willingness to pay Brook larger amounts earlier, including in the next Cuti Matter Share "bonus" payment.

110.     Simon proposed that they continue under the terms of the Negotiation Plan with the clarification that Step One was not complete until after at least two more initial "bonus" payments were made: (1) one on the next payroll and (2) another at year end.

111.     Although Brook was encouraged by Simon's conciliatory tone, Brook left the meeting frustrated and reluctant to proceed further on their preliminary agreement. That evening, after discussion with Peed and others, Brook decided to wait and see how much Simon paid with the next payroll, since it was only a few days away.

112.     On October 31, 2011, Brook received a second supplemental Cuti Matter Share payment. The amount of $60,000 was significantly larger than the previous supplemental payment of $35,000, even though the amount paid by Duane Reade in October ($116,617) was less than half the amount paid by Duane Reade in September ($256,105).

113.     The increased payment convinced Brook that Simon was sufficiently serious about continuing to negotiate Brook's compensation in good faith that Brook elected to continue

working at S&P with the Negotiation Plan. Brook told S&P that he would remain at S&P to complete the Cuti Matter appeal brief, which was due at the end of January 2012.

**Simon Got Upset After Unsuccessfully Attempting to Take Over the Cuti Matter**

114.    On November 15, 2011, Brook argued Mr. Cuti's motion for bail pending appeal before the Second Circuit Court of Appeals. The argument was unsuccessful, and Mr. Cuti was understandably upset about the realization that he would have to report to prison in a few weeks.

115.    Simon attempted to take advantage of the lost argument to convince Mr. Cuti replace Brook as his lead counsel for the merits appeal, which still had yet to be briefed.

116.    Simon even went so far as to misrepresent his knowledge and experience to Mr. Cuti. For example, during a meeting immediately following the bail argument, Simon overstated the extent to which he understood Mr. Cuti's case by claiming to have "read" the entire trial record, when in fact he not read any of it.[5]

117.    Simon did not succeed in his attempt to take over the Cuti Matter. Due to his dishonesty with the client, Simon lost having even an advisory role.

118.    In or about late November, Brook began looking for a different experienced criminal defense attorney to replace Simon as an advisor on the Cuti Matter. At Brook's recommendation, Mr. Cuti retained a group of attorneys at WilmerHale who had recently successfully overturned a similar securities fraud conviction in the Ninth Circuit.

119.    Simon ceased billing time to the Cuti Matter entirely after December 16, 2011.

120.    Brook did not receive a "bonus" payment at year end. Instead, Brook received two paystubs for December 30, 2011, both of which reflected direct deposits of "regular" earnings. One was the usual amount of $6,250, while the second was in the amount of $20,000.

---

[5] The falsity of this statement is demonstrable from the non-privileged bills submitted to Duane Reade.

Other S&P employees said that Simon paid them year-end bonuses with personally delivered live checks rather than through direct deposits. Brook received no such check.

121.    Brook did not know what to make of this, and Simon did not explain it. After discussing the situation with other employees, including Waller, Brook inferred that it was not intended to be the complete year-end bonus that Simon had promised, and that more Cuti Matter Share payments would come later, because Duane Reade was again behind on making payments.

122.    Based on the totality of the information provided by S&P to Brook and Peed, Brook and Peed were led to believe that Duane Reade had made no payments since October.

123.    In fact, they were wrong: Duane Reade had paid Invoice 4 on December 2, 2011.

124.    Simon failed to disclose Duane Reade's payment to Peed, even though Simon had promised to do so pursuant to the terms of their preliminary agreement.

125.    Simon's failure to disclose the Duane Reade payment was intentional.

126.    Simon actively concealed the Duane Reade payment by, among other things, making only a small additional payment to Brook at year end characterizing it differently than any other bonus payment ever made by S&P, either to Brook or to anyone else at S&P.

127.    On information and belief, Simon concealed the December payment because he had decided to renege on his obligation to negotiate final agreements with Brook and Peed.

128.    Bitter about being essentially replaced by Seth Waxman and no longer having a substantive role in the Cuti Matter, Simon avoided talking to Brook entirely from approximately the last week of December through the entire month of January.

129.    By the time Brook realized that Simon was intentionally avoiding him, Brook did not seriously consider leaving S&P because of his obligations to Mr. Cuti, since his appellate brief and appendix were due on January 31, 2012. At that point, Brook could not realistically

replace Waller or the S&P associate who had invested months of time becoming familiar with the case. Nor could Brook afford to spend time looking for alternative office space, if it were even possible to move into a new office and acquire the necessary furniture, supplies, and equipment on such short notice.

130.    After receiving a *sua sponte* extension from the Second Circuit, the Cuti appellate brief was filed on February 3, 2012.

**Simon Terminated Brook's Employment (Sort Of, and Without Telling Him)**

131.    With the appellate brief complete, no significant Cuti Matter work was anticipated until June 2012, when the Reply to the Appellee's Brief would need to be drafted. In the meantime, Brook intended to turn his day-to-day focus onto the Ali Matter, which was then still in the early stages, prior to the pretrial motion deadline.

132.    On or about February 6, 2012, Brook met with Simon in Simon's office. Simon stated that he wanted Brook to stop receiving any base salary and instead to receive one hundred percent of what he billed on the Cuti Matter going forward.

133.    Brook rejected Simon's request as stated because, among other things, it did not resolve the still-outstanding issue of Brook's Cuti Matter Share, which by that point was an issue of receiving fair compensation for prior work performed. Brook explained, Simon's proposal would be simply selfish and fundamentally unfair to Brook after all the hours he had just put in.

134.    Brook also pointed out that Simon's proposal was missing two things that had been explicitly discussed and agreed upon in principal back in June 2011:

        a.   First, it did not account for Simon's promise that Brook would receive origination credit for work performed by others.

      b.   Second, removing Brook's salary from that point forward, when he was finally

            turning to the Ali Matter, would be contrary to Simon's promise that S&P would

            provide its "full support" for the Ali Matter.

135.    Brook countered with an explicit condition: He would agree only if the arrangement was made retroactive, covering the time since October when Brook had proposed a similar arrangement and Simon had delayed resolving it instead.

136.    Simon did not reject Brook's condition, but instead said he would think about it.

137.    After more than a week passed and Simon refused to give Brook an answer, Brook presented Simon with a proposed written employment agreement to finally resolve the financial terms of the relationship, both past and future. Aware by then that Simon had a bad temper and often behaved erratically and irrationally, Brook expressly wanted to avoid a lawsuit. Brook presented this proposed agreement in an attempt to compromise his potential claims against Simon, in the hope that Simon would at least present a concrete counteroffer.

138.    Notably, the draft agreement's recitals also reflected Brook's mistaken belief that the Cuti Matter "ha[d] not resulted in cash flow for the Firm since October 2011." Consistent with Simon's intent to deceive, Simon did not attempt to correct Brook's mistake.

139.    Simon reacted quite poorly to Brook's first attempt to present a written agreement (especially since he is a lawyer).  He rejected Brook's written compromise proposal and reasserted that he was standing by his offer to pay Brook 100% of his billed fees.

140.    But Brook again stated his condition of retroactivity, to ensure that Brook was fully and fairly paid at least for the hundreds of hours billed for the Cuti Matter up to that point.

141.    Simon again did not reject Brook's condition, but instead indicated that he was still considering it. Thus, Brook's attempt to finally resolve the still-open issue of his

compensation from the Cuti Matter revenue was again thwarted as Simon once again kicked the can down the road.

142.     Simon never provided a verbal response to Brook's counteroffer with the condition that he be paid in full for the Cuti Matter hours that he billed since October 2011.

143.     On or about February 29, 2012, Brook received a paystub indicating that Brook's base salary had been terminated on or about February 17, 2012.

144.     After his base salary was terminated, Brook continued to have access to his office at S&P' Fifth Avenue location and to receive health insurance paid for by S&P.

145.     When Brook attempted to retain a new client, who was referred to him by Mr. Cuti, Simon prevented Brook from doing so, expressing concerns about S&P's liability.

146.     When Brook submitted a loan application on or about April 12, 2012, he stated that he was employed at S&P. He believed at the time that his statement was true. At that time, Brook was also at best only vaguely familiar with the concept of an independent contractor, and he was not aware that it was not a type of employee.

