UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN C. BROOK and MATTHEW J. PEED,

                                    Plaintiff,

        -v-

SIMON & PARTNERS, LLP, <u>et</u> al.,

                                    Defendants.

CIVIL ACTION NO.: 17 Civ. 6435 (GBD) (SLC)

<u>**OPINION AND ORDER**</u>

**SARAH L. CAVE**, United States Magistrate Judge.

## I. <u>INTRODUCTION</u>

In this long-running litigation, Plaintiffs Brian Brook and Matthew Peed ("Plaintiffs"), both attorneys, seek to recover from Defendants Simon & Partners, LLP ("S&P"), and its principal, Defendant Bradley Simon (S&P and Simon, "Defendants"), damages related to legal work performed on behalf of the former CEO of Duane Reade Drugstores, Anthony Cuti (the "Cuti Matter"). <u>See</u> <u>Brook v. Simon</u>, No. 17 Civ. 6435 (GBD), 2020 WL 5817161, at *1 (S.D.N.Y. Sept. 29, 2020) ("<u>Brook</u> <u>IV</u>").  Before the Court is Plaintiffs' motion to compel Defendants to produce an email thread dated February 16, 2012 (the "Emails"), which Defendants contend are entitled to work product protection.  (ECF Nos. 107, 113 (the "Motion")).[1]  Following a conference with the parties and <u>in</u> <u>camera</u> review of the Emails, the Court GRANTS the Motion, and directs Defendants to produce the Emails to Plaintiffs by **Thursday, December 23, 2021**.

---

[1] The Court granted Defendants' request to seal certain exhibits that Plaintiffs attached to the Motion, (ECF No. 112), and Plaintiffs refiled the Motion with redacted exhibits.  (ECF No. 113).

## II. BACKGROUND

The Court incorporates by reference the factual and procedural background set forth in detail in several decisions issued by the Honorable George B. Daniels and the Second Circuit, and summarizes only those facts relevant to the Motion.  See Brook v. Simon, No. 17 Civ. 6435 (GBD), 2021 WL 878561, at *1 (S.D.N.Y. Mar. 9, 2021) ("Brook V"); Brook IV, 2021 WL 5817161, at *1–2; Brook v. Simon & Partners LLP, 783 F. App'x 13, 16–19 (2d Cir. 2019) ("Brook III"); Brook v. Simon, No. 17 Civ. 6435 (GBD), 2018 WL 6518855, at *1–7 (S.D.N.Y. Nov. 27, 2018) ("Brook II"); Brook v. Simon & Partners, LLP, No. 17 Civ. 6435 (GBD), 2018 WL 2383142, at *1–4 (S.D.N.Y. May 14, 2018) ("Brook I") (vacated by Brook III).

### A. Brook's Employment at S&P

In 2011, Brook began discussing with management at S&P his interest in joining the firm, mentioning the Cuti Matter as work he expected "to consume all of his time for the foreseeable future" such that he "would be satisfied with deriving his income solely from that matter." Brook I, 2018 WL 2383142, at *1.  On June 20, 2011, Simon and Brook met to discuss further the terms of Brook's employment.  Id.  "Though Brook's employment with [S&P] officially began on July 13, 2011, he began working with [S&P] on the [Cuti] Matter prior to that date."  Id. at *2.  "In October 2011, Brook met with Simon to discuss concerns about his compensation."  Id.  "On February 6, 2012, Simon informed Brook that [S&P] would stop paying Brook a base salary and, instead, pay Brook 100% of what he billed to the [Cuti] Matter."  Id.  Judge Daniels summarized Brook and Simon's subsequent discussion:

> Brook stated that he would only agree if the arrangement was made retroactive to at least October, and Simon said he would think about Brook's proposal . . . When Brook asked if partnership was still a possibility, Simon said that it was . . .

> Simon also indicated that his reference to 'partnership' was to a title, not an equity interest in the firm.

Id.  On February 15, 2012, Brook sent a "Basic Term Sheet" to which is attached a draft at-will employment agreement, specifying that Brook would hold the position of Counsel at S&P and the compensation Brook and Peed were to receive for past and future work on the Cuti Matter, as well as for work on other matters.  (ECF No. 118-1 ("Brook's Proposal")).  Simon "rejected" Brook's Proposal, stating, "'If what I'm offering isn't good enough, you and [Cuti] can go elsewhere.'"  Brook I, 2018 WL 2383142, at *2.  The same day, Brook told Peed in an email, "I have a bad feeling that I'm going to have to sue him to get anything close to the money he owes me."  (ECF No. 108-1 at 2 (the "Peed Email")).