147.     On or about April 16, 2012, S&P gave Brook a check in the amount of $105,254.64 (the "**April 2012 Payment**").

148.     S&P offered no explanation for how the April 2012 Payment was calculated.

149.     The April 2012 Payment was almost exactly 60% of Brook's time billed on the Cuti Matter from October 20 to December 19, 2011.

150.     On information and belief, the $165.36 difference between 60% of Brook's time ($105,420) and the April 2012 Payment was due to S&P deducting Ali Matter expenses that Brook had submitted to S&P for reimbursement.

151.    Unlike all prior payments made to Brook, the April 2012 payment was made by check, and not made through a payroll service direct deposit.

152.    On or about May 21, 2012, Brook's bank contacted S&P to verify Brook's employment in connection with Brook's loan application. S&P told the bank that Brook was not an employee of the Firm. Brook's loan was denied.

153.    Upon learning of S&P's response, Brook began researching the legal definitions of and distinctions between employees and independent contractors.

154.    On May 22, 2012, Brook confronted Simon about his position that Brook was not an employee. Based on his research, Brook argued that he was still an employee of S&P, and that Simon was violating federal tax laws by claiming that Brook was not an employee.

155.    Apparently, this caused Simon to become completely unhinged.

156.    On the morning of May 23, 2012, Simon called Brook into his office and proceeded to scream, bang on his desk, and hurl insults at Brook for nearly ten minutes. Simon also made ad hominem attacks against Peed.

157.    After Brook again mentioned the employee-contractor issue and specifically stated that being given an office without charge was a significant factor against Simon's position, Simon's solution was to instruct Brook to vacate his office by the end of the day. Simon told Brook that he could continue to work with S&P on the Cuti Matter, but that Simon would manage the case. Later that day, Simon repeated this instruction by email and stated that Simon would make "all staffing decisions with respect to the reply [brief]" that would be filed in June.

158.    In or about January 2013, S&P reported the April 2012 payment on a 1099-MISC as "non-employee compensation"; i.e., a payment to an independent contractor, rather than on a

W-2 as a payment to an employee, even though Brook had performed the work associated with the April 2012 payment while he was still treated as an employee of S&P.

159.    S&P's classification of the April 2012 payment as non-employee compensation caused Brook to incur additional tax liability, including self-employment taxes, and thus reduced his take-home pay significantly more than if the payment had been reported as employee income.

160.    New York Labor Law § 195(6) required S&P to provide Brook with written notice of his termination within five business days, and that notice was required to specify "the exact date of such termination."

161.    S&P never provided Brook with any written notice indicating that his employment was terminated at any date in February 2012.

**S&P Violates the Negotiation Plan to Gain Leverage and Force a Cheap Settlement**

162.    On June 11, 2012, Murphy told Brook by phone that Duane Reade had paid over $500,000 in outstanding bills since Brook's departed.

163.    Murphy conveyed to Brook that S&P would pay Brook $75,000—less than 15% of the gross amount received from Duane Reade in May 2012, and less than 30% of Brook's own billings—but only *if* Brook signed a full general release.

164.    Brook rejected the offer immediately over the phone.

165.    Murphy protested: "You don't have any leverage." Murphy thus confirmed that Simon's intention was to breach the agreed-upon procedure and withhold any payment entirely in order to force Brook to agree to final terms that were unfair and significantly lower than what he had ever indicated were acceptable to him or what Simon himself had promised.

166.    For the last two invoices issued by S&P for the Cuti Matter, most—but not all—
of the billed time was Brook's. Nonetheless, in June 2012, S&P paid Brook *all* of the money
received from Duane Reade for the invoices: 100% of his time *and* 100% of Waller's time, too.

**Mr. Cuti Stuck with Brook and Peed, and Duane Reade Paid Their Full Rates**

167.    On May 25, 2012, Brook conveyed to Simon a written Notice of Termination of
Representation from Mr. Cuti, who chose to retain Brook's newly formed firm, Brian C. Brook
& Associates, PLLC.

168.    Brook continued to represent Mr. Cuti after leaving S&P. He engaged Peed as Of
Counsel to Brian C. Brook & Associates, PLLC, primarily to assist with the Cuti Matter. Peed
received hourly payments from Brook equal to 60% of his billings, i.e. $270/hour (60% of $450).
Brook negotiated the same split percentage with Peed's then-partner, Timothy Clinton, as well as
Ryan Bates, a 2006 Duke Law graduate who provided additional assistance on the Cuti Matter in
later years.

169.    Duane Reade continued to pay Brook's and Peed's full hourly rates for the Cuti
Matter ($500/hour and $450/hour, respectively, for 2012) after they stopped working with S&P.

170.    The fair and reasonable value of Brook's and Peed's legal services in connection
with the Cuti Matter in 2011–12 is fairly measured by the amount paid by Duane Reade pursuant
to Brook's engagement agreement with Mr. Cuti. This was fair and reasonable because it
constituted a contemporaneous, arm's length transaction with a third party. Moreover, this third
party was in fact Mr. Cuti's adversary, and it routinely challenged bills that were submitted by
Mr. Cuti's lawyers on the basis that they were not reasonable, and Duane Reade was only
required to pay Mr. Cuti's reasonable fees and expenses.

171.    Alternatively, the reasonable value of Plaintiffs' legal services may be measured by the generally accepted lodestar method and/or by expert testimony about the prevailing rates for similar services in the relevant metropolitan area.

172.    The actual, negotiated split of Cuti Matter fees between Brook (40%) and others (60%) reflects the fair and reasonable value of Brook's role in originating and managing the Cuti Matter. Alternatively, the reasonable value of Brook's origination and management of the Cuti Matter for S&P may be measured by expert testimony on the standards of law firm practice in law firms that recognize and compensate attorneys for the origination and management of cases, as S&P agreed to do with respect to the Cuti Matter.

173.    In the alternative, the reasonable value of Plaintiffs' services is the amount paid by Duane Reade to Defendants less any demonstrable costs or expenses incurred by Defendants relating to Plaintiffs.

**Simon Is a Serial Breacher of Oral Agreements with Young, Skilled Attorneys**

174.    Shortly before Brook joined S&P, Simon hired Adam Katz as an Associate. Katz came from the firm Hoguet, Newman, Regal & Kenney, LLP ("Hoguet") and, before then, Proskauer Rose.

175.    Upon joining the firm, Katz sought to convince one of his clients from Hoguet to retain S&P as counsel instead. As an inducement, Simon promised Katz that he would pay him a set percentage of gross collections from the client. Simon called that an "origination bonus."[6] This bonus was non-discretionary. Katz succeeded in convincing his former client to terminate Hoguet and retain S&P in its stead.

---

[6] It was because of Simon's use of the term "origination bonus" when discussing his agreement with Katz that Brook and Simon discussed his case-specific compensation in terms of being a "bonus" even though it was explicitly distinct from an ordinary discretionary bonus. Both Brook and Katz were told by Simon that they were still eligible for separate S&P discretionary bonuses.

176.    S&P began regularly paying Katz an origination bonus after each payment was received in approximately May 2011. The payments inexplicably stopped in November 2012.

177.    Katz resigned from S&P in 2013. When he left, his client chose to remain with Simon as his lead attorney. Simon played a significantly larger role in Katz's matter than in the Cuti Matter. For example, Simon signed all pleadings, appeared for all court proceedings, and had the final say on all strategic decisions or recommendations to the client.

178.    Katz is now a partner in the Manhattan office of Goldberg Segalla.

### Simon Is Personally Liable

179.    According to K-1s issued by S&P for Murphy, Simon's "partners" Murphy and Waller were compensated through guaranteed payments.

180.    Murphy and Waller had no right to receive any portion of the profits earned by S&P beyond the amount of their guaranteed payments.

181.    Murphy and Waller did not bear any risk for any losses incurred by S&P, as their compensation was in the form of guaranteed payments.

182.    Neither Murphy nor Waller contributed any capital to S&P, nor did they otherwise "buy into" the Firm.

183.    New York defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.Y. Partnership Law § 10[1]. an "indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses."

184.    New York permits a general partnership for professional services to be constituted as a Limited Liability Partnership.

185.    S&P was improperly formed as a limited liability partnership because, at the time of its formation, there was not a valid general partnership satisfying New York's definition of a partnership, and thus nothing to be converted into an LLP.

    a.    Pursuant to Section 121-1500 of the New York State Partnership Law, before S&P could register as an LLP, as it did on March 1, 2004, it had to be "a partnership," i.e. a valid general partnership.

    b.    At the time of registration, however, Simon was the sole equity holder in the firm; no other person was a co-owner of the business or had any right to share in any profits or bore any risk from of losses.