The next day, February 16, 2012, the Emails were sent in a single thread.[2]  The first is a message from Simon to Kenneth C. Murphy, an S&P limited partner, with a blank subject line.  The second message is Murphy's response several hours later to Simon and Brian Waller, another S&P limited partner, with the subject line, "I ran the numbers."  (ECF No. 107 at 1).  On February 20, 2012, Brook was "taken off of salary," although he continued to work at S&P for three more months.  (ECF No. 123-4 at 5).

On May 23, 2012, Simon instructed Brook to vacate his office, although Simon said Brook could continue to work on the Cuti Matter, managed by Simon.  See Brook I, 2018 WL 2383142, at *3.  On May 25, 2012, Brook informed Simon that Cuti had terminated S&P as his counsel and asked that the Cuti Matter be transferred to Brook.  Id.  In mid-June 2012, Murphy offered Brook

---

[2] Defendants emailed a copy of the Emails to the Court for in camera review.  (ECF No. 108 at 1 n.1).

$75,000 if he would sign a release, in response to which Brook stated "that [he] would sue instead of doing that." (ECF No. 123-4 at 5–6).

**B. <u>Deposition Testimony</u>**

In response to the Court's request, Plaintiffs submitted excerpts of Simon's, Murphy's, and Waller's deposition testimony. (ECF No. 123). Defendants also submitted separate excerpts of those three depositions, as well as excerpts from Brook's deposition. (ECF Nos. 126-2; 126-3; 126-6; 126-7).[3]

Simon testified that Brook was "threatening to sue us from day one," and that Brook told an S&P employee in June 2011 that he was "going to sue" S&P. (ECF No. 123-1 at 9:4-11). Simon then clarified, however, that he did <u>not</u> believe that Brook was going to sue S&P "from the beginning of [his] work" for S&P, i.e., July 2011. (<u>Id.</u> at 9:12-14). Simon admitted that S&P did not preserve Brook's email account at S&P after Brook left the firm in May 2012. (<u>Id.</u> at 11:13-15).

Waller testified that after Brook gave Simon the Proposal, Brook told Simon that he "wanted him to sign it, he got very upset with [Brook] about it, and [Brook] got upset in response." (ECF No. 123-2 at 3:14-17). Waller recalled that Brook then came into his office and said, "I just gave [Simon] an agreement that I wanted him to sign and he got very upset with me and we had a big fight." (<u>Id.</u> at 3:18-21). Waller did not "recall" ever attempting to calculate what Brook's Proposal "would have meant in terms of dollars and cents." (<u>Id.</u> at 5:10-14). Waller testified that he did not "have any specific recollection of" Brook threatening to sue around

---

[3] The excerpts of Brook's deposition testimony that Defendants submitted do not reference events during the period February 15, 2012 through the end of May 2012. (ECF No. 126-2).

February 15, 2012 but rather only "[a]fter [Brook] left" in May 2012. (<u>Id.</u> at 7–8).  Waller did state, however, "that there was always this feeling that [Brook] ultimately [was] going to sue or [he] very well might," although not a "specific[] discuss[ion]." (<u>Id.</u> at 8–9).

Murphy testified that he first saw Brook's Proposal the day after Brook gave it to Simon, <u>i.e.</u>, February 16, 2012, and that after he saw Brook's Proposal, he "got the impression this could get ugly and this guy may sue" Simon. (ECF No. 123-3 at 3:23-24, 4:8-9).  Murphy stated that "at that point, once that document [Brook's Proposal] was produced, [he] kind of took the role of counsel, for lack of a better word, and [he] was advising Brad on how to deal with the situation, which didn't look good at that time." (<u>Id.</u> at 4:11-15).  Asked what "legal advice" he gave Simon, Murphy testified that it was on the subject of "employer/employee relations and that space . . . it was basically how to deal with what could be a potentially troubling legal situation." (<u>Id.</u> at 5:5-10).