186.    Because S&P was improperly formed, Simon as sole owner is personally liable for all of S&P's obligations, including the unfulfilled financial obligations to Plaintiffs.

187.    Additionally, these same facts, along with others that are now known and will be adduced through discovery, support a finding that S&P constituted Simon's alter ego.

188.    For example, Simon owned and controlled a Mercedes sedan, which he used largely for personal purposes, but he registered the car in the name of S&P in order to fully deduct the car costs as a business expense.

189.    On information and belief, Simon did not reimburse S&P for his personal use of the Mercedes vehicle.

190.    S&P has ceased operations, and Simon has moved his practice to a new law firm.

191.    On information and belief, Simon continues to represent clients who were clients of S&P.

192.    On information and belief, Simon has taken over one million dollars in distributions from S&P since June 2012, and failed to leave sufficient funds in S&P to pay its

debts, including its debts to Brook and Peed. The amounts drawn from S&P after S&P was paid by Duane Reade for the Cuti Matter exceeded the amount that constituted reasonable compensation for Simon's own services.

## COUNT ONE[7]

### Quasi-Contract

193.     Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

### *No Enforceable Contract Existed*

194.     In the absence of an express, complete, and binding agreement between the parties, New York law recognizes several quasi-contract remedies, including *quantum meruit* and unjust enrichment.

195.     As alleged in detail above, there was never a complete meeting of the minds between Brook and Simon with respect to the complete and final amount of or formula for Brook's compensation.

196.     Brook and Simon reached an oral agreement only on preliminary compensation and a procedure for their future negotiations of Brook's final compensation (the Negotiation Plan). Despite setting this procedure, there was never an agreement on the amount or method of calculating Brook's full and final compensation.

197.     Thus, as to the amount of Brook's compensation, the parties had merely an "agreement to agree," which is unenforceable.

---

[7] Counts One through Six are Brook's claims. Counts Seven and Eight are Peed's claims.

198.     Similarly, the parties' agreement that the amount of compensation to Brook should be "fair," involves an essential term that is too indefinite to be enforceable. And even if it were enforceable, the amount of compensation would be the same as through *quantum meruit*.

199.     Alternatively, to the extent that any valid agreement on the amount of compensation may found to have existed, it is subject to rescission on the grounds of fraud or unilateral mistake induced by fraud. Simon knew or should have known that Brook was under the mistaken factual belief that S&P, LLP was an equity partnership in which Simon and two other "Partners" held equity interests as partners. Brook's belief that S&P was an equity sharing partnership was reasonable (i.e., not negligent) based on the statements made by Simon, the New York law of partnerships, and other circumstances.

*Quantum Meruit*

200.     As alleged in detail above, Brook performed services for S&P in good faith. These services included, without limitation:

a.   Acting as the procuring cause for Simon and his firm, S&P, to be engaged as counsel for the Cuti Matter from June 2011 through May 2012;

b.   Managing the Cuti Matter, including co-counsel at other firms;

c.   Ensuring the receipt of full payments from Duane Reade for Cuti Matter bills;

d.   Providing essential information about the Cuti Matter and Mr. Cuti to Simon and Waller weeks before becoming an employee; and

e.   Providing legal services as an associate attorney for the Cuti Matter and other legal matters.

201.     Defendants accepted Brook's services (and benefitted from them).

202.   Defendants benefitted as a direct and proximate result of the services performed by Plaintiffs, including origination of the Cuti Matter by Brook.

203.   Defendants accepted the services rendered by Plaintiffs and, indeed, induced Plaintiffs to continue to provide those services longer than they otherwise would have had Defendants not misrepresented and concealed material facts.

204.   Brook is entitled to be compensated for the full, fair and reasonable value of the services he rendered.

205.   The reasonable value of Brook's services on the Cuti Matter shall be an amount determined at trial that is equal to (a) the amount billed to and paid by Duane Reade for Brook's time ($500 per hour); plus (b) a reasonable percentage for origination credit, which shall be determined by expert testimony on the range of rates used in the New York legal market (since Simon had explicitly agreed in principle that origination credit was supposed to be part of Brook's compensation); plus (c) the reasonable value of Brook's services for S&P on non-Cuti matters; minus (d) amounts already paid to Brook, and minus (e) the quantifiable costs of Brook's employment (e.g., health insurance) that Defendants can prove at trial.

206.   Alternatively, Defendants have conceded that the reasonable value of Brook's services on the Cuti Matter is at least, simply, the full amount of Brook's own billings on the Cuti Matter—the formula that Simon himself proposed should be used in February 2012. If that formula was fair and reasonable for the period after the appellate brief was filed, then it must be deemed fair and reasonable for the earlier period as well.

*Unjust Enrichment*

207.   The benefit conferred on Defendants was at Plaintiffs' expense because, had Plaintiffs provided the same services elsewhere, they would have received significantly more

compensation, including at a minimum their full hourly billing rates plus, in the case of Brook, origination credit for work performed by other attorneys.

208.    If Simon is not required to provide further compensation to Plaintiffs, he will effectively have earned in excess of $5,000 per hour for his work on the Cuti Matter—a case which he neither originated nor managed, and in which the client asked that Simon not be substantially involved due to misconduct that will be detailed in the trial of this matter.

209.    Equity and good conscience require restitution to Plaintiffs of the benefits received by Defendants, including, among other things, the profits Defendants earned from Brook's and Peed's work; and, as to other lawyers' work on the Cuti Matter, the extra profits earned, which is at the minimum equal to the difference between what S&P would have been paid for having its lawyers work the same number of hours for another matter versus the higher hourly rates that they were paid for the Cuti Matter.

*Alternative Theories – More Limited Quasi-Contract Recovery*

210.    To the extent that there was a valid and enforceable employment agreement, that agreement (a) only covered Brook's performance of services that were typical of an associate litigation attorney in a New York law firm, and (b) only for the period of July 16, 2011 to on or about February 17, 2012 (i.e., the period when Brook received the base salary). Such agreement did not cover Brook's services in originating the Cuti Matter, as those services were rendered before he began to be compensated as an associate (and even before he verbally committed to start working for S&P), and were outside the scope of services expected of an associate attorney.

211.    Brook performed services for S&P prior to July 16, 2011, for which he was never paid.

212.     Specifically, Brook began recording time spent on the Cuti matter contemporaneously with giving his notice of resignation to Greenberg Traurig (and with the permission from his supervisor at Greenberg). Among other things, Brook joined Simon for an interview of a witness who had come forward post-trial to support Cuti's motion for a new trial based on perjured testimony by a key government cooperator. Brook provided that time to S&P, which billed the time to Duane Reade.

213.     Although Duane Reade paid S&P for Brook's time billed prior to July 16, 2011, S&P did not pay Brook for that time.

214.     Accordingly, Brook is entitled to the reasonable value of his services, which was $500 per hour (the amount actually paid by Duane Reade), for each hour worked prior to July 16, 2011.

215.     In addition, Brook secured the engagement agreement with Mr. Cuti for S&P, after helping draft the agreement and convincing Mr. Cuti to sign it prior to agreeing to join S&P as an associate. Thus, the value of compensation for these services was not covered by any contract covering Brook's services as an associate.

216.     No complete and binding agreement existed between Brook and S&P as to certain types of the services performed by Brook.

217.     Brook rendered substantial valuable services to S&P that were outside the scope of the employment agreement (if any).

218.     Brook's non-employee services benefitted and enriched Simon and S&P, which accepted Brook's services.

219.    By paying Brook additional sums upon receipt of payments from the Cuti matter in April 2012, *after* Brook's employment ended, Simon and S&P have implicitly recognized that Brook performed valuable services for S&P that were outside the scope of his employment.

220.    Because no agreement was ever reached as to any amount of, or means of calculating, such non-employee compensation, Brook may pursue the foregoing quasi-contractual remedies.

221.    In private law firms within the legal industry, Associates have many responsibilities that can be assigned to them, but originating business and having final authority to manage client matters are <u>not</u> among those responsibilities.

222.    Some law firms, including Greenberg Traurig, had policies about what happened if and when an associate did originate a client matter, the associate is typically given additional compensation on top of whatever compensation is otherwise paid, including the salary and the discretionary year-end bonus.