### C. **The Motion**

On October 27, 2021, Plaintiffs filed the Motion. (ECF No. 107).  Plaintiffs state that both Murphy and Waller "were involved in management of" S&P, and that the Emails came "one day after [Brook] provided a proposed written agreement to govern" how he would be paid for past work and "for work going forward as an employee of [S&P]" (<u>Id.</u> at 1).  Plaintiffs infer from the subject line of the Emails – "I ran the numbers" – that the Emails "[were] about a business decision whether to agree" to Brook's proposed terms or to make a counteroffer. (<u>Id.</u>)

On November 1, 2021, Defendants filed the Opposition. (ECF No. 108).  Defendants argue that the Emails constitute attorney work product because "[they were] prepared with an eye toward litigation between" Brook and S&P "regarding Brook's compensation, which in fact came

to fruition." (Id. at 1). Defendants state that the Emails were sent at a time when there was "a clear dispute between Brook and S&P regarding compensation," and "that the email was prepared based on the prospect of litigation," pointing to the Peed Email, in which Brook told Peed, "I have a bad feeling that I'm going to have to sue him to get anything close to the money he owes me." (Id. at 1–2; ECF Nos. 108-1; 126 at 1 n.1). Defendants offer no evidence that Simon, Murphy, or anyone else at S&P saw the Peed Email. Defendants also state that "Murphy was acting in a counsel capacity rather than in a management capacity when preparing [the Emails]." (ECF No. 108 at 2).

On November 2, 2021, Plaintiffs filed the Reply. (ECF No. 111). Plaintiffs argue that a key question for the factfinder in this case is "whether there was a meeting of the minds," such that "the mental state of Simon and his partners during the time of [Brook's] employment is critical evidence that cannot be obtained from any other source." (Id. at 1). Plaintiffs note that "there are no other contemporaneous communications in Defendants' discovery from February 2012 relating to anything substantive," and that there is a "dearth of contemporaneous communications between the partners of [S&P] relating to [Brook's] supposed contract at all," which Plaintiffs find "striking given that Defendants assert that there was a final and binding agreement" by which Brook gave Simon "full discretion to decide [his] compensation." (Id. at 1–2).

On November 18, 2021, the Court held a telephonic conference with the parties to discuss the dispute about the Emails, and directed the parties to make additional submissions. (ECF No. 117). On November 19, 2021, Plaintiffs submitted two exhibits: Brook's Proposal, and

communications concerning Brook's vacating S&P's office on and after May 23, 2012 (the "May Emails").  (ECF Nos. 118; 118-1–118-3).

On December 2, 2021, Plaintiffs filed a letter attaching excerpts from Simon's, Waller's, and Murphy's deposition testimony.  (ECF No. 123).  On December 10, 2021, Defendants filed a supplemental letter attaching additional documents concerning Brook's employment and compensation with S&P, and deposition excerpts, and advancing arguments why Plaintiffs do not have a substantial need for the Emails.  (ECF No. 126; 126-1–126-8).

### III. DISCUSSION

#### A. Legal Standard

"Federal law governs the applicability of the work product doctrine in all actions in federal court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015) (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)); see Fed. R. Evid. 501. "[D]ocuments and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" are eligible for work product protection. Sokol v. Wyeth, Inc., No. 07 Civ. 8442 (SHS) (KNF), 2008 WL 3166662, at *10 (S.D.N.Y. Aug. 4, 2008) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  The purpose of the work product protection is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his [or her] adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) ("Adlman II") (quoting Hickman v. Taylor, 329 U.S. 495, 510–11 (1947)); Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 74 (S.D.N.Y. 2010) (explaining that the "core purpose" of the doctrine "is to 'prevent exploitation of a party's efforts in preparing for trial' by precluding the adversary from obtaining such material absent substantial need")

(quoting <u>Admiral Ins. Co. v. U.S. District Ct. for the Dist. of Ariz.</u>, 881 F.2d 1486, 1494 (9th Cir. 1989)).

"The party asserting work-product protection must demonstrate that the material at issue '(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.'" <u>McGowan v. JPMorgan Chase Bank, N.A.</u>, No. 18 Civ. 8680 (PAC) (GWG), 2020 WL 1974109, at *3 (S.D.N.Y. Apr. 4, 2020) (quoting <u>Allied Irish Banks</u>, 252 F.R.D. at 173 (internal citations omitted)).  In response to a challenge to the work product protection, the party asserting the protection must "submit evidence, by way of affidavit, deposition testimony, or otherwise, establishing only the challenged elements of the applicable privilege or protection, with the ultimate burden of proof resting with the party asserting the privilege or protection." <u>A.I.A. Holdings, S.A. v. Lehman Bros., Inc.</u>, No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002), <u>supplemented by</u>, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002)); <u>see</u> <u>Kingsway Fin'l Servs. Inc. v. PricewaterhouseCoopers LLP</u>, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *4 (S.D.N.Y. Feb. 14, 2007) ("The party asserting the protection of the work-product doctrine bears the burden of proof.").  The party asserting the protection can meet this burden "only by an evidentiary showing based on competent evidence . . . and cannot be 'discharged by mere conclusory or ipse dixit assertions.'" <u>Bowne of New York City, Inc. v. AmBase Corp.</u>, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (quoting <u>von Bulow v. von Bulow</u>, 811 F.2d 136, 146 (2d Cir. 1987)).