223.    Accordingly, to the extent that Brook and S&P formed a contract in June 2011 that provided for compensation of all of his services as a Senior Associate to the firm, that contract did <u>not</u> provide compensation for Brook's (a) origination of the Cuti matter for S&P, or (b) Brook's lead responsibility in managing and finalizing the Cuti Second Circuit appeal. For example, Brook was designated as lead counsel in the Second Circuit from the first filing in September 2011; Brook decided who to staff on the appeal; Brook supervised the work of "partner" Brian Waller; Brook made all final decisions about the arguments and issues to include in the appeal; and Brook signed the appeal brief alone—Simon's name did not even appear below in the signature block.

224.     Brook is entitled to damages equal to the reasonable value of those unpaid services that were not encompassed within or compensated by his agreement to be a Senior Associate for S&P.

225.     The reasonable value of those non-associate services shall be determined at trial by the jury, which may determine it by reference to the actual practice of the parties prior to parting ways; by reference to the proposals advanced by the parties though not agreed upon; and/or by reference to expert testimony about the customs of the legal profession.

### COUNT TWO

### Breach of Contract (Declaratory Judgment and Damages)

226.     Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

227.     This Count is pleaded in the alternative to Count One's primary theories, or in addition to Count One's alternative theories.

228.     To the extent that there was a complete, final, and valid oral employment agreement, Brook performed all of his obligations under any such agreement.

229.     This claim seeks both (a) a judicial declaration of the scope and terms of Brook's compensation contract with Defendants, to the extent that one existed, and (b) damages for Defendants' breaches of that contract where calculable.

230.     A declaration as to the scope and substance of any such employment agreement necessitates judicial clarification because the terms are unrecorded in any written document and substantially affect the rights and obligations of the parties. Moreover, to the extent that Brook performed services outside the scope of such contract, Brook is eligible to recover compensation under a quasi-contract theory (Count One).

*Failure to Pay Brook More Than He Would Have Made on His Own*

231.    Simon promised Brook that he would be paid fairly and make more money by working for S&P than he would earn if he started his own practice. They discussed Brook having a $500 per hour billing rate, which Simon acknowledged that Brook would be able to collect entirely for himself if he started his own practice.

232.    Accordingly, to the extent that an enforceable oral agreement between Brook and S&P existed, it included Simon's verbal promise that Brook would be paid more than he would make on his own, which would have been at a minimum his $500 per hour rate multiplied by the number of hours he worked. Even though the promise of "more" is indefinite, it amounts to an enforceable guarantee that Brook would be paid, at the minimum, the full amount of his billables on the Cuti Matter plus a nominal sum (e.g., $1.00).

233.    Brook performed fully everything required of him. He helped S&P become engaged as counsel for Mr. Cuti in June 2019 and continue to be so retained for many months thereafter. Brook also performed legal services for S&P's clients, as agreed.

234.    S&P paid Brook compensation that was several hundred thousand dollars less than the $735,100 in billable hours that he recorded for his work on the Cuti Matter alone.

235.    Accordingly, S&P breached the promise to pay Brook more than he would have made if he started his own practice.

236.    Brook has suffered damages as a result of S&P's breach equal to at least the difference between the amount that he was paid and the amount of his billables on the Cuti Matter.

*Brook's Right to Cuti Matter Share Payments Survived Termination of Employment*

237.    Per the terms of the June 20, 2011 oral agreement, S&P's obligation to pay Brook for generating Cuti Matter revenue survived the termination of his employment. S&P's issuance of the April 2012 Payment conclusively demonstrates that this was S&P's understanding as well, because there was no other economically rational reason for the payment.

238.    Accordingly, Brook seeks a declaration that S&P was required to pay Brook a similar portion of the money it received from Duane Reade in May 2012—S&P could not withhold payment.

239.    S&P failed to pay Brook any portion of the money received from Duane Reade in May 2012.

240.    Accordingly, Defendants are liable to Brook for breach of contract.

241.    The amount of damages due is an amount proportionate to that paid in April 2012, as that time period was also after the termination of Brook's employment in February 2012. As such, the amount of damages is, as noted above, either $156,960 (60% of Brook's own billings) or $158,230 (33.3% of the total Cuti paid billings) depending on the method that Simon actually employed in calculating the April 2012 Payment.

*Simon Failed to Provide Base Salary Payments*

242.    The June 20, 2011 oral agreement between Brook and Simon required Simon to provide Brook with base salary payments of $6,250, paid biweekly, and to provide the Firm's full support for Brook's work on the Ali Matter.

243.    Brook worked for S&P from June 21, 2011 until May 23, 2012, the date when Simon instructed Brook to vacate his office.

244.    As of May 23, 2012, S&P still listed Brook on its website as a "Senior Associate."

245.    Brook received no base salary payments for the period from June 21 through July 15, 2011. To the extent that he is not permitted to a quasi-contract remedy for that time, he is entitled to contract damages in the amount of the unpaid base salary.

246.    Brook received no base salary payments for the period from about February 17, 2012 through May 23, 2012.

247.    Brook never agreed to relinquish his agreed-upon right to receive base salary payments on a going-forward basis starting in February 2012. Brook conditioned his willingness to do so on the requirement that, at the minimum, Simon pay Brook 100% of his billings retroactively, including for past work on the Cuti Matter, at least back to October 2011.

248.    Because S&P failed to satisfy Brook's condition for eliminating his salary, there was no valid modification of the June 20, 2011 oral agreement.

249.    Thus, S&P's failure to pay Brook's salary was a breach of the oral agreement.

250.    Brook has suffered damages in an amount to be determined at trial, not less than the total amount of unpaid base salary payments that should have been paid to Brook ($40,000), plus an amount to cover the employment taxes that should have been paid by S&P.

*Alternative Based on the February 2012 Negotiation*

251.    Alternatively, S&P is bound by the condition set by Brook for his agreement to remain associated with S&P but to relinquish his base salary payments and origination credit.

252.    As alleged above, Brook stated that he would not agree to Simon's proposal to eliminate Brook's salary but to pay Brook his full hourly rate unless S&P agreed to pay Brook his full hourly rate for his work on the Cuti Matter since October 2011.

253.    On or about February 17, 2012, S&P terminated Brook's base salary.

254.    By performing the step of terminating Brook's base salary without giving any suggestion to Brook that S&P was terminating Brook's employment or continued association with S&P, Simon's conduct demonstrated his acceptance of Brook's express condition for terminating his salary. Thus, a binding contract was formed.

255.    To the extent that this contract was formed, Brook performed all of his obligations under it, including by remaining with S&P until after Simon directed Brook to vacate his office.

256.    In fact, S&P did not terminate Brook's employment in February 2012. Brook continued to use of the S&P office, sign court documents as part of S&P, be listed as a Senior Associate on S&P's website, and receive health insurance. Simon also continued to exercise control over the non-Cuti or Ali matters that Brook worked on. Regardless of whether Brook was technically still an employee, S&P certainly continued to be associated with Brook and happily permitted Brook to go on thinking that he was an S&P employee for over two months.

257.    Further demonstrating Simon's acceptance of Brook's condition, S&P at least partially performed under the new compensation terms by making the April 2012 Payment after receiving payment from Duane Reade for Invoices 5 and 6. *See* Ex. A.

258.    The April 2012 Payment, combined with the base salary payments already made to Brook for the same time period, amounted to approximately 85% of Brook's billings for the period of November 1, 2011 to December 19, 2011. Assuming the cost of Brook's overhead was reasonably estimated as approximately 15% of his billings, then the April 2012 Payment apparently ensured that Brook received value roughly equal to 100% of his billings.

259.    After Duane Reade paid Invoices 7 and 8, S&P failed to pay Brook anything close to 100% of his Cuti Matter billings. Brook received only has base salary payments, which amounted to less than 10% of his paid billings, which totaled $261,600. Ex. A. Assuming 15%

goes to overhead, as it apparently did in April 2012, then S&P should have paid Brook at least an additional $197,360 (perhaps more, depending on S&P's actual overhead costs).

260.    S&P's failure to pay Brook 100% of his billings for his work from December 20, 2011 to February 19, 2012 constituted a breach of the contract formed in February 2012.

261.    Brook has suffered damages as a result of S&P breach in an amount to be determined at trial, but not less than $261,600.

*Breach of the Duty to Negotiate in Good Faith*

262.    To the extent that any enforceable agreement was reached between Brook and Defendants, the Negotiation Plan for resolution of the Cuti Matter Share formed an integral part of it.