Concerning the second prong, "in anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." <u>Costabile v.</u>

County of Westchester, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (quoting Adlman II, 134 F.3d at 1202)); In re Application Pursuant to 28 U.S.C. § 1782, 249 F.R.D. 96, 102 (S.D.N.Y. 2008) (explaining that litigation must be "the motivating force behind the preparation of" the document). "Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity . . . . It is firmly established, however, that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 221 (S.D.N.Y. 2001) (citing Adlman II, 134 F.3d at 1202). A party's "consider[ation of] the possibility of litigation . . . is insufficient to trigger the protection of the work product doctrine." Gucci, 271 F.R.D. at 75; see Kingsway, 2007 WL 473726, at *5 (collecting cases); In re Grand Jury Proc., No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) (explaining that "a generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement"). Rather, the party must have taken "affirmative steps in anticipation of litigation." Gucci, 271 F.R.D. at 75.

A finding that a document was prepared "because of the prospect of litigation . . . does not necessarily mean that the document will be protected against discovery," but instead that the "document is eligible for work-product" protection. Adlman II, 134 F.3d at 1202–03. Pursuant to Fed. R. Civ. P. 26(b)(3)(A), "work product materials are discoverable if '(i) they are otherwise discoverable under Rule 26(b)(1),' and '(ii) the party [seeking them] shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" Rackwise, Inc. v. Foley Shechter Ablovatskiy, LLP, No. 19 Civ. 11094 (AT) (SLC), 2020 WL 7342743, at *8 (S.D.N.Y. Dec. 14, 2020) (quoting Fed. R.

Civ. P. 26(b)(3)(A)).  "A substantial need exists 'where the information sought is essential to the party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.'"  Gucci, 271 F.R.D. at 74–75 (quoting Nat'l Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)) (internal quotation omitted)).  Even when a showing of substantial need has been made, the court must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3)(B).

## B.  Application

### 1.  Because of actual or anticipated litigation

The Court finds that the Emails were not prepared because of the prospect of litigation between Brook and S&P.  As an initial matter, nothing about the Emails "reflects litigation defense strategy, or an evaluation of litigation exposure" that the work product doctrine was intended to protect.  Bovis Lend Lease LMB, Inc. v. Seasons Contr. Corp., No. 00 Civ. 9212 (DF), 2002 WL 31729693, at *10 (S.D.N.Y. Dec. 5, 2002) (holding that document was not subject to work product protection).

In addition, Simon testified that he did not believe Brook planned to sue S&P from when he began working there in June 2011, (ECF No. 123-1 at 9:12-14), and Waller testified that Brook threatened to sue after he left S&P, i.e., after May 23, 2012.  (ECF No. 123-2 at 8:18–9:21).  Even Murphy described the situation with Brook on February 16, 2012 as, at most, a "potentially troubling legal situation."  (ECF No. 123-3 at 4–5).  And although Brook told Peed on February 15, 2012 that he had "a bad feeling" he was "going to have to sue" Simon, Defendants point to no

evidence showing that <u>they</u> were aware of Brook's statement at that time. (ECF Nos. 108 at 2; 108-1 at 2; 111 at 2). Thus, at the time of the Emails, litigation with Brook was no more than a "possibility," which is "insufficient to give rise to work-product protection." <u>Kingsway</u>, 2007 WL 473726, *5 (collecting cases); <u>see</u> <u>United States v. Adlman</u>, 68 F.3d 1495, 1501 (S.D.N.Y. 1995) ("<u>Adlman I</u>") (explaining that if "the expected litigation is merely a vague abstract possibility without precise form" it weighs against application of the protection); <u>Gould Inc. v. Mitsui Mining & Smelting Co.</u>, 825 F.2d 676, 680 (2d Cir. 1987) (explaining that work product protection "depends upon the existence of a real, rather than speculative, concern that the thought processes of [] counsel in relation to pending or anticipated litigation would be exposed"). At the time the Emails were sent, Simon and Murphy were negotiating with Brook about compensation in anticipation that he would continue to provide legal services at S&P—which he in fact was doing at that time and continued do until May 23, 2012. <u>See</u> <u>Brook I</u>, 2018 WL 2383142, at *2–3. The fact that, during negotiations with Brook about his compensation, Simon and Murphy "considered the possibility of litigation" if they were unable to work out an agreement "is insufficient to trigger the protection of the work product doctrine within the scope of Rule 26(b)(3)." <u>Gucci</u>, 271 F.R.D. at 75.