263.    Brook performed all of his obligations under the Negotiation Plan and any other aspects of the parties' preliminary employment agreement.

264.    Essential to the Negotiation Plan was the obligation of all parties to negotiate in good faith.

265.    Simon repeatedly delayed finalizing an agreement with Brook for several months due at least in part to lingering uncertainties about whether Duane Reade would pay all of the fees and expenses that S&P had invoiced.

266.    Upon learning that Duane Reade was making a full payment on the two largest invoices S&P ever issued—more than $500,000—Simon did not tell Brook about the payment, and instead threw Brook out of the office.

267.    A few weeks later, Simon presented a non-negotiable offer: Accept $75,000 and sign a general release, or get nothing.

268.     Simon's conduct constituted a material breach of Defendants' obligation to negotiate the Cuti Matter Share in good faith.

269.     Because Brook's damages for this breach would require speculation about the result of a hypothetical good faith negotiation, Brook seeks equitable relief instead of damages; namely, rescission of the contract.

270.     This breach went to the root of the agreement between Brook and Defendants, which provided that Brook would begin working with S&P without an agreement on compensation so long as S&P and Simon committed negotiate in good faith. By refusing to negotiate in good faith, Simon's conduct substantially defeated the purpose of the contract.

271.     Thus, to the extent that there was any enforceable agreement between Brook and Defendants, Brook should be permitted to rescind that agreement.

Upon rescission of any such contract, Brook is entitled to obtain compensation *in quantum meruit* or under principles of unjust enrichment.

## COUNT THREE

### Promissory Estoppel

272.     Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

273.     Alternatively, Defendants are liable for promissory estoppel. This Count is pleaded in the alternative to Counts One and Two.

274.     As detailed above, in the course of negotiating Brook's agreement to join S&P, Simon clearly and unambiguously promised Brook that he would reach a future agreement with Brook about Brook's total compensation, and that that agreement would be more financially

rewarding for Brook than if Brook started his own law firm and collected an hourly rate of $500 per hour.

275.    Brook reasonably relied on Simon's promise and agreed to join S&P rather than start his own law firm.

276.    When Simon appeared not to be compensating Brook at a level that even matched what Brook could have earned, Simon promised Brook at least two larger payments in addition to his base salary payments, the latter of which would be the largest and would come at year end. Simon also agreed to reconsider his position and to provide compensation to Brook that involved more money in the near term.

277.    Brook again reasonably relied on Simon's promise, particularly after S&P followed through and made the first of two larger payments a few days later.

278.    By the time year end came, and no second larger payment was made, so little time remained before the Cuti Matter Appellant's Brief was due that Brook could not practicably leave S&P without severely prejudicing his client and thus his long-term career. In other words, Brook was stuck there through the filing date of February 3, 2012.

279.    Because Simon promised to pay Brook at least his full hourly rate going forward on or about February 6, 2012, and because Simon indicated he was seriously considering that arrangement retroactively, Brook reasonably remained with S&P through at least February 15, 2012, if not later.

280.    As a result of his reliance on Simon's promises and assurances, Brook suffered damages equal to the difference between the revenue he would have generated from the Cuti Matter through his own firm and the total value he received from S&P (including employee and non-employee compensation, plus benefits and overhead). These damages shall be in an amount

determined at trial, not less than approximately $400,000 based on Brook's own billings alone
(see Ex. A), and even more based on the 60/40 split of revenue generated by Peed, as per the
terms that Brook and Peed had agreed upon.

281.    Defendants are therefore liable to Brook on the grounds of promissory estoppel
and must compensate him for the damages suffered in reliance on Defendants' promise.

## COUNT FOUR

### Breach of the Implied Covenant of Good Faith and Fair Dealing

282.    Plaintiffs repeat the allegations of the preceding paragraphs as though fully set
forth herein.

283.    In addition, to the extent that a valid oral agreement between Brook and S&P
existed, it incorporated the implied covenant of good faith and fair dealing.

284.    To the extent that any valid agreement between Brook and S&P "contemplated
the exercise of discretion" by Simon over some or all of Brook's Cuti Matter Share
compensation, such a "pledge includes a promise not to act arbitrarily or irrationally in
exercising that discretion."[8] In other words, Simon required to exercise discretion in good faith,
and not in an arbitrary and capricious manner.

285.    Brook performed all of his requirements to be eligible for any and all
discretionary bonuses.

286.    Brook's contractual right to receive "bonuses" based on Cuti Matter revenue was
not tied to him remaining an employee of the Firm (as demonstrated by Simon's April 2012
Payment to Brook, which was months after the date when S&P has since claimed that it
terminated Brook's employment).

---

[8] *State Street Bank and Trust Co. v. Inversioned Errazuriz*, 374 F.3d 158, 169 (2d Cir. 2004).

287.     In the April 2012 Payment, S&P issued a Cuti Matter Share payment to Brook that was almost exactly equal to 60% of Brook's billings that had recently been paid by Duane Reade. It was also almost exactly equal to 1/3 of the total amount of fees paid.

288.     Simon failed to provide *any* "bonus" to Brook after S&P received payment on S&P's final Cuti Matter invoices. This was an abuse of discretion.

289.     Considering that Brook did not receive any "base salary" payments after the April 2012 Payment, Simon's decision not to make any "bonus" payment to Brook amounted to a decision to withhold Brook's *entire* Cuti Matter Share for the final Duane Reade payment.

290.     Simon demonstrably failed to exercise his discretion in good faith, and thereby unreasonably prevented Brook from received the reasonably expected fruits of his labors.

291.     As a result, Brook has suffered damages in an amount to be determined at trial, based on the difference between what Simon actually authorized in his discretion versus what Simon would or should have authorized had he exercised his discretion in good faith. That amount may be determined examining Simon's history of payments, including in particular the most recent payment (also made at a time when Brook was receiving no "base salary"), which amounted to approximately 60% of Brook's paid billings.

**COUNT FIVE**

**Violations of New York Labor Laws**

292.     Plaintiff Brook repeats the allegations of the preceding paragraphs as though fully set forth herein.

293.     Brook's employment at S&P was at all times governed by New York law.

294.     Per New York Labor Law, S&P's failure to pay Brook wages that were due and failure to provide required notices subjects S&P to liability for compensation to Brook, plus fines and an award of reasonable attorney's fees.

*Failure to Provide Notice Upon Starting Work*

295.     Effective April 9. 2011, New York Labor Law § 195(1)(a) required S&P to provide Brook with written notice of his complete compensation amount or formula before he began working for S&P.

296.     S&P did not provide Brook with a written notice of the basis for his compensation prior to his beginning work with S&P on June 21, 2011.

297.     S&P did not provide Brook with a written notice of the basis for his compensation within ten days of July 13, 2011, then date when Brook started to show up in person for work at S&P's offices regularly.

298.     S&P's failure to provide such written notice constituted a violation of N.Y. LAB § 195(1)(a).

299.     S&P continued to violate N.Y. LAB § 195(1)(a) by failing to provide Brook with the required written notice at any time during employment, including when Brook began working in S&P's offices in July 2011.

300.     To the extent that Brook received any employment documents referencing the base salary, the documents were ineffective to satisfy § 195(1)(a) because (i) Brook never signed "a written acknowledgment" that he received such notice and (ii) any such documents failed to state Brook's compensation completely, accurately, or with the required specificity.

301.     Brook was unaware that S&P's refusal to specify the full amount or rate of Brook's compensation at the outset of his employment (as Brook had requested) was a violation

of New York labor law. Had Brook known of the law, Brook would have insisted that the parties reach an agreement at the outset of the relationship, rather than deferring it as Simon proposed. Had S&P not violated this law, the instant dispute between the parties might have been avoided.

302.    S&P's failure to provide Brook with the required notice within ten days of commencing his employment subjects S&P to a fine of $50 per day, up to $5,000, plus costs and reasonable attorney's fees. N.Y. LAB § 198(1-b).

303.    In addition, the Court should grant Brook "other relief, including … declaratory relief," *id.*, by declaring S&P's failure means that it is estopped from attempting to claim that the "base salary" (as described above) constituted Brook's entire compensation.

### *Failure to Pay Brook Earned Cuti Matter Share "Bonuses"*

304.    Under New York law, a "bonus" may constitute part of an employee's wages when the bonus is non-discretionary but tied to the employee's performance.[9]

305.    As alleged above, the Cuti Matter Share was due and payable to Brook based on receipt of payment from Duane Reade.