Furthermore, Defendants have shown "no evidence" that S&P "took affirmative steps in anticipation of litigation during this time period[,]" <u>i.e.</u>, February 2012. <u>Gucci</u> 271 F.R.D. at 75. It was not until June 2012 that Murphy offered Brook $75,000 if he would sign a release. (ECF No. 123-4 at 5:22–6:4). Even if Simon and Murphy had "a generalized desire to avoid litigation" with Brook in February 2012, such a desire does not demonstrate that the conversation in the Emails was "'in anticipation of litigation'" within the meaning of Rule 26(b)(3)(A). <u>In re Grand</u>

Jury Proc., 2001 WL 1167497, at *15.  In short, Defendants have not met their burden to show that anticipated litigation with Brook was the "motivating force" behind the Emails.  In re Application, 249 F.R.D. at 102.

### 2.   Substantial need and undue hardship

Even if the Emails were eligible for work product protection, the Court finds that Plaintiffs have shown a substantial need for and inability to obtain the information from another source without undue hardship.  See Fed. R. Civ. P. 26(b)(3)(A).  A key issue in this case is whether the parties had a binding oral agreement as of June 2011.  See Brook IV, 2020 WL 5817161, at *4 (discussing Brook's quasi-contract claim).  (See ECF Nos. 57 ¶¶ 195–99; 93 ¶¶ 195–99, 266; 107 at 2; 111 at 1).  Having reviewed the document in camera, the Court observes that the document "carries great probative value on [this] contested issue[]."  Gucci, 271 F.R.D. at 74–75 (internal citation omitted).  Plaintiffs have shown, and Defendants have not rebutted,[4] that this email thread "is the only email from anywhere around the time when" Brook provided his Proposal, in response to which Simon decided to pay him on an hourly, rather than a salaried, basis.  (ECF Nos. 107 at 2; see 123-4 at 8–9).  In addition, as an email drafted by one of S&P's partners—Murphy—it is an admission by a party-opponent.  Fed. R. Evid. 801(d)(2)(A); see Flair Int'l Corp. v. Heisler, 173 F.3d 844, at *2 (2d Cir. 1999) (finding that memorandum authored by plaintiff's president was party admission under Fed. R. Evid. 801(d)(2)(A)); Altman v. New Rochelle Pub. Sch. Dist., No. 13 Civ 3253 (NSR), 2017 WL 66326, at *14 (S.D.N.Y. Jan. 6, 2017) (finding that plaintiff's written statements were party admissions under Fed. R. Evid. 801(d)(2)(A)).

---

[4] The additional emails Defendants have submitted are all from 2011, and they offer no other emails from February 2012.  (ECF Nos. 126-1; 126-8).

Defendants' argument that Plaintiffs can "obtain information concerning the alleged value of their services through billing records and [] deposition testimonies" is without merit. (ECF Nos. 108 at 2; 126 at 2–3).  The value of Plaintiffs' services is secondary to the question whether the parties had reached an oral agreement, and if so, when and on what terms, about Plaintiffs' compensation, however much those services were worth.  The Emails speak to that question, and, as indicated above, Plaintiffs have a demonstrated substantial need for them.

### 3.  Waiver

Plaintiffs argue in the alternative that Defendants have waived work product protection over the Emails by producing other communications between Simon, Murphy, and Waller concerning Brook's employment.  (ECF No. 107 at 3).  Because the Court has found that the Emails are not eligible for work product protection, and even if they were, Plaintiffs have shown substantial need, the Court need not reach the question of waiver.  See Durling v. Papa John's Int'l, Inc., No. 16 Civ. 3592 (CS) (JCM), 2018 WL 557915, at *6 n.4 (S.D.N.Y. Jan. 24, 2018) (declining to analyze waiver where material was not covered by work product protection); In re Initial Pub. Offering Sec. Litig., 220 F.R.D. 30, 36 n.32 (S.D.N.Y. 2003) (same).

### IV.CONCLUSION

For the reasons set forth above, Plaintiffs' Motion is GRANTED.  No later than **Thursday, December 23, 2021**, Defendants shall produce the Emails, unredacted, to Plaintiffs.

The Clerk of Court is respectfully directed to close ECF No. 113.


Dated:          New York, New York
                December 15, 2021

                                        SO ORDERED.

13

SARAH L. CAVE
United States Magistrate Judge