306.    Brook's right to "bonus" payments towards the complete payment of the Cuti Matter Share was not discretionary and was not conditioned on his continued employment at the time when the payment was received by S&P (as demonstrated by the April 2012 Payment).

307.    To the extent that the scope of Brook's employment included his services in connection with originating and managing the Cuti Matter, then the receipt of income from the Cuti Matter was directly related to Brook's work, and not tied to the firm's overall finances.

308.    Accordingly, the Cuti Matter Share bonuses constituted wages under New York Labor Law.

---

[9] *See Bader v. Wells Fargo Home Mortg. Inc.*, 773 F.Supp.2d 397, 416 (S.D.N.Y. 2011).

309.     As alleged above, S&P failed to pay Brook any of the Cuti Matter Share for the last nearly $500,000 received in earned fees in May 2012.

310.     This failure to pay constitutes an improper withholding of wages under N.Y. LAB § 193.

## COUNT SIX

### Fraudulent Misrepresentation

311.     Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

312.     This Count alleges fraud by Simon against Brook, making Simon personally liable for Brook's damages and providing a basis to rescind any agreements between Brook and S&P, to the extent that any such agreements were otherwise enforceable.

313.     In short, Simon induced Brook to join S&P by misrepresenting S&P as an equity partnership, when in fact Simon alone held all of the equity in the firm.

314.     The difference between an equity partnership interest and a non-equity partnership interest is indisputably material.

315.     Simon knew that Brook was interested in joining a firm with a realistic prospect of attaining an equity partnership interest in the near future. Despite knowing this, Simon falsely represented to Brook that S&P provided such an opportunity for Brook. This was not a promise of partnership, but rather a misrepresentation about the structure and operation of S&P. The true nature of S&P as a fiefdom run by Simon as dictator was far less attractive as an opportunity than the fictitious partnership that Simon described to Brook.

316.    To the extent that otherwise valid and binding contracts existed between Plaintiffs and S&P, Plaintiffs seek to rescind them on the grounds of fraudulent inducement or, alternatively, unilateral mistake.

317.    Each of these grounds is based on the fact that Simon represented S&P as an equity partnership when it was not.

318.    Simply put, Brook thought he was joining a firm with three equity partners, and that was important to him because he wanted to join a firm where he could have a realistic goal of becoming an equity partner in the future. Instead, Brook joined a firm with a single lawyer who kept a tight grip on the firm's equity solely for himself, refusing to share actual power and authority, or to allow others in the firm to take part in the attendant financial risks and rewards.

*Misrepresentation*

319.    As alleged in detail above, Simon made numerous material representations to Brook to induce him to choose S&P over other options.

320.    Simon repeatedly said that he had "partners"; the name of the Firm was "Simon *& Partners*"; and the Firm was practicing law as a registered limited liability partnership.

321.    At the June 20, 2011 meeting, when Simon rejected Brook's request for the title of Of Counsel, Simon said that he would be happy to give Brook whatever title he wanted, and even said that Brook could be "name partner" for all that he cared. Brook understood Simon's comment to be a joke because it was too soon, since Simon and he had discussed that Simon needed time to work with Brook before deciding whether to offer him partnership. In the next breath, Simon said in a serious, *non*-joking tone, that "the sky is the limit on what you can do at this firm." Brook understood Simon to be saying that at some point, becoming a name partner

Case 1:17-cv-06435-GBD   Document 57   Filed 09/09/19   Page 52 of 66


was a possibility. Brook understood that a name partner would necessarily be an equity partner with a significant ownership share of the business.

322.     During one of their earlier conversations prior to June 20, 2011, Simon and Brook discussed another Manhattan law firm, O'Leary Partners LLP,[10] that had a single former prosecutor as its chief rainmaker. Brook mentioned it as another firm that he had interviewed with. Simon attacked that firm and its leader, Smith, as not having "real" partners because O'Leary controlled everything about the firm. In that context, Simon also referred to Smith by a profanity. Simon also mocked the fact that O'Leary's wife, who was herself a lawyer, had a role in the management of the firm even though she no longer practiced law. Simon distinguished S&P, which Simon described as a "real" partnership.

323.     When discussing the history of S&P and how Waller and Murphy had risen through the ranks as associates to become partners, Simon presented their ascension to partnership as a landmark event that took a long time to achieve. Simon explained that he needed to work with them for years before "trusting" them enough to give them a share of his business.

324.     In discussing the history of the firm, Simon also explained that he changed the name and corporate form of his firm in order to accommodate the addition of Waller as his first partner.

325.     Simon's comments to Brook were materially misleading because Simon did not have any true "partners" in his firm at that time. Instead, Simon had complete and undivided ownership of the business; neither Waller nor Murphy had any ownership interest.

326.     Simon omitted to disclose that his so-called "partners" had no equity interest in the firm and had no right to share in the profits, nor a responsibility to share in the losses.

---

[10] Because Simon made disparaging comments about that firm and its lead partner, it shall be referred to herein as "O'Leary Partners," even though the name was not O'Leary.

*Intent*

327.    Simon made his misrepresentations and omissions about his firm with the intent to deceive Brook.

328.    Simon and Brook had discussed Brook's desire to build a law practice as a rainmaking litigation partner, and thus Simon knew that Brook was interested specifically in equity partnership. Simon knew that he was deceiving Brook into believing that Simon already had two equity partners by failing to disclose that his so-called "partners" had no equity interest in his firm.

329.    When meeting with Simon in February 2012, Brook expressed skepticism about long-term partnership prospects and asked Simon whether he still believed that partnership was feasible in the near term. Simon said that partnership was still a possibility. Brook then confronted Simon with what he had learned from Waller, about how no one had any equity besides Simon. Simon responded angrily, asking, "Who told you that?" Simon ultimately admitted that he was talking about giving Brook only a title, and not an actual equity ownership interest in the Firm.

330.    Simon caused the misrepresentations to be made with the intention that Brook rely on them by deciding to join S&P instead of another option that would have provided more financial certainty.

*Reliance and Materiality*

331.    Brook relied on Simon's representations about the nature of the firm because one of his main considerations in deciding whether to join S&P was whether it provided a platform for Brook's long-term career goals, which included equity partnership in a prestigious firm.

332.    Brook's reliance was reasonable given his experience:

a.  Prior to July 2011, Brook had never worked for a law firm that had any so-called "non-equity partners."

b.  In 2004, Brook was a summer associate at Wachtell, Lipton, Rosen & Katz, a general partnership.

c.  From 2005 through 2007, Brook worked at Sullivan & Cromwell, LLP, which only had equity partners. If very senior associates were not ready for equity partnership but the firm wanted to retain them, they were offered the position of "Special Counsel."

d.  From 2008 through 2011, Brook worked at Greenberg Traurig, LLP, which was a partnership comprised of professional corporations. Accordingly, no individuals held the title of "Partner." Instead, senior attorneys held shares in the corporations, and were referred to as "Shareholders." There were different classes of Shareholders based on the number of shares that they held, but every Shareholder by definition held an equity interest in the firm.

e.  When Brook had interviewed at law firms that had two tiers of partnership, including a class of so-called non-equity partners, those law firms had affirmatively disclosed that fact to Brook during the interview process.

f.  Brook had never heard of any small law firms that had adopted the tiered partnership, which Brook had believed were used by large law firms that wanted to retain talented associates prior to the point when those associates were capable of generating income from their own books of business.

333.  Brook had no desire to remain a permanent employee, and it was at all times Brook's understanding that a so-called "non-equity" partner is still just an employee.

334.    In virtually every major law firm with a "tiered" partnership, i.e. having a class of "non-equity" partners, the "non-equity" partners are classified as employees for legal purposes, including for tax purposes (receiving a Form W-2 instead of a Form K-1).

335.    Ethics opinions have been issued that have held that it is ethically permitted to call non-equity lawyers "partners" when dealing with clients, so long as they have sufficient seniority and authority over the representation. These ethics opinions have not expressed an opinion on whether calling non-equity lawyers "partners" is permissible when forming a partnership or in the context of informing lawyers about the makeup of the firm. In other words, what is acceptable to clients (who have no interest in potentially becoming partners themselves) may nonetheless be misleading and fraudulent to individuals who are making choices based on the prospect of obtaining partnership in the future.

*Damages*

336.    As a direct, proximate and foreseeable result of his reliance on Simon's misrepresentations about the nature and structure of his law firm, Brook chose to join S&P over other opportunities available in June 2011. Brook wanted to join a firm that included a realistic prospect of equity partnership in the near future.

337.    Had Brook known the true fact—that Simon did not have any equity partners and had never had an equity partners—Brook would not have chosen to join S&P as an employee, nor would Brook have drafted an engagement agreement between Mr. Cuti and S&P.

338.    If Brook had not agreed to join S&P, Mr. Cuti would not have engaged S&P as his counsel, or he would have terminated the engagement agreement quickly, as he had already done twice before.

339.     Instead, if he had known that Simon did not have any partners, Brook would have chosen to start his own firm and to work primarily with Levitt on the Cuti Matter and with Peed on the Ali Matter.

340.     Brook would have formed an of counsel relationship with Peed prior to June 2012, when he actually did so, and thus would have started receiving 40% of Peed's billable hours for the Cuti Matter from the outset of Peed's work on the case.

341.     Brook's reliance on Simon's representations and omissions about the nature of S&P LLP was reasonable.

342.     Brook suffered damages as a result of the fraudulent misrepresentations and omissions by Simon.

343.     Simon is personally liable for Brook's damages, whether calculated based on reliance or *quantum meruit*, because Simon himself was the primary tortfeasor.

344.     Brook's damages due to his reliance on Simon's misrepresentations may be measured by the difference between what Brook was paid by Defendants and what Brook would have been paid by Duane Reade directly, plus 40% of Peed's billable hours.

345.     Furthermore, to the extent that a contract existed at all, Simon's fraudulent inducement of Brook's agreement to work at the Firm warrants rescission of that contract. *See Sokolow, Dunaud, Mercadier & Carraras, LLP v. Lacher*, 299 A.D.2d 65 (1st Dep't 2002).

**COUNT SEVEN**

**Breach of Contract (Peed)**

346.     Plaintiff Peed repeats the allegations of the preceding paragraphs as though fully set forth herein.

347.    The Count seeks a declaration of the material terms of Peed's contract with S&P and a declaration that S&P materially breached that contract.

348.    Alternatively, to the extent that the contract is declared to have continued in effect for some or all of the time that Peed worked for S&P, this Count also seeks rescission of the contract based on S&P's material breach.

349.    Alternatively, to the extent that a contract is found to have continued indefinitely and not been subject to rescission, this Count seeks damages for S&P's failure to pay Peed the amount due to him in accordance with the terms of such contract.

350.    The material terms of the agreement reached between Peed and Simon are alleged in detail above.

351.    Pursuant to their oral agreement, Defendants were obligated to inform Peed if and when Duane Reade paid fees for Peed's time because, at that time, the contract would automatically terminate and need to be renegotiated.

352.    Defendants breached the initial oral compensation agreement by delaying payments to Peed and, worse, by concealing the fact that Duane Reade had paid Peed's billed fees in full at $450 per hour.

*Simon's Concealment of Duane Reade's December 2011 Payment Was a Material Breach*

353.    Peed submitted monthly time sheets beginning in October 2011. Although Mr. Simon indicated in October 2011 and again in November 2011 that he needed to "issue a check to Mr. Peed," it was not until December 2011—two months after submitting his initial time sheet—that Peed received his first check from S&P in the amount of $4,787.50. No explanation or breakdown was provided for the amount that was disbursed to Peed.

354.    Unbeknownst to Peed, the invoice reflecting Peed's initial work on the Cuti Matter was paid *in full* by Duane Reade in December 2011—*before* S&P sent a check to Peed.

355.    Accordingly, even though Simon had promised Peed that his receipt of hourly wages for working on the Cuti Matter would not be contingent on receiving payment form Duane Reade, Simon had delayed making any payment to Peed until after a payment was received.

356.    Simon failed to disclose the fact of the December payment by Duane Reade to Peed.

357.    By failing to disclose the December payment, Simon also concealed the fact that he had delayed paying Peed until after he received payment from Duane Reade, in express contravention of the terms agreed upon.

358.    Had Simon disclosed the December payment to Peed; the fact that Peed's recorded hours were paid at his full hourly billing rate; and the fact that Simon never went out-of-pocket to pay Peed before receiving payment from Duane Reade, Peed would not have agreed to continue working at $125 per hour.

359.    Simon concealed the December payment by Duane Reade from Brook as well. Among other things, Simon characterized the additional payment on Brook's final paystub of 2011 as "additional compensation," which was different than how he had the earlier "bonus" payments that resulted from payments being received from Duane Reade. As a result, neither Brook nor Peed even suspected that there had been a payment made by Duane Reade in December 2011 until many months later.

*Four Months Later, Simon Finally Admits He Received the Duane Reade Payment*

360.    Despite continuing to submit monthly time sheets submitting time sheets each month from October 2011 through February 2012, Peed did not receive additional compensation from Simon until April 2012. No explanation or breakdown was provided for the $12,400.00 amount that was disbursed to Peed (although it was apparently based on services performed through December 19, 2011).

361.    Upon receiving the payment, Peed emailed Simon on April 20, 2012 to ask (1) "what months it covers"; (2) "whether expenses are included"; and (3) whether Duane Reade "g[a]ve you any problems with my time?"  Simon responded the same day, stating, "I am not sure.  I have been out of the office today.  I will find out the answers to your questions."

362.    On April 23, 2012, Peed and Simon met for lunch in the Washington, D.C. office of S&P.  During lunch, Peed again inquired as to whether Duane Reade had paid Peed's initial bill at the full hourly rate of $450.00 per hour. Simon confirmed that all bills had been paid by Duane Reade at Peed's full hourly rate.

363.    Peed was stunned by Simon's admission. Shortly thereafter, Peed sent an email to Simon reminding him of the representations that Simon had made at their initial meeting and requesting that the issue of his compensation be revisited.  Peed also noted in the email that the April 2012 payment appeared to only cover time through December 19, 2011, leaving time from December 20, 2011 to February 19, 2012 and $1,193 in expenses unpaid.

364.    Simon responded the next day, stating that he would "look at the numbers and get back to" Peed.  However, despite repeated attempts by Peed to schedule a conference to finalize his compensation with S&P, to discuss unpaid amounts, and to obtain an accounting for the amounts that had already been paid, Simon never followed-up with Peed as he had promised.

Instead, without ever communicating again with Peed, Simon removed Peed's biography from the firm's website without notice.

*The June 2012 Check*

365.    In June 2012, Peed received a check from S&P in the amount of $16,337.50, which reflects a rate of compensation of $125.00 per hour for the 130.7 hours billed by Mr. Peed between December 19, 2011 and February 3, 2012.  The check was accompanied by a letter apologizing for the delay in repaying Peed's expenses, stating that Simon was under the mistaken belief that Peed's expenses had been repaid.  The letter contained no apology for the extreme delay in the payment of fees, however.

366.    By the time the June 2012 payment by Duane Reade was made on invoices for December 20, 2011 through April 19, 2011, Peed had learned about Simon's material breach of the agreement described above.

367.    Accordingly, when Waller sent Peed the June 2012 check as supposed "final payment in full for the time he worked on the Cuti appeal (through February 3, 2012)," Peed justifiably refused to deposit it.

368.    By sending the June 2012 check, S&P has acknowledged its liability to Peed for at least $16,337.50, but as to which S&P sought to impose an improper and extracontractual condition: that Peed release his claims in order to deposit it. Accordingly, in the alternative, even if Peed's primary contract-related and quasi-contract claims do not prevail, S&P must pay Peed $16,337.50 plus accrued prejudgment interest.

369.    Defendants materially breached the contract in December 2011, or, alternatively, failed to complete a condition of the contract's continuation by failing to disclose the December

2011 payment by Duane Reade. Either way, Peed is not bound by the contractual compensation rate for the period of work performed after the date of Defendants' breach.

*Rescission due to Material Breach*

370.     Rescission is warranted under New York law when there has been a fraudulent inducement or in circumstances where there has been a material breach that goes to the root of the contract, such that the breach substantially defeats the purpose of the contract. Here, both bases support permitting Peed to rescind his initial contract with Simon.

371.     Simon materially breached by delaying payments to Peed and failing to disclose the fact of payment being received from Duane Reade.

372.     These breaches were so severe that they substantially defeated the purpose of the agreement to pay Peed $125 per hour for Cuti Matter work.

373.     Peed was led to understand that he was being paid far less than his full hourly rate only because Simon was assuming the risks of non-payment, which turned out to be untrue.

374.     Accordingly, Peed seeks to rescind the agreement and to instead receive compensation *in quantum meruit*.

375.     To the extent that rescission in full is not permitted, the agreement should be rescinded as of the date in December when Simon received payment on Peed's time on the Cuti Matter, because Simon failed to disclose and fraudulently concealed this fact from Peed in order to avoid letting Peed know that they were now required to renegotiate Peed's rate at that time.

376.     By failing to perform his promise to disclose the first Duane Reade payment of Peed's time to Peed, Simon concealed his material breach of the agreement and thus fraudulently induced Peed's continued performance under the agreement by denying Peed the opportunity to

terminate that agreement based on Simon's material breach. Such fraudulent conduct is further grounds supporting Peed's right to rescind.

## COUNT EIGHT

### Quasi-Contract (Peed)

377. Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

378. The initial agreement with S&P for Peed to be paid just $125 per hour while being billed out at $450 per hour was expressly temporary and included a disclosure requirement.

379. Peed's initial agreement with S&P automatically terminated by its terms when Duane Reade paid S&P in December 2011 for the first invoice with Peed's time on it.

380. Peed continued to provide services to S&P after the point when the initial agreement terminated.

381. In addition, as explained in Count Seven, Peed may rescind the initial agreement in whole or in part based on S&P's material breach of it.

382. Either way, Peed has a right to recover *in quantum meruit* for the reasonable value of his services, and under a theory of unjust enrichment because S&P received an unjustly large share of the profits from his work on the Cuti Matter, which Brook originated and managed.

383. The rate of $125 per hour that S&P paid Peed did not reflect the reasonable value of Peed's services. Rather, it was a temporary, artificially-low rate negotiated by Peed and Simon for Peed's "getting up to speed" time, and was based on representations by Simon that were not true, including: (1) that S&P would pay Peed out-of-pocket before knowing whether Duane Reade would pay Peed's full hourly rate and/or pay for Peed's "getting up to speed" time; and

(2) that Simon had long-term plans to use Peed in S&P's D.C. office. The rate of $125 per hour was further unreasonable given that Peed was not an employee of S&P; S&P incurred no taxes, costs or other overhead expenses associated with Peed; and S&P lacked the capacity to perform the services that Peed was able to provide on the Cuti Matter.

384.    The reasonable value of Peed's services was $450 per hour, which is the amount that an adverse third-party was willing to pay for Peed's time. This is a reasonable benchmark of the value of Peed's services because (i) it is the value that Peed brought to S&P; (ii) S&P paid virtually no overhead to receive that value, while Peed paid for his own office; (iii) Peed was of counsel to S&P, not a salaried associate or contract attorney; (iv) without Peed's services S&P did not have adequate resources to complete the work required in the Cuti appeal; (v) by using Peed to complete the Cuti appeal, S&P received significant fees and profits above and beyond the cost of Peed's full hourly rate; and (vi) Peed brought unique benefits to S&P above and beyond the work on the Cuti matter. Specifically, Peed's association with S&P (1) allowed it to market itself as having an attorney with a quality background in its D.C. office; and (2) enabled S&P to partner in the defense of a high-profile national security prosecution, which gave S&P the chance for recognition and gave an S&P attorney (Brook) the chance to gain standup trial court experience.

385.    While Peed would have been willing to negotiate away some of the reasonable value of his services as part of a longer relationship with S&P, Simon gave up the chance to benefit from such a discount by deceiving Peed about Duane Reade's payments, and did not offer Peed any of the consideration that would have made such a negotiated apportionment of Peed's fee reasonable. Accordingly, by deceiving Peed and depriving Peed of these benefits, S&P forfeited any reasonable expectation of receiving a significant share of the value of Peed's

services as reflected in the marketplace. Thus, again, the reasonable value of Peed's services to S&P, in the context of his value in helping to bring the Cuti appeal to completion, was approximately equal to the value of his services to S&P's client as reflected by Duane Reade's payment, to wit, $450.00 per hour.

386.     In the alternative, the reasonable value of Peed's services was $270 per hour, which is 60% of his full billing rate. This is the percentage that Peed regularly received for cases generated and managed by his partner in his law firm, and is the minimum that Peed would have been willing to consider to continue working with S&P on the Cuti matter. (Indeed, as noted above, this is the percentage that Peed and Brook agreed upon so that Peed would continue working on the Cuti Matter after they ceased working with S&P.)

387.     S&P has kept between $325 and $450 of profit from every hour that Peed billed on the Cuti Matter. For the reasons alleged in detail above, this significant amount of profit is unjustified because, in short, Peed caused S&P to incur no costs while the Cuti Matter was handled by Brook. Thus, to the extent that any portion of Peed's billings do not get paid to him *in quantum meruit*, they should be paid to Brook pursuant to the claims stated above. Otherwise, S&P will be unjustly enriched.

### PRAYER FOR RELIEF

Plaintiffs demand judgment against Defendants as follows:

A.     To the extent that any enforceable contract with Plaintiffs existed, a judicial declaration of all material terms and that Defendants materially breached certain of those terms;

B.     Rescission or voiding of the contracts with Brook and Peed, if any existed;

C.     Compensatory damages;

D.     Restitution and disgorgement to prevent unjust enrichment by Simon;

E.       Statutory penalties or fines, for violating N.Y. Labor Law;

F.       Reasonable attorneys' fees and costs of suit;

G.       Prejudgment interest;

H.       Such further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated:  September 9, 2019


                              /s Brian C. Brook_____
                              Brian C. Brook (BB-1980)
                              100 Church St. Fl. 8
                              New York, NY 10007
                              Tel: (212) 256-1957
                              Fax: (212) 257-2334
                              brian@brook-law.com

                              *Attorney for Plaintiffs and pro se*

## Cuti Matter Legal Fees Invoiced by and Paid to Simon & Partners

| No. | Period Invoiced | Date Sent | Date Paid | Total Legal Fees Paid | Brook | Peed | Simon | Waller | Stern | Murphy |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 06/20/11-07/19/11 | 8/5/2011 | 9/16/2011 | $ 109,250 | $ 41,450 | $ - | $ 45,300 | $ 22,500 | $ - | $ - |
| 2 | 07/20/11-08/19/11 | 9/9/2011 | 9/16/2011 | $ 146,855 | $ 93,050 | $ - | $ 24,525 | $ 29,280 | $ - | $ - |
| 3 | 08/20/11-09/19/11 | 10/4/2011 | 10/18/2011 | $ 116,618 | $ 78,900 | $ - | $ 19,425 | $ 10,080 | $ 8,213 | $ - |
| 4 | 09/20/11-10/19/11 | 11/2/2011 | 12/2/2011 | $ 111,118 | $ 76,400 | $ 17,055 | $ 3,225 | $ 8,100 | $ 6,338 | $ - |
| 5 | 10/20/11-11/19/11 | 11/29/2011 | 3/28/2012 | $ 166,218 | $ 97,900 | $ 12,105 | $ 16,275 | $ 22,680 | $ 15,938 | $ 1,320 |
| 6 | 11/20/11-12/19/11 | 1/6/2012 | 3/28/2012 | $ 149,928 | $ 77,800 | $ 32,535 | $ 10,050 | $ 18,480 | $ 11,063 | $ - |
| 7 | 12/20/11-01/19/12 | 2/10/2012 | 5/22/2012 | $ 238,818 | $ 142,750 | $ 33,795 | $ - | $ 48,480 | $ 12,413 | $ 1,380 |
| 8 | 01/20/12-02/19/12 | 3/8/2012 | 5/22/2012 | $ 235,870 | $ 118,850 | $ 25,020 | $ - | $ 88,620 | $ 1,860 | $ - |
| 9 | 02/20/12-03/19/12 | 3/26/2012 | 6/6/2012 | $ 5,990 | $ 5,450 | $ - | $ - | $ 540 | $ - | $ - |
| 10 | 03/20/12-04/19/12 | 4/27/2012 | 6/6/2012 | $ 2,670 | $ 2,550 | $ - | $ - | $ 120 | $ - | $ - |
| All | 06/20/11-04/19/12 | | | $ 1,283,333 | $ 735,100 | $ 120,510 | $118,800 | $ 248,880 | $ 55,823 | $ 2,700 |

Hourly Rates Billed: Brook ($500); Peed ($450); Simon ($750); Waller & Murphy ($600); Stern ($375